IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

DAVID RABB,

      Petitioner,

v.                                    Case No. 2:09-cv-00159

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

On February 23, 2009, Petitioner filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (docket sheet document # 1) This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).  Pending before the court are Respondent's Renewed Motion for Summary Judgment (# 40) and Petitioner's Motion for Partial Summary Judgment (# 32). [figure out what to do with P's Motion for Correction of Illegal Sentence (# 45)].

## PROCEDURAL HISTORY

In his Motion for Summary Judgment, Respondent incorporates by reference the Procedural History section of the undersigned's Proposed Findings and Recommendation filed on July 23, 2009 concerning Respondent's Motion to Dismiss Petition as Untimely,

which was ultimately denied. Nevertheless, the undersigned will repeat the relevant procedural history herein, citing to exhibits that were submitted with both the Motion to Dismiss (# 7) and the instant Motion for Summary Judgment (# 25).

Following a jury trial in the Circuit Court of Kanawha County, on December 12, 1997, Petitioner was convicted of one count of Malicious Wounding (Count One), two counts of Kidnapping (Counts Two and Four), and one count of Aggravated Robbery (Count Three). (# 7, Ex. 1). Petitioner was represented by Barbara Brown and Chanin Wolfingbarger, of the Kanawha County Public Defender's Office, during his criminal proceedings.

By Order entered May 18, 1998, the Circuit Court of Kanawha County sentenced Petitioner to consecutive terms of 2-10 years in the penitentiary on Count One, life without the possibility of parole on Count Two, and 46 years on Count Three. Petitioner was also sentenced to a concurrent term of life with the possibility of parole on Count Four. (Id.)

Petitioner, by counsel, filed a Petition for Appeal of his convictions and sentences to the Supreme Court of Appeals of West Virginia (the "SCAWV") on April 8, 1999. (Id., Ex. 2). It appears that the Petition for Appeal has been produced by Respondent as his Exhibit 25, which was filed with Respondent's Response to Petitioner's Motion for Partial Summary Judgment (# 39). According to Respondent's Exhibit 25, the grounds for relief raised in

2

Petitioner's direct appeal were as follows:

1.  The Circuit Court erred in denying Rabb a motion for change of venue and request for a continuance because he demonstrated there was a present hostile sentiment against him in Kanawha County.

2.  The Circuit Court's refusal to instruct the jury on Rabb's theory of defense, i.e., larceny of the Leopold vehicle, denied Rabb due process of law and a fair jury trial.

3.  Because the Leopold kidnapping was incidental to the aggravated robbery and malicious wounding, the Circuit Court erred in denying Rabb's motion to dismiss this kidnapping charge.

(# 39, Ex. 25 at 9).  Petitioner's section 2254 petition asserts that he also raised the following claim in his direct appeal:

Because bodily harm is a fact that increases a kidnapping sentence from a term of years to life (with or without parole), that fact must be alleged in the indictment, proven, and found by a jury beyond a reasonable doubt before a life sentence may be imposed.  Since bodily harm was not alleged, proven and found in this case, sentence for kidnapping convictions and life sentences violate his right to due process of law and trial by jury.

(# 1 at 2).  The undersigned's staff has confirmed that this claim was addressed in an Amended Petition for Appeal filed by Petitioner's counsel on April 8, 1999.  The SCAWV refused the Amended Petition for Appeal on May 4, 1999.  (# 7, Ex. 2).

Petitioner also filed a Petition for a Writ of Certiorari in the Supreme Court, which was denied on October 12, 1999.  Rabb v. West Virginia, 528 U.S. 935 (1999).  (Id., Ex. 3).

Petitioner filed a Petition for a Writ of Habeas Corpus in the Circuit Court of Kanawha County on September 18, 2000.  (Rabb v.

3

<u>Painter</u>, Case No. 00-MISC-350).  (# 12, Ex. 8).  That petition raised the following grounds for relief:

1.  Petitioner was denied his rights to the equal protection of the law, due process of law, and a fair and impartial jury trial as guaranteed by Article III, Sections 10, 14, and 17 of the West Virginia Constitution and the First, Sixth, and Fourteenth Amendments to the Constitution of the U.S.A. when he was denied meaningful and effective assistance of counsel.

   a.  Failure to seek a psychiatric evaluation.

   b.  Failure to properly investigate the case and provide information to Petitioner.

   c.  Failure to properly object to evidence under Rules 401 and 403 of the West Virginia Rules of Evidence.

   d.  Failure to request a hearing to determine the admissibility of Petitioner's alleged confession.

   e.  Failure to subpoena and call Melanie Lynn Carte to discredit the State's eyewitness.

   f.  Failure to request a bifurcated trial.

   g.  Failure to properly prepare for trial.

2.  Petitioner contends that he was denied a right to a fair and impartial jury trial as guaranteed by the equal protection clause of the Fourteenth Amendment to the Constitution of the U.S.A. because the prosecutor used peremptory challenges to exclude black jurors.

3.  Petitioner contends the trial court committed reversible error because his supposed confession should not have been admitted into evidence.

4.  The trial court committed reversible error when it allowed the state prosecution to submit demonstration and character evidence before the

4

jury.

5.     Petitioner was denied his constitutional right as
secured by the Sixth Amendment and the due process
clause of the Fourteenth Amendment to the
Constitution of the U.S.A. when the Circuit Court
of Kanawha County denied Petitioner's Motion for a
Change of Venue.

6.     Petitioner's conviction is based upon a record
wholly devoid of any finding by the jury whether
the alleged victims were returned, or were
permitted to return, alive without bodily harm.
This element of the offense of kidnapping was not
alleged in the indictment returned by the grand
jury that indicted petitioner.  This element of the
offense of kidnapping was not proven at trial.
And, this element of the offense of kidnapping was
not found by the jury beyond a reasonable doubt.
Therefore, the underlying state proceedings violate
the Fourteenth Amendment to the Constitution of the
U.S.A. and Article III, § 10 of the Constitution of
West Virginia.

7.     Petitioner contends the prosecuting attorney
violated his constitutional rights to the equal
protection of the law, due process of law, a fair
and impartial jury trial as secured by the Sixth
and Fourteenth Amendment to the Constitution of the
U.S.A. and Article III, §§ 4, 10, 13.

8.     The trial court should apply the plain error
doctrine when considering the argument it erred
when allowing petitioner's confession into
evidence, when allowing a trial by tainted jury and
all other grounds of error of this pro se petition
for writ of habeas corpus.

9.     The petitioner contends his state and federal
constitutional rights to equal protection, due
process of law, a fair and impartial jury trial
were violated due to the cumulative effect of
numerous errors committed by the State of West
Virginia by her prosecuting attorney, trial court,
and trial counsel during pre-trial, trial and post
trial court proceedings.

> 10.  The petitioner contends there may be other denials of his state and federal constitutional rights to equal protection, due process of law, and a fair jury trial which may be evident upon review of all the records, transcripts, statements, exhibits of all the proceedings including but not limited to all other pre-trial, trial and post-trial rulings in this case and prior to the same during suppression hearings which were adverse to him.

(Id. at 9-21).

The Circuit Court denied Petitioner's first habeas corpus petition on the merits on August 21, 2001. (# 25, Ex. 24). However, there were numerous issues concerning the failure of the Circuit Court to rule on a pending motion for appointment of appellate counsel filed by Petitioner, and the filing of a petition for appeal from the denial of Petitioner's first habeas corpus petition.[1]

With the appeal of the first petition still at issue, Petitioner filed a second habeas corpus petition in the Circuit Court of Kanawha County on June 12, 2002. (Rabb v. Coleman, Case No. 02-MISC-232). (# 12, Ex. 9).  The following grounds for relief were raised in that petition:

> 1.  The Circuit Court of Kanawha County, WV was obligated to make a critical finding prior to sentencing, i.e., was Jay Ming Chu returned, or permitted to be returned, alive, without bodily

---

[1]  The facts surrounding the appointment of appellate counsel and the handling of an appeal of the denial of Petitioner's first habeas petition were set forth in detail in the Proposed Findings and Recommendation addressing Respondent's Motion to Dismiss filed on July 23, 2009 (# 13), and are not relevant to the instant motions.

harm having been afflicted [sic; inflicted] on her?
This fact decreases a kidnapping sentence from a
life sentence and as such finding was not made in
the instant case, [violated] Petitioner's right to
due process of law as guaranteed by the Fourteenth
Amendment to the Constitution of the United States
and Art. III Section 10 and 14 of the Constitution
of West Virginia.

2.   The Circuit Court of Kanawha County, WV violated
Petitioner's constitutional right to a
proportionate sentence under Article III, section 5
of the West Virginia Constitution when court
imposed a sentence of 46 years on Petitioner for
aggravated robbery.

3.   The Circuit Court of Kanawha County, WV violated
Petitioner's constitutional right to a
proportionate sentence under the Eighth Amendment
to the United States Constitution when court
imposed a sentence of 46 years on Petitioner for
aggravated robbery.

4.   Petitioner, a black male, was denied his right to a
fair and impartial jury selection procedure as
guaranteed by the due process and equal protection
clauses of the state and federal constitutions at
his criminal trial before the Circuit Court of
Kanawha County.

(Id. at 8-13).  Petitioner further states that his counsel filed an

Amended Petition containing the following grounds for relief:

1.   The trial court erred in the denial of Petitioner's
right to due process of law in the selection of a
jury.

2.   The trial court erred in the denial of Petitioner's
right to due process by the trial court's failure
to sever unrelated counts for trial.

3.   The trial court erred in the denial of Petitioner's
right to due process for the trial court's failure
to grant a motion for change of venue.

4.   The trial court erred in the denial of Petitioner's
right to due process for the trial court's failure

7

to grant a continuance due to late disclosure of evidence.

5. The trial court erred in the denial of Petitioner's right to due process for the trial court's failure to suppress statements purportedly made by Petitioner.

6. The trial court erred in the denial of Petitioner's right to due process for the trial court's failure to dismiss kidnapping charge as incidental to the commission of the offense of first degree robbery.

7. Ineffective assistance of counsel for counsel's failure to advise Petitioner of his right to seek a bifurcated trial.

8. Ineffective assistance of counsel for failure to move the court for a bifurcated trial.

9. Ineffective assistance of counsel for failure to advise Petitioner of the necessity to argue for mercy in a capital case.

10. Ineffective assistance of counsel for failure to retain a competent expert in the issue of identification.

11. Ineffective assistance of counsel for failure to assert the defense of diminished capacity.

12. Ineffective assistance of counsel for failure to properly investigate.

13. The trial court erred in the denial of Petitioner's right to due process in the trial court's failure to instruct the jury on the Petitioner's theory of defense.

14. The trial court erred in failing to instruct the jury on a lesser included offense.

15. Cumulative effect of all of the above errors by trial counsel and trial court denied the Petitioner his rights to due process of law and a fair trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article III, Section 10 and 14 of the West Virginia

8

Constitution.

(# 1-2 at 4-5, Supp. 2).

Evidentiary hearings on Petitioner's second Circuit Court habeas corpus petition were held over the course of four days in 2004, with Petitioner being present in person. (# 25, Exs. 19-22).

On March 12, 2008, Judge Stucky entered a Final Order denying Petitioner relief on his second habeas petition. (# 25, Ex. 23). On October 3, 2008, Petitioner's counsel filed a Petition for Appeal from the denial of that habeas corpus petition. (# 39, Ex. 26). In the habeas appeal, Petitioner raised the following grounds for relief:

1.  The trial court erred in the denial of Petitioner's right to due process of law in the selection of a jury.

2.  The trial court erred in the denial of Petitioner's right to due process by the trial court's failure to sever unrelated counts for trial.

3.  The trial court erred in the denial of Petitioner's right to due process for the trial court's failure to grant a motion for change of venue.

4.  The trial court erred in the denial of Petitioner's right to due process for the trial court's failure to grant a continuance due to late disclosure of evidence.

5.  The trial court erred in the denial of Petitioner's right to due process for the trial court's failure to suppress statements purportedly made by Petitioner.

6.  The trial court erred in the denial of Petitioner's right to due process for the trial court's failure to dismiss kidnapping charge as incidental to the commission of the offense of first degree robbery.

9

7.   Ineffective assistance of counsel for counsel's failure to advise Petitioner of his right to seek a bifurcated trial.

    a.   Ineffective assistance of counsel for failure to move the court for a bifurcated trial.

    b.   Ineffective assistance of counsel for failure to advise Petitioner of the necessity to argue for mercy in a capital case.

    c.   Ineffective assistance of counsel for failure to retain a competent expert in the issue of identification.

    d.   Ineffective assistance of counsel for failure to assert the defense of diminished capacity.

    e.   Ineffective assistance of counsel for failure to properly investigate.

8.   The trial court erred in the denial of Petitioner's right to due process for the denial of Petitioner's right to set forth mitigating evidence as to punishment.

9.   The trial court erred in the denial of Petitioner's right to due process in the trial court's failure to instruct the jury on the Petitioner's theory of defense (specifically, failure to instruct the jury on the lesser included offense of grand larceny).

(Id. at 20-21).   The SCAWV refused the Petition for Appeal on January 27, 2009.   (# 7, Ex. 6).

Petitioner then filed the instant section 2254 petition on February 23, 2009.   The instant petition raised the following grounds for relief:

1.   Because bodily harm is a fact that increases a kidnapping sentence from a term of years to life (with or without parole), that fact must be alleged

10

in the indictment, proven, and found by a jury
beyond a reasonable doubt before a life sentence
may be imposed.  Since bodily harm was not alleged,
proven and found in this case, sentence for
kidnapping convictions and life sentences violate
his right to due process of law and trial by jury.

2.   The trial court erred in the denial of Petitioner's
     right to due process of law and trial by jury
     rights in the selection of a jury as guaranteed by
     the Sixth and Fourteenth Amendments to the United
     States Constitution.

3.   The trial court erred in the denial of Petitioner's
     right to due process of law and trial by jury
     rights when it failed to sever unrelated counts for
     trial as guaranteed by the Sixth and Fourteenth
     Amendments to the United States Constitution.

4.   The trial court erred in the denial of Petitioner's
     right to due process of law and trial by jury right
     as guaranteed by the Sixth and Fourteenth
     Amendments to the United States Constitution when
     it failed to grant a change of venue.

5.   The trial court erred in the denial of Petitioner's
     right to due process of the law as guaranteed by
     the Sixth and Fourteenth Amendments to the United
     States Constitution when it failed to grant a
     continuance due to late disclosure of evidence.

6.   Petitioner's right to due process of law and a fair
     trial as guaranteed by the Sixth and Fourteenth
     Amendments to the United States Constitution were
     violated when the trial court failed to suppress
     statements purportedly made by Petitioner.

7.   Petitioner's right to due process of law and a fair
     trial as guaranteed by the Sixth and Fourteenth
     Amendments to the United States Constitution were
     violated when the trial court failed to dismiss the
     kidnapping charge as incidental to the commission
     of first degree robbery.

8.   Ineffective assistance of counsel for counsel's
     failure to advice [sic; advise] Petitioner of his
     rights to seek a bifurcated trial denied Petitioner
     of his due process of law and a fair jury trial

11

rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

9.   Ineffective assistance of counsel for counsel's failure to move the court for bifurcation denied Petitioner of his due process of law and a fair jury trial rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

10.  Ineffective assistance of counsel for counsel's failure to advise Petitioner of the necessity to argue for mercy in a capital case denied Petitioner of his due process of law and a fair jury trial rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

11.  Ineffective assistance of counsel for counsel's failure to retain a competent expert on the identification issues denied Petitioner of his due process of law and a fair jury trial rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

12.  Ineffective assistance of counsel for counsel's failure to assert the defense of diminished capacity denied Petitioner of his due process of law and a fair jury trial rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

13.  Ineffective assistance of counsel for counsel's failure to properly investigate denied Petitioner of his due process of law and a fair jury trial rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

14.  Petitioner's right to due process and fair jury trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated when the court failed to instruct the jury on Petitioner's theory of defense.

15.  Petitioner's right to due process and a fair jury trial were violated as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when the trial court refused to instruct the jury on a lesser included offense.

12

>    16.   Petitioner's right to due process and a fair jury
>          trial, and equal protection were violated as
>          guaranteed by the Sixth and Fourteenth Amendments
>          to the United States Constitution due to the
>          cumulative effect of the errors set forth above.

(# 1-1 at 6-14, Supp. 3).

On January 4, 2010 (following the denial of Respondent's Motion to Dismiss), Respondent filed an Amended Answer to the Petition (# 24), a Motion for Summary Judgment (# 25), and a Memorandum in Support Thereof (# 26).

On April 5, 2010, Petitioner filed a Reply to Respondent's Motion for Summary Judgment (# 34), and his own Motion for Partial Summary Judgment (limited only to Ground Eleven of his section 2254 petition, which concerns ineffective assistance of counsel for failure to retain a competent expert on cross-racial identification issues) (# 32), with a Memorandum in Support Thereof (# 33).

In light of Petitioner's Response to Respondent's Motion for Summary Judgment and the filing of Petitioner's own Motion for Partial Summary Judgment, Respondent moved to withdraw his Motion for Summary Judgment (# 37) and sought additional time to file a Renewed Motion for Summary Judgment and to respond to Petitioner's Motion for Partial Summary Judgment.[2]  That motion was granted on

---

[2]  Respondent's first Motion for Summary Judgment focused on his assertion that Petitioner's petition had failed to adequately present the substance of any federal issues and that it was facially insufficient to merit relief.  In light of arguments made in Petitioner's Response to the Motion for Summary Judgment and the filing of Petitioner's own Motion for Partial Summary Judgment, Respondent believed it better to file a new motion addressing the

May 25, 2010 (# 38).

On July 15, 2010, Respondent filed a Renewed Motion for Summary Judgment (# 40) and a Memorandum in Support thereof (# 41). Respondent also filed a Response to Petitioner's Motion for Partial Summary Judgment (# 39). These motions are the subject of this Proposed Findings and Recommendation.

After being granted additional time, on October 21, 2010, Petitioner filed a Reply to Respondent's Renewed Motion for Summary Judgment (hereinafter "Petitioner's Response") (# 44), a Motion for Correction of Illegal Sentence (# 45), a Reply to Respondent's Response to Petitioner's Motion for Partial Summary Judgment (# 46) and a Motion for Judicial Notice (# 47). The substance of these documents will be addressed as necessary <u>infra</u>. The undersigned notes that Respondent did not file a reply brief concerning his own Motion for Summary Judgment; nor did Respondent file responses to Petitioner's Motion for Correction of Illegal Sentence or his Motion for Judicial Notice.

<u>**STANDARD OF REVIEW**</u>

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that

merits of each of Petitioner's claims.

14

was adjudicated on the merits in State court proceedings
unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly
established Federal Law, as determined by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the

Supreme Court held that under the "contrary to" clause, a federal

court may grant a writ of habeas corpus with respect to claims

adjudicated on the merits in state court only if (1) the state

court arrives at a conclusion opposite to that reached by the

Supreme Court on a question of law, or (2) if the state court

decides a case differently from the Supreme Court on a set of

materially indistinguishable facts.  The Court further held that

under the "unreasonable application" test, a federal court may

grant a writ of habeas corpus with respect to a claim adjudicated

on the merits in state court only if the state court identifies the

correct governing principle from the Supreme Court's decision, but

unreasonably applies that principle to the facts of the prisoner's

case.  Id. at 413.

Moreover, the AEDPA contains a presumption that a state

court's factual findings are correct:

In a proceeding instituted by an application for a writ
of habeas corpus by a person in custody pursuant to the

15

> judgment of a State court, a determination of a factual
> issue made by a State court shall be presumed to be
> correct.   The applicant shall have the burden of
> rebutting the presumption of correctness by clear and
> convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.   See, e.g., Blackledge v. Allison, 431 U.S. 63, 81 (1977); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## STATEMENT OF FACTS AND RELEVANT TESTIMONY

### Facts surrounding Chu incident

On January 20, 1997, Ms. Jay Ming Chu was traveling from her home in Lewisburg, West Virginia to Huntington, West Virginia, where she attended Marshall University.  On her way, she stopped at a travel plaza on Interstate 64 to go to the restroom.  When Ms. Chu got back into her car, Petitioner approached her and tried to talk to her through the closed window.  Chu rolled down her window and Petitioner told her he was having car trouble and asked for a ride to Charleston, but Chu refused.[3]  (# 25, Ex. 13 at 1053-56).

---

[3] The evidence demonstrated that Petitioner had traveled to the area in a car he previously had stolen in North Carolina, and was involved in an accident, which damaged that vehicle.  (# 25,

When Chu tried to put the car in reverse and escape, Petitioner reached into the car, put it in park, and got into the passenger seat. (Id. at 1056). Petitioner told Chu he had a gun. Chu asked to see the gun, so Petitioner told her he didn't have one. (Id. at 1057).

Chu then told Petitioner she would give him a ride if he would give his name to the woman working at the travel plaza. Thus, Chu and Petitioner went into the travel plaza together. Chu gave the attendant her name and telephone number and asked her to call the police if she did not hear from Chu within a half an hour. (Id. at 1057-1059). Petitioner showed the attendant his military identification. (Id. at 1067). The attendant testified that Chu seemed very nervous and acted as if she was not voluntarily helping Petitioner. (# 25, Ex. 14 at 1147).

After Chu and Petitioner returned to the car, Petitioner wielded what was described as a metal pole. (# 25, Ex. 13 at 1059). Chu testified that she drove very fast, hoping that the police would pull her over, but noone did. (Id. at 1060). Chu dropped Petitioner off at the Greenbrier Street exit in Charleston and continued on her way to Huntington. (Id. at 1060-1061).

Chu identified Petitioner as the man who coerced her to drive him to Charleston that day. She did not notify police until she learned through news reports of the attack on Julia Leopold the

_____

Ex. 13 at 1029-53).

17

next day.  (Id. at 1062-1064).  On cross-examination, Chu stated her friend, Helen Shipira, told her that the news reports stated that the police were looking for Chu.  (Id. at 1072; 1084-1085). As it turns out, after seeing Petitioner's picture on the news following his arrest in Chicago, the attendant at the Morton Travel Plaza had contacted the police and informed them about seeing Petitioner with Chu.  (# 25, Ex. 14 at 1148-1149).

<u>Facts surrounding the Leopold attack</u>

In the early morning of January 21, 1997, Julia Leopold, who was nine months pregnant, parked her 1994 red Ford Explorer in the parking garage across the street from where she worked in Charleston ("the Cinema Seven parking garage").  Leopold got out of her car and went around to the passenger side of the vehicle to retrieve her purse and briefcase.  At that point, a man, whom Leopold later identified as Petitioner, approached her and said, "I want your car, give me your keys, I have a tire iron."  (# 25, Ex. 14 at 1201).  Petitioner then produced and wielded a tire iron at Leopold as she handed him the keys.  According to Leopold, she backed away from Petitioner around toward the bumper of her car, but Petitioner grabbed her by the waist, pulled her off her feet and threw her into the back seat of the car on the driver's side. (Id. at 1203).  Petitioner got into the driver's seat, started the car with his left hand, and held Leopold down with his right hand. Petitioner drove towards the upper floors of the parking garage,

continuing to hold Leopold down on the floor.

Leopold was able to break free and jumped out of the back of the car. She ran into the stairwell and began to flee down the stairs. However, Petitioner caught up to her and began to strike her with the tire iron. (Id. at 1208). After the first blow to the left side of her head (Id. at 1208-1209), Petitioner grabbed Leopold's arm, swung her until she was facing him and struck her on the head again. Leopold testified to remembering three blows, but little else about the attack. However, crime scene evidence demonstrated a bloody, brutal attack.

Blood spatters suggested that Leopold was chased and beaten over four floors of the stairwell, and that she was beaten on the ground at one point. (# 25, Ex. 15 at 1630). The crime scene technician testified that the amount of blood was so extensive that it literally poured down the stairwell. He stated: "[T]here's so much saturation of [blood] that the transference didn't have anywhere to go, so it started draining down just because of the gravity pull." (Id. at 1632).

In the course of the investigation of the Leopold attack, her car was reported stolen. Leopold's car was discovered, having been illegally parked in a high crime area of Chicago, the day after this crime. From a check of the license plate, the Chicago police discovered that the car had been reported stolen in conjunction with an aggravated robbery in Charleston, West Virginia. Police

19

assigned a plain-clothes unit to watch the vehicle.  (# 25, Ex. 14 at 1277-1283).  Petitioner and a female companion were observed coming out of a nearby apartment, and they drove off in the vehicle.  They were arrested by Chicago police for possession of a stolen vehicle.  (Id. at 1301, 1326-27).  The arresting officers testified that Petitioner was Mirandized several times following his arrest.  (Id. at 1326, 1329, 1332, 1354, 1373, 1410-11).

In pre-trial hearings, several officers testified regarding the circumstances of Petitioner's arrest in Chicago.  No officer testified that Petitioner appeared to be in any way impaired at the time he was arrested and responded to questions.  During the questioning, Petitioner allegedly admitted that he had taken the vehicle from a "lady" in "West Virginia."  (Id. at 1337, 1375, 1391-1392).

This alleged "confession" was not put in writing and had not been disclosed to either the State or the defendant prior to this hearing, which took place just before the start of the trial.  This statement occurred after Petitioner's military and other identification had been located in a crack in the wall of the house outside of which the Leopold vehicle had been spotted.  Prior to being confronted with his identification, Petitioner had told police his name was Derrick Jones, and had also told them he was in the Army, not the Marines.  The witnesses stated that, when confronted with his identification, Petitioner became very

emotional.

An inspection of the car revealed that there were blood stains on the front seats and the back passenger side floor mat. (Id. at 1650-1651). Blood recovered from the scene, the inside of the vehicle, and the pants Petitioner was wearing at the time he was arrested matched that of Leopold. (# 25, Ex. 16 at 1922-1926).

Several of the State's witnesses placed Petitioner in the parking garage around the time of the attacks. All but one identified Petitioner in court as the person they had seen that morning. (# 25, Ex. 13 at 1090-1112; # 25, Ex. 14 at 1162-1185; 1256-1276). Two of the State's witnesses testified that they saw a black man driving Leopold's car from level four to a higher floor within the parking garage. (# 25, Ex. 14 at 1167-1168, 1178). A third witness, Kenneth Smith, testified to seeing Leopold's vehicle coming back down from level five in the wrong lane. Mr. Smith testified that the vehicle nearly struck his vehicle. Mr. Smith subsequently identified Petitioner as the driver of the vehicle. (Id. at 1259-1269).

The defense intended to present the testimony of three expert witnesses. The first, who did testify at trial, was Michelle Yezzo, a bloodstain expert from the state crime lab in Ohio, testified that she examined the bloodstain evidence in this case, including the pants worn by Petitioner at the time of his arrest, which contained a blood stain, and determined that the pants were

21

not worn by anyone who was actively involved in the bloody assault as depicted in this case. (# 25, Ex. 17 at 2198-2199). Yezzo testified that the attacker in this case should have had spattered bloodstains on his pants and shoes. (<u>Id.</u> at 2194). According to Yezzo, the contact bloodstain on the knee of Petitioner's pants was caused by blood that had penetrated the surface of the garment, possibly from kneeling on the bloody rear floor mat of the Leopold vehicle. (<u>Id.</u> at 2198).

Petitioner also disputed Leopold's identification of him as her assailant. Leopold's identification of Petitioner occurred after she had seen pictures of Petitioner on television following his arrest in Chicago. Leopold's description of her attacker was not very detailed, and she could not accurately remember much about the attack. In support of this defense, Petitioner called Dr. Alfredo Velasquez, who testified that Leopold's faulty memory of events is consistent with a diagnosis of retrograde amnesia, and that it was possible that Ms. Leopold had inaccurately identified Petitioner as her attacker. (# 25, Ex. 17 at 2082).

Finally, in further support of his inaccurate identification defense, Petitioner attempted to call another expert witness, Dr. Marc Lindberg, to testify about issues concerning memory and the difficulties in eyewitness identification, particularly in incidents involving cross-racial identification. Following an <u>in camera</u> hearing, the trial court excluded the testimony of Dr.

22

Lindberg.  (# 25, Ex. 17 at 2117-2150).

<u>Relevant testimony from the omnibus hearings</u>

The testimony at the Petitioner's omnibus habeas corpus hearings in the Circuit Court of Kanawha County focused on Petitioner's claims of ineffective assistance of counsel.  (# 25, Exs. 19-22).  Both Barbara Brown and Chanin Wolfingbarger, Petitioner's defense attorneys, testified to their recollections concerning decisions they made in the course of Petitioner's trial. Petitioner also called Harry Melvin Curry, an investigator for the Kanawha County Public Defender's Office, and George Castelle, the Chief Public Defender for Kanawha County, who testified about their roles in the investigation of this case, and their recollections of the conduct of Ms. Brown and Ms. Wolfingbarger.  Petitioner and Respondent also presented expert witness testimony on the ineffective assistance of counsel claims.

Finally, Petitioner presented the testimony of his mother and his wife in an attempt to establish what their testimony would have been had they been called as defense witnesses at trial.  The testimony from these evidentiary hearings will be discussed as necessary <u>infra</u>.

**ANALYSIS**

A.   **Ground One - <u>Apprendi</u>-type claim.**

In Ground One of Petitioner's section 2254 petition, Petitioner asserts that, under the West Virginia kidnapping

23

statute, because bodily harm is a fact that increases a kidnapping sentence from a term of years to life (with or without parole), that fact must be alleged in the indictment, proven, and found by a jury beyond a reasonable doubt before a life sentence may be imposed.  Since bodily harm was not alleged and found beyond a reasonable doubt in this case, Petitioner asserts that his life sentences on both of the kidnapping counts violate his right to due process of law and trial by jury.

West Virginia's kidnapping statute is found in West Virginia Code § 61-2-14a(a), which, at the time of Petitioner's conviction and sentencing, stated in its entirety:

> If any person, by force, threat, duress, fraud or enticement take, confine, conceal, or decoy, inveigle or entice away, or transport into or out of this state or within this state, or otherwise kidnap any other person, or hold hostage any other person for the purpose or with the intent of taking, receiving, demanding or extorting from such person, or from any other person or persons, any ransom, money or other thing, or any concession or advantage of any sort, or for the purpose or with the intent of shielding or protecting himself or others from bodily harm or of evading capture or arrest after he or they have committed a crime, he shall be guilty of a felony and, upon conviction, *shall be punished by confinement by the division of corrections for life*, and, notwithstanding the provisions of article twelve, [§ 62-12-1 et seq.] chapter sixty-two of this code, shall not be eligible for parole: provided, That the jury may, in their discretion, recommend mercy, and if such recommendation is added to their verdict, such person shall be eligible for parole in accordance with the provisions of said article twelve; Provided, however, That if the accused pleads guilty, the court may, in its discretion, provide that such person shall be eligible for parole in accordance with the provisions of said article twelve, and, if the court so provides, such person shall be eligible for parole in accordance with

24

the provisions of said article twelve in the same manner
and with like effect as if such person had been found
guilty by the verdict of a jury and the jury had
recommended mercy; Provided further, That *in all cases
where the person against whom the offense is committed is
returned, or is permitted to return, alive, without
bodily harm having been inflicted upon him*, but after
ransom, money or other thing, or any concession or
advantage of any sort has been paid or yielded, the
punishment shall be confinement in the penitentiary for
any term of years not less than twenty: And provided
further, That in all cases where the person against whom
the offense is committed is returned, or is permitted to
return, alive, without bodily harm having been inflicted
upon him, but without ransom, money or other thing, or
any concession or advantage of any sort having been paid
or yielded, the punishment shall be confinement in the
penitentiary for any term of years not less than ten.*

W. Va. Code § 61-2-14a(a)(1998)(emphasis added).[4]

Petitioner's section 2254 petition states in pertinent part:

Petitioner was charged with two counts of kidnapping
on two separate occasions.  The facts that increased his
sentences from a term of years to life (returned alive,
unharmed, or not) were never alleged in the indictment or
presented to the jurors for consideration.  Therefore the
jury never made a finding of whether or not these facts
were present when deciding the sentence to be imposed.
Essentially, the jury could make a determination of mercy
in one instance and no mercy in another without having to
make distinctions or a finding as to *what factors*
elevated the sentence.  The kidnapping broadly worded
statute in West Virginia allows for life sentences to
[be] handed down without any findings (by court or jury)
as to the *relevant* factors that would warrant such an

_____

[4]   The penalty provisions of the statute have since been
amended to change the sentence in a case in which the victim was
returned, alive, without bodily harm, but where a ransom, money or
other concession has been made, to not less than twenty nor more
than fifty years.  The sentence in a case where the victim was
returned or permitted to return, without bodily harm, and where no
ransom, money or other concession had been made, is now not less
than ten nor more than thirty years.  W. Va. Code § 61-2-
14a(a)(1999).

increased sentence.

Petitioner could not challenge the *factors* that elevated his sentence from a term of years and have an opportunity to raise reasonable doubt due to the above Constitutional violations.  State essentially did not have the **burden of proving** the factors that could and did raise the petitioner's sentence from a term of years to life.

The court itself also failed to make a finding of any factor or relevant fact that raised the petitioner's sentence.  An analogy to describe this miscarriage of justice [is] a man being sentenced to the most harsh punishment available and there being no justification or factors presented as to why such a sentence was warranted.

(# 1-2 at 7)(emphasis in original).

Respondent's Memorandum of Law in support of his Motion for

Summary Judgment characterizes Petitioner's claim in Ground One as

follows:

In ground one Petitioner claims that the State violated his rights under the Due Process Clause, and the Notice and Jury Trial guarantees of the Sixth Amendment. [FN 2].  Specifically, Petitioner claims that West Virginia's kidnapping statute authorizes the trial court, not the jury, to determine one of the elements of the offense, the presence of bodily harm; and that the State failed to allege the presence of bodily harm in the indictment.  Petitioner's ground for relief focuses upon Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny.

[FN 2 - The habeas court addressed this claim as a challenge to the sufficiency of the evidence to sustain the elements of kidnaping required for a life sentence and dismissed it as failing to raise an issue proper in habeas corpus.  Petitioner presents this claim in the instant petition as a challenge to the indictment and

West Virginia's kidnaping statute. . . .][5]

In Apprendi, the defendant pleaded guilty to two firearms offenses carrying maximum sentences of ten years each, preserving his right to challenge the constitutionality of any enhancement under a separate hate-crime statute. See Apprendi, 530 U.S. at 469-70. At sentencing, the trial judge increased the sentence for one firearm count to twelve years based upon the hate-crime law and defendant appealed. The Supreme Court reversed the enhanced sentence, holding that sentencing facts necessary to increase the defendant's maximum punishment served as elements of the enhanced or separate offense and, therefore, were required to be found by a jury. Id. at 490 (holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.")

In Blakely v. Washington, 543 U.S. 294, 303 (2004), the United States Supreme Court held, "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (Emphasis omitted).

In Syl. Pt. 2, State v. Haught, 624 S.E.2d 899 (W. Va. 2005), the West Virginia Supreme Court of Appeals addressed this very issue. "Our kidnapping statute, W. Va. Code 61-2-14a (1999) does not provide for the enhancement of a defendant's sentence beyond the statutory maximum based on additional facts found by the trial judge in violation of the constitutional right to a trial by jury as interpreted by the United States Supreme Court in Blakely v. Washington, 542 U.S. 296 (2004)."

---

[5] The undersigned believes that Petitioner has, throughout the entirety of his post-conviction proceedings, raised this issue as a proposed violation of his rights to due process, notice, and a jury trial under the Sixth and Fourteenth Amendments. Thus, the undersigned finds that there is no issue concerning whether Petitioner has exhausted the claim as raised in his section 2254 petition.

In Haught the appellant was convicted of domestic battery and kidnapping.  Haught, 624 S.E.2d at 900. During the course of the kidnapping, the appellant strangled his then-girlfriend.  Id.  Pursuant to West Virginia Code 61-2-14a [footnote omitted], the jury sentenced the appellant to life with mercy.  Because the appellant failed to return the victim unharmed, the trial court sentenced the appellant to life with mercy. [Footnote omitted].

On appeal the appellant claimed that West Virginia Code [61]-2-14a(a) improperly permitted the trial court to make findings of fact which enhanced appellant's sentence in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000) and Blakely v. Washington, 542 U.S. 296 (2004).  The State argued that the sentence for kidnapping in West Virginia was life.  See W. Va. Code § [61]-2-14a(a).  West Virginia Code § [61]-2-14a(a)(2)(3) & (4) permit a jury to recommend mercy, and a trial court to reduce the life sentence to a reduced term of years.

(# 41 at 15-17).

Respondent asserts that Petitioner's reliance on the Apprendi line of cases is misplaced.  Respondent further asserts that the clear and unambiguous default sentence for kidnapping in West Virginia is life in prison, with statutory mitigators if the victim is returned unharmed.  Haught, 624 S.E.2d at 904 ("We believe it is perfectly reasonable to construe W. Va. Code § 61-2-14a as a statute that provides for the possible reduction of a defendant's sentence based on any additional findings by the trial judge and not one that permits the enhancement of a defendant's sentence.") (Id. at 18-19).

Petitioner's Response to Respondent's Motion for Summary Judgment asserts that Respondent has mischaracterized his claim as "being based solely on Apprendi and its progeny."  (# 44 at 5).

28

Petitioner contends that "the building blocks of [his] claim [are] the constitutional rubric of <u>Jones v. United States</u>, 526 U.S. 227 (1999), the foreshadow of <u>Apprendi</u>, and the constitutional principles espoused in the series of cases [upon] which the decision was predicated: <u>In re Winship</u>, 397 U.S. 258, 367 (1970); <u>Mullaney v. Wilbur</u>, 421 U.S. 684 (1975); <u>Patterson v. New York</u>, 432 U.S. 197 (1977); <u>McMillan v. Pennsylvania</u>, 477 U.S. 79 (1986)." (<u>Id.</u> at 5).

Petitioner's Response further states:

> Contrary to the Respondent's position, it is clear that under W. Va. Code § 61-2-14a(a), the requisite determination of whether the victim is found to not have been released, alive, and without "bodily harm," increases a defendant's sentence from an otherwise definite term of years to life. It is this factual assessment which determines not only the "statutory minimum and statutory maximum," but it is a fact which is "legally essential to the punishment to be inflicted." <u>Jones</u>, supra at 232; <u>United States v. Reese</u>, 92 U.S. 214, 232 (187[5]).

* * *

> The Respondent has failed to show how it is constitutional for a legislature (or trial court) to remove from the jury such facts that exposed the Petitioner to an increased sentence. Regardless of this failure, it is "unconstitutional for a legislature to remove from the jury the assessment of facts that increase a prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established beyond a reasonable doubt." <u>Jones</u>, supra, at 252-53.

(<u>Id.</u> at 7).

Petitioner's Response further states:

The Respondent's position fails to acknowledge that Petitioner faced a punishment "beyond that provided when" kidnapping is committed without bodily harm versus when it is committed with bodily harm.  It is this legally essential fact which elevates a defendant's sentence beyond an otherwise term of years to life. [FN1]  And under the "Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees [of] the Sixth, any fact (other than a prior conviction) that increases the maximum penalty for a crime must be found beyond a reasonable doubt." Jones, Supra, at 243 n.6 (quoted in Apprendi, 530 U.S. 269, 476).

[FN 1 - Interestingly, the Respondent's position is remiss of the fact that Winship was not limited to those facts that constitute crimes defined by State law, as a "State could simply undermine many of the interests that decision was sought to protect." Mullaney, Supra, at 698]

Petitioner had a right to have these facts alleged, submitted to the jury and have them found beyond a reasonable doubt.  The State, then was constitutionally obligated to do just that.  As it is clear that "if a defendant faces punishment beyond that provided when an offense is committed under certain circumstances and not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not - at the moment the State is put to proof - be deprived of protections that have until this point, unquestionably attached." [Apprendi, 530 U.S. at 484.]

The reasonable doubt requirement, relative to the Sixth and Fourteenth Amendments, and implicated in this instance, applies to the facts that distinguish the more serious crime of kidnapping (not released, alive, or without bodily harm), from the less serious crime (released, alive, without bodily harm).

The Respondent posits that the statute allows the trial court to mitigate, after guilt, and not increase a defendant's sentence.  This is tantamount to arguing form over function.  The language in the pertinent provisions are, in this instance, clear that in all cases where the facts in question are present the only authorized

sentence (not in some, most or at the court's discretion) is a term of years; thus, this essential fact increases a defendant's sentence from an otherwise term of years to life.

(Id. at 8-9).

Petitioner was convicted on December 12, 1997, and he was sentenced by an Order entered on May 18, 1998. Petitioner filed his initial Petition for Appeal from his conviction on November 19, 1998. (# 39, Ex. 25). The initial petition did not raise the instant claim. However, on April 8, 1999, Petitioner, by counsel, filed an Amended Petition for Appeal, which did raise this claim. It appears that the amended petition was filed in light of the Supreme Court's decision in United States v. Jones, 526 U.S. 227 (1999), which was decided less than one month earlier.

The principles announced in Jones discussed by Petitioner above were grounded in earlier Supreme Court decisions. In In re Winship, the Supreme Court held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. 358, 364 (1970). Then, in Mullaney v. Wilbur, 421 U.S. 684 (1975), the Supreme Court found that a murder statute in Maine did not comport with this principle because it required the defendant charged with murder to prove that he acted "in the heat of passion on sudden provocation" in order to reduce the homicide to manslaughter. Critically, the Supreme Court stated:

31

Maine has chosen to distinguish those who kill in the
heat of passion from those who kill in the absence of
this factor. Because the former are less
"blameworth(y)," . . . they are subject to substantially
less severe penalties. By drawing this distinction,
while refusing to require the prosecution to establish
beyond a reasonable doubt the fact upon which it turns,
Maine denigrates the interests found critical in Winship
. . . Thus, if [the State's] argument were accepted,
Maine could impose a life sentence for any felonious
homicide - even one that traditionally might be
considered involuntary manslaughter - unless the
defendant was able to prove that his act was neither
intentional nor criminally reckless. [FN 24]

[FN 24 - Many States impose different statutory schemes
on different degrees of assault. If Winship were limited
to a State's definition of the elements of a crime, these
states could define all assaults as a single offense and
then require the defendant to disprove the elements of
aggravation - e.g., intent to kill or intent to rob.]

Winship is concerned with substance rather than this
kind of formalism. [Footnote omitted]. The rationale of
that case requires an analysis that looks to the
"operation and effect of the law as applied and enforced
by the state," St. Louis S.W.R. Co. v. Arkansas, 235 U.S.
350, 362, 35 S. Ct. 99, 102, 50 L. Ed.2d 265 (1914), and
to the interests of both the State and the defendant as
affected by the allocation of the burden of proof.

421 U.S. 698-699. The Mullaney Court further stated:

In this case, by contrast, the State has affirmatively
shifted the burden of proof to the defendant. The
result, in a case such as this one where the defendant is
required to prove the critical fact in dispute, is to
increase further the likelihood of an erroneous murder
conviction. Such a result directly contravenes the
principle articulated in Speiser v. Randall, 357 U.S.
513, 525-526, 78 S. Ct. 1332, 1342, 2 L. Ed.2d 1460
(1958):

(W)here one party has at stake an interest of
transcending value - as a criminal defendant
his liberty - th(e) margin of error is reduced
as to him by the process of placing on the
(prosecution) the burden . . . of persuading

32

> the factfinder at the conclusion of the trial
> . . . ."

Id. at 701.   Thus, the Mullaney Court held that due process
requires the prosecution to prove beyond a reasonable doubt the
absence of the heat of passion on sudden provocation.   Id. at 703.

However, two years later, in Patterson v. New York, 432 U.S.
197 (1977), the Court ruled on a Winship challenge to a statute
defining murder as "causing death with intent" which was subject to
an affirmative defense of "extreme emotional disturbance for which
there was reasonable explanation or excuse."   The Patterson Court
rejected the petitioner's argument that the presence or absence of
an extreme emotional disturbance affected the severity of sentence
and, thus, Winship and Mullaney "required the State to prove the
absence of that fact beyond a reasonable doubt."   Rather, the Court
found that shifting the burden of proving an affirmative defense by
a preponderance of the evidence to the defendant did not give rise
to a due process violation, so long as the State did not reallocate
the traditional burden of proving the essential elements that the
state legislature had, within its power, chosen to define the
crime.   432 U.S. at 241-242.

Then, in McMillan v. Pennsylvania, 477 U.S. 70 (1986), the
Court addressed whether a provision in a Pennsylvania statute
triggering a mandatory minimum sentence for visible possession of
a firearm involved an essential element of a new crime or was
merely a "sentencing factor."   The McMillan Court found that the

33

possession of a firearm was a sentencing factor that need not be proven by the prosecution beyond a reasonable doubt.  The McMillan Court characterized the holding in Patterson as "rejecting the claim that whenever a State links the 'severity of punishment' to the 'presence or absence of an identified fact' the State must prove that fact beyond a reasonable doubt."  477 U.S. at 84.

Subsequently, the Supreme Court issued decisions in Martin v. Ohio, 480 U.S. 228 (1987) (finding that requiring a defendant to prove by a preponderance of the evidence that she acted in self-defense did not violate due process) and Almendarez-Torres v. United States, 523 U.S. 224 (1998) (holding that recidivism was a sentencing factor; therefore, enhanced penalties for recidivism were authorized without being pled in an indictment).  This was the state of the law at the time of Petitioner's conviction and sentencing.

On March 24, 1999, however, the Supreme Court issued its decision in United States v. Jones, 526 U.S. 227 (1999), in which the Court addressed the constitutionality of the federal car-jacking statute, 18 U.S.C. § 2119, which contained a provision for a default sentence of a fine or imprisonment of not more than 15 years, or both, but also included numbered subsections containing graduated penalties in instances where serious bodily injury or death resulted in the course of the crime.  Id. at 230. As noted by the Court, the indictment in Jones made no reference to the

34

numbered subsections and charged none of the predicate facts that would result in the penalties discussed in those subsections. Id.

In discussing whether the facts that would support the enhanced penalties are elements of the offense that must be proved beyond a reasonable doubt, or merely sentencing factors, the Jones Court engaged in a discussion of all of the cases discussed above. Notably, the Jones Court stated:

> McMillan is notable not only for acknowledging the question of due process requirements for factfinding that raises a sentencing range, but also for disposing of a claim that the Pennsylvania law violated the Sixth Amendment right to jury trial as well. The petitioner's basic argument was for a right to a jury determination of all "ultimate facts concerning the offense committed," id. at 93, 106 S. Ct. 2411, and although the Court disposed of this by reference back to its due process discussion, that discussion has broached the potential constitutional significance of factfinding that raised the sentencing ceiling.

> McMillan, then, recognizes a question under the Due Process Clause of the Fourteenth Amendment and the jury guarantee of the Sixth: when a jury determination has not been waived, may judicial factfinding by a preponderance support the application of a provision that increases the potential severity of the penalty for a variant of a given crime? The seriousness of the due process issue is evident from Mullaney's insistence that a State cannot manipulate its way out of Winship and from Patterson's recognition of a limit on state authority to reallocate traditional burdens of proof; the substantiality of the jury claim is evident from the practical implications of assuming Sixth Amendment indifference to treating a fact that sets the sentencing range as a sentencing factor, not an element. [FN6]

Id. at 242-243. In footnote 6, the Jones Court stated the driving principle of the issue before this court:

> under the Due Process Clause of the Fifth [and
> Fourteenth] Amendment and the notice and jury trial
> guarantees of the Sixth Amendment, any fact (other than
> prior conviction) that increases the maximum penalty for
> a crime must be charged in an indictment, submitted to a
> jury, and proven beyond a reasonable doubt.

526 U.S. at 243 n.6.

The Court emphasized that this constitutional proposition is not a new rule of constitutional law, and that it does not infringe upon a legislature's ability to identify conduct it wishes to characterize as criminal and to define the elements of such a crime. Id. Rather, the Court stated:

> The constitutional safeguards that figure in our analysis
> concern not the identity of the elements defining
> criminal liability but only the required procedures for
> finding the facts that determine the maximum permissible
> punishment; these are the safeguards going to the
> formality of notice, the identity of the factfinder, and
> the burden of proof.

Id. Thus, legislative intent is a significant factor in such constitutional analysis. Significantly, the Jones Court also emphasized that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise, and by the other of which such questions are avoided, our duty is to adopt the latter." 526 U.S. at 239 (quoting United States v. Attorney ex rel. Attorney General v. Deleware & Hudson Co. 213 U.S. 366 (1909). Thus, the Court held that "[a]ny doubt on the issue of statutory construction is hence to be resolved in favor of avoiding those [constitutional] questions." Id. at 251.

36

Petitioner's Response contends "[t]he underlying principles born out of Jones and of Petitioner's claim, is that a 'defendant must be afforded the procedural protections of notice, a jury trial, and a heightened standard of proof with respect to facts warranting exposure to a greater penalty,' and that the jury stands between the power of the State, and the Sixth and Fourteenth Amendments' guarantee that a jury (whose role it is to make determinations of fact) finds any disputed fact essential to increase a potential sentence ceiling. Jones, Supra, at 253." (# 44 at 5).

As a first step, the undersigned will address the SCAWV's major cases concerning the interpretation of the kidnapping statute's penalty provisions, up to the time of Petitioner's conviction and sentencing.

In 1964, the SCAWV decided Pyles v. Boles, 135 S.E.2d 692 (W. Va. 1964). In that case, the court held that the penalty provisions of the kidnapping statute depending on the treatment of the victim did not state any element of the offense. The Pyles court distinguished the West Virginia kidnapping statute from its murder statutes stating:

> As the foregoing statutory provisions relating to the punishment do not state or prescribe degrees or essential elements of the crime of kidnapping, the jury is not required to make any finding with respect to the punishment to be imposed, except in the case in which it finds that the accused should be punished by confinement in the penitentiary for life. There is a difference between the requirements of a verdict of guilty upon an

37

> indictment for murder and of a verdict of guilty upon an
> indictment for kidnapping.   The reason for this
> difference is that in the case of murder, the statute
> [citation omitted], unlike the kidnapping statute,
> requires the jury, if it finds a person indicted for
> murder guilty, to state in its verdict whether he is
> guilty of the first or the second degree.   Likewise,
> under an indictment for murder, if the jury finds the
> accused guilty of manslaughter, which is included within
> such indictment the jury must state in its verdict,
> whether he is guilty of voluntary or involuntary
> manslaughter for the reason that those offenses are
> separate and distinct, constitute different degrees of
> homicide, and are subject to different punishments.

135 S.E.2d at 701.

Then, in State v. Farmer, 454 S.E.2d 378, 382 (W. Va. 1994),
the court held, despite the mandatory language in the penalty
provisions concerning a sentence of a term of years, that the trial
judge "has the discretion to make findings as to whether a
defendant inflicted bodily harm on a victim and as to whether
ransom, money or any other concession has been paid or yielded for
the return of the victim."   The Farmer court further specifically
found:

> Because the findings by the trial judge are made solely
> for the purpose of determining the sentence to be imposed
> on a defendant and are not elements of the crime of
> kidnapping, W. Va. Const. art. III, §§ 10 and 14,
> relating to a defendant's due process rights and right to
> a trial by jury, are not violated.

Id.   Of course, these decisions were rendered before Jones,
Apprendi and Blakely.

In State v. King, 518 S.E.2d 663, 667 (W. Va. 1999), the court
acknowledged that the absence of bodily harm is one of the

38

prerequisites for the imposition of a sentence of a term of years;
however, in that particular case, the issue before the court
centered on whether the victim was "returned or allowed to return"
because the defendant did not allow the victim, who had not
suffered any bodily harm, to leave his presence voluntarily.
Rather, the victim was released when the defendant was stopped by
armed police officers at a roadblock.   Id.

Finally, in State v. Haught, 624 S.E.2d 899 (W. Va. 2005), the
case that Respondent believes to be dispositive of this claim, the
SCAWV specifically held that the Sixth Amendment principles
espoused in Apprendi and Blakely are not violated by the West
Virginia kidnapping statute because the statute does not provide
for an enhancement beyond the statutory maximum.   As previously
noted by Respondent, the Haught court stated:

> After careful consideration of this issue, we reject
> Appellant's argument.  This Court believes that Blakely,
> is clearly distinguishable from the instant case.
> Blakely stands for the principle that any fact, other
> than a prior conviction, that increases the penalty for
> a crime beyond the statutory maximum must be submitted to
> a jury and proved beyond a reasonable doubt.  In Blakely,
> the facts admitted by Blakely qualified him for a
> standard sentence of 53 months.  This sentence, however,
> was impermissibly *enhanced* to 90 months after the trial
> judge made additional findings of fact.  In contrast, the
> statutory maximum in this case, or in other words, the
> maximum sentence that Appellant could receive based on
> the jury's findings, was life with mercy which is the
> sentence Appellant received.  Thus, Appellant received no
> greater sentence than the statutory maximum.  In sum, it
> is clear to this Court that, pursuant to the statute, any
> additional findings of fact made by the trial judge can
> only operate under the statute to *reduce* and not *enhance*
> a defendant's sentence.

624 S.E.2d at 904.

It should be noted, however, that in a dissenting and concurring[6] opinion in <u>Haught</u>, Justice Starcher opined that the majority's legal holdings were contrary to the Sixth Amendment, as articulated by the Supreme Court.  <u>Id.</u>  The dissent further states:

> The majority opinion in the instant case could be invalidated by a federal court.  West Virginia prosecutors and circuit judges who do not ensure that *all* sentence-related findings are made *by a jury*, including those relevant to kidnapping sentences, are "asking for" the reversal of those sentences, and possibly their underlying convictions. * * *
>
> In the instant case, the trial judge found that this statutory clause [the penalty provision concerning a sentence of a term of years where the victim was returned, or permitted to return, alive, without bodily harm] did not apply to Haught and imposed a higher sentence, because the victim did have "bodily harm" done to her.  The specific question of whether or not the victim suffered "bodily harm" during the kidnapping was not put to the jury; the judge made this finding of fact on his own.

<u>Id.</u> at 904-905.  Justice Starcher elaborates in his opinion as follows:

> The United States Supreme Court's decision in <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed.2d 403 (2004) would suggest that a *jury* must make the finding that bodily harm was inflicted on the victim; otherwise the statutory sentencing scheme is violative of <u>Blakely</u>.  Haught argues that W. Va. Code, 61-2-14a(a) violates the 6th Amendment and <u>Blakely</u> because the statute requires the trial judge to make certain findings of fact if the jury returns a guilty verdict with a recommendation of mercy.

---

[6]    Justice Starcher concurred in the majority opinion upholding Haught's sentence because he found that Haught did not properly preserve this issue for his appeal.

Actually, contrary to Haught's argument, the statute does not require that the trial judge make these findings.  Instead, the statute is silent and does not specify who should make the findings.

* * *

Our Court should, in accordance with <u>Blakely</u>, have clarified that W. Va. Code, 61-2-14a(a) does not violate a defendant's 6th Amendment jury trial rights so long as a *jury* finds the facts necessary for determining the sentence, not a judge (unless this right is knowingly waived by the defendant).

Current West Virginia law is out of step with the holdings of <u>Apprendi</u> and <u>Blakely</u>.  In Syllabus Point 1 of <u>State v. Farmer</u>, 193 W. Va. 84, 454 S.E.2d 378 (1994) our Court explicitly permitted a judge to make findings of fact for sentencing purposes in kidnaping cases:

> Pursuant to West Virginia's kidnapping statute set forth in W. Va. Code § 61-2-14a [1965], a trial judge, *for purposes of imposing a sentence on a defendant . . .has discretion to make findings* as to whether a defendant inflicted bodily harm on a victim and as to whether ransom, money or any other concession has been paid or yielded for the return of the victim . . . .

<u>Blakely</u> and <u>Apprendi</u> directly prohibit this type of fact finding by a judge.  <u>Farmer</u> must be overruled.

* * *

The wording of W. Va. Code, 61-2-14a(a) makes it difficult to apply the language in <u>Blakely</u> and <u>Apprendi</u>. Rather than starting with a minimum sentence and then outlining the findings of fact that can be used to enhance that sentence, the language of W. Va. Code, 61-2-14a(a) begins with the maximum sentence and then describes the findings of fact that can be used to reduce the sentence.  W. Va. Code, 61-2-14a(a) speaks in terms of reductions rather than enhancements, the result is the same; it is only the process that is different.

<u>Id.</u> at 905-906.

The difficulties encountered with the West Virginia kidnapping statute are evident in this case.   The trial record demonstrates that the parties and the trial court struggled with the meaning of the kidnapping penalty provisions.   On at least two occasions during the trial the parties debated the procedure for imposing a sentence of a term of years for kidnapping.   First, when the defense moved for judgment of acquittal at the close of the State's case, the following colloquy occurred:

> THE COURT: What's the State's position in regard to the penalty phase [with regard to Count 4, the Chu kidnapping]?
>
> * * *
>
> THE COURT: Is that all a jury question?   In other words, could they come back with that portion where a finding would be made that -- where a person is returned or permitted to return unharmed but after certain concessions are taken that would impose the term of not less than 20 years?
>
> MS. WHITMYER: Your Honor, the case that's on point here is <u>Pyles v. Boles</u>, and that Pyles, 135 S.E.2d --
>
> * * *
>
> - basically says that all the jury is to do is decide whether the kidnapping occurred, and then they decide whether to recommend mercy or to withhold mercy, and then it's the Court's finding as to whether she was able to escape unharmed --
>
> THE COURT: In the penalty phase.
>
> MS. WHITMYER: Yes, the jury does not make that determination on the sentence; they only make a determination of whether the crime occurred, and mercy or no mercy.   In reading this case, let's assume that the case goes to the jury, the jury returns a verdict of guilty as to Count 4; they either recommend mercy or

42

> withhold mercy.  But you, your Honor, have the discretion
> now to determine whether or not she was permitted to be
> released either before the concessions or advantage was
> received or afterwards and whether serious bodily injury
> occurred.  That's my reading of the case.
>
> THE COURT: Well, that's my problem, and I just don't know
> the answer to it.  That makes it a lot easier, obviously.
> But you think that if the jury would come back
> withholding a recommendation that I would have the
> ability to, in essence, overrule that based on certain
> findings that -- like in Count 4, for example, where --
> let's just assume she was returned unharmed.
>
>                          * * *
>
> MS. BROWN: I have to tell you, your Honor, I'm vexed by
> the entire statute pertaining to kidnapping.

(# 25, Ex. 17 at 2098-2101).  The motion for judgment of acquittal

was denied without prejudice at that point.  (Id. at 2102).

The second time this issue was discussed was during the charge

conference, at which time the trial court stated:

> THE COURT: 7? 7 is -- now what you are telling me,
> though, so that there's no misunderstanding - that if
> this jury comes back in the kidnapping counts withholding
> a recommendation of mercy that I still have the authority
> to - if I make the proper findings under 61-2-14A [sic;
> 61-2-14a]; under either of these now, just don't take the
> one with Jay Ming Chu - I have the right to then invoke
> the sentencing provision under the ten years or twenty
> years.
>
> MS. WHITMYER: And I believe that to be the case
> regardless of whether they recommend mercy or they
> withhold mercy.
>
> THE COURT: All right.
>
> MS. WHITMYER: Yes, I agree with that, Judge.
>
> THE COURT: Do you agree, Barbara?
>
> MS. BROWN: Is this going to be instructed to them?

THE COURT: No.

MS. BROWN: Yes.

\* \* \*

THE COURT: I think <u>Farmer</u> touches on it.  It reenforces what we're saying.

(# 25, Ex. 17 at 2251-2252).

As has been noted by Petitioner, after the jury returned guilty verdicts on both kidnapping counts and recommended mercy on the Chu count, but returned no recommendation of mercy on the Leopold count, the trial court apparently determined that he did not have the discretion to reduce either of the life sentences, and stated such on the record at Petitioner's sentencing hearing.  At the sentencing hearing, Ms. Wolfingbarger asked the court to impose a ten-year determinate sentence on the Chu kidnapping count, and to set aside the verdict on the Leopold kidnapping as being incidental to the aggravated robbery and malicious wounding convictions.  (# 52, Ex. 34 at 4).  The trial court declined to adopt the probation officer's recommendation to reduce the life without mercy sentence to life with mercy on the Leopold kidnapping count, stating that he did not believe he had the authority to do that.  (<u>Id.</u> at 9-10). There was no discussion whatsoever about reducing the Chu kidnapping sentence to a term of years; nor was there any discussion whatsoever about whether the victims had suffered bodily harm before the imposition of both life sentences.  (<u>Id.</u> at 33-35).

44

The undersigned now turns to consideration of whether the West Virginia courts adjudicated Petitioner's Sixth and Fourteenth Amendments claim of lack of due process, notice and jury trial in a manner which is contrary to clearly established Federal law, as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1).  Petitioner raised this issue in his Amended Petition for Appeal, stated as follows:

> Because bodily harm is a fact that increases a kidnapping sentence from a term of years to life (with or without parole), that fact must be alleged in the indictment, proven, and found by a jury beyond a reasonable doubt before a life sentence may be imposed.  Since bodily harm was not alleged, proven and found in this case, sentence for kidnapping convictions and life sentences violate his right to due process of law and trial by jury.

(# 1 at 2).  The SCAWV refused the Amended Petition.  (# 7, Ex. 2)

Petitioner's first State habeas corpus petition included the claim:

> 6.  Petitioner's conviction is based upon a record wholly devoid of any finding by the jury whether the alleged victims were returned, or is permitted to return, alive without bodily harm.  This element of the offense of kidnapping was not alleged in the indictment returned by the grand jury that indicted petitioner.  This element of the offense of kidnapping was not proven at trial.  And, this element of the offense of kidnapping was not found by the jury beyond a reasonable doubt.  Therefore, the underlying state proceedings violate the Fourteenth Amendment to the Constitution of the U.S.A. and Article III, § 10 of the Constitution of West Virginia.

(# 12, Ex. 8.)  The Circuit Court of Kanawha County rephrased the claim and stated its finding:

> (6)  Petitioner contends that the evidence the State introduced at trial was "constitutionally insufficient"

45

to prove Petitioner guilty of a degree of kidnaping that
would warrant the sentence imposed on Petitioner and that
the trial court failed to give the jury appropriate
instruction regarding West Virginia Code § 61-2-14a.

The Court finds it inappropriate to question weight
or sufficiency of evidence in a petition for habeas
corpus relief. Issues of weight and sufficiency of
evidence should be raised on appeal.

(# 25, Ex. 24, at 205.)

The West Virginia courts did not adjudicate the issue which
was raised by Petitioner. Accordingly, pursuant to the holding of
Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000), this Court must
conduct an independent examination of the record and the clearly
established Supreme Court law, confining our review to whether the
State courts' denial of the writ "was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States."

Under the State's interpretation of West Virginia Code § 61-2-
14a, the default sentence is life in prison. Haught, 624 S.E.2d at
904. (# 41 at 18). There are several problems that arise from
this position.

First, the State asserts that the trial court has the
discretion to impose a sentence of a term of years if the victim is
unhurt and there is no ransom, see Farmer, 454 S.E.2d at 382,
despite the mandatory language in the statute: "in all cases . . .
the punishment shall be confinement in the penitentiary for any
term of years not less than ten." W. Va. Code § 61-2-14a(a). The

46

State's argument is contrary to the Supreme Court's holdings on statutory interpretation.  The clear intent of the West Virginia Legislature was to require imposition of increasingly severe penalties for increasingly reprehensible conduct:

| | |
|---|---|
| Victim returned alive, without bodily harm, without ransom, money, concession or advantage | Not less than ten years in prison |
| Victim returned alive, without bodily harm, after payment of ransom, money, concession or advantage | Not less than twenty years in prison |
| Victim kidnapped or held hostage for the purpose/with the intent of obtaining ransom, money, concession or advantage | Life imprisonment with or without the possibility of parole. |

If Respondent is correct that the default sentence is life imprisonment, no matter what happened to the victim, the mandatory word "shall" for returning the victim without bodily harm is meaningless.  Longstanding rules of statutory construction strongly discourage an interpretation of a statute that renders part of it meaningless. The "cardinal principle of statutory construction" is "to give effect, if possible, to every clause and word of a statute." Duncan v. Walker, 533 U.S. 167, 174 (2001) (quoting Williams v. Taylor, 529 U.S. 362, 404 (2000), and Montclair v. Ramsdell, 107 U.S. 147, 152 (1883)).  The Supreme Court is "reluctan[t] to treat statutory terms as surplusage" in any setting, and considers it a duty to "give each word some operative effect" where possible. Duncan, id. at 174-75 (quoting Babbitt v.

Sweet Home Chapter, Communities for Great Ore., 515 U.S. 687, 698 (1995), and Walters v. Metropolitan Ed. Enterprises, Inc., 519 U.S. 202, 209 (1997)).

The State's position that the default sentence is life in prison appears to be based on a presumption that the victim suffered bodily harm, even though that fact was not pled and, with respect to Ms. Chu, not proved.

Respondent has offered no suggestion as to a procedure which a West Virginia circuit court should follow in kidnapping cases and which comports with the Sixth Amendment. The record reflects that even the Hon. Arthur Recht, an experienced trial judge who presided over Petitioner's trial, and who has served with distinction on the Supreme Court of Appeals of West Virginia, was confused as to the elements and the penalties of the kidnapping statute. When the West Virginia Legislature chose to distinguish between those who hurt a kidnapping victim and those who do not, that choice necessarily requires that the prosecutor plead and prove the distinguishing fact.

Second, the State's interpretation impermissibly shifts the burden of proof to the defendant in violation of the principles espoused in Winship and Mullaney. Under the State's theory, if the prosecution presents evidence that a defendant kidnapped a person, who else but the defendant would have to assume the burden of proving no bodily injury? Who else would prove the absence of a

ransom or concession?  Lack of bodily injury is not an affirmative
defense; it is simply one fact relating to a crime as to which the
defendant has an absolute right to remain silent.  The State is
unlikely to offer evidence in support of a reduction in sentence.
If the State wants to argue that a convicted kidnapper deserves
life imprisonment, then the State should undertake the burden of
proving the facts that lead to that sentence.

Petitioner notes this critical distinction in his Response:

> The State drew a critical and sharp distinction
> between the absence or presence of bodily harm, and
> determined the latter to be "more blameworthy" and
> subject to a more severe penalty.  "By drawing this
> distinction while refusing to require the prosecution to
> establish beyond a reasonable doubt the facts upon which
> it turns," the State denigrated the "interests found in
> Winship." Mullaney, supra, at 698.

(# 44 at 10).

Third, the undersigned suggests that the West Virginia
kidnapping statute may be compared to the federal controlled
substances statute, 21 U.S.C. § 841.  Section 841(a) sets forth the
unlawful acts governed by the statute, and section 841(b) specifies
graduated penalties based upon the quantity of controlled
substances involved.  The federal courts have held that the Jones,
Apprendi, and Blakely cases are applicable to the drug statute and
the advisory Sentencing Guidelines.  United States v. Booker, 543
U.S. 220 (2005).  If no drug quantity is pled and proved, or
admitted, the default penalty is the lowest category so as not to
offend the principles espoused in Jones and subsequent cases.  If

49

an indictment is silent as to whether a kidnapping victim was returned, or permitted to return, without bodily harm, it would appear that the only sentence that would conform to the principles of <u>Jones</u> and its progeny would be a sentence of a term of years.[7]

The undersigned is mindful that the Supreme Court of Appeals of West Virginia is the court with the ultimate authority to interpret a West Virginia statute.  See <u>Wainwright v. Goode</u>, 464 U.S. 78, 84 (1983) ("the views of the state's highest court with respect to state law are binding on the federal courts"); <u>Faircloth v. Finesod</u>, 938 F.2d 513, 517 n.9 (4th Cir. 1991)("This court is bound by the state court's interpretation [of a state statute], and must assume that the statute says what the state court says it says.").  This concept was reiterated in a ruling on a section 2254 petition filed in the Northern District of West Virginia in <u>Jones v. Painter</u>, 140 F. Supp.2d 677, 679 (N.D. W. Va. 2001)(Broadwater, J.).  In <u>Jones</u>, however, Judge Broadwater noted that:

> The West Virginia Supreme Court of Appeals is the final arbiter of the law of West Virginia.  Its determination of what the law of this State means is final and cannot be reviewed by the federal courts, *unless the interpretation by that court is in conflict with some federally protected right.*

<u>Id.</u> at 679 (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991)[Emphasis added].

---

[7]   The undersigned has not specifically addressed the other factors relating to ransom or concession.  The undersigned believes these facts must also be pled and proved beyond a reasonable doubt, in order to determine the proper maximum penalty.

It is the role of the federal courts to determine whether a person is "in custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). The undersigned notes that this is not the first time that serious questions have been raised concerning the West Virginia kidnapping statute. In addition to Justice Starcher's dissent/concurrence in Haught, 624 S.E.2d at 904-05, the Hon. John R. Frazier, sitting by special designation on the Circuit Court of Kanawha County, concluded that State v. Farmer, 454 S.E.2d 738, is no longer controlling on the issue of whether bodily harm to a kidnapping victim is a sentencing factor or an element of the offense, and granted a writ of habeas corpus as to a defendant's kidnapping conviction. State ex rel. McLaurin v. McBride, No. 00-MISC-16 (Kan. Cnty. Cir. Ct. July 11, 2005, at 26). Respondent did not appeal that ruling. The Supreme Court of Appeals of West Virginia noted Judge Frazier's reasoning in State ex rel. McLaurin v. McBride, 640 S.E.2d 204, 209 n.7 (W. Va. 2006), which was decided less than one year after Haught.

Based on the principles set forth in Jones and its antecedent cases, and because Petitioner received two life sentences without a jury finding beyond a reasonable doubt, or without an admission by Petitioner, that either of the victims was returned or permitted to return, alive, without bodily harm, with or without ransom or concession, the undersigned proposes that the presiding District Judge **FIND** that the State courts' decisions denying Petitioner

relief on this ground were contrary to clearly established Federal law, as determined by the Supreme Court of the United States. The failure to return a kidnapping victim without bodily harm increases the maximum sentence in West Virginia from a term of years to a life sentence, and proof of this fact should be legally essential before a life sentence is imposed. The undersigned further proposes that the presiding District Judge **FIND** that the imposition of a life sentence without a jury finding or admission by the defendant that the victim was not returned without bodily harm, violates the Sixth and Fourteenth Amendments to the United States Constitution. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Respondent is not entitled to judgment as a matter of law on this claim.

It is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the petition for a writ of habeas corpus as to the first ground for relief.

**B.   Grounds Two and Four - Jury selection and denial of Motion for Change of Venue.**

In Ground Two of his section 2254 petition, Petitioner contends that errors occurred in the selection of the jury which resulted in the denial of Petitioner's rights to due process and a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. (# 1-2 at 7). The petition further asserts:

52

> There were several crucial errors that occurred in the impaneling of the jury in petitioner's case.  The jury panel from which the petit jury was selected was not large enough to provide a fair and impartial jury and it was not free from the taint [of] pre-trial publicity and familiarity of state witnesses.  During voir dire, an article in regards to admissions made by the petitioner was discovered in the jury lounge that several potential jurors acknowledged that they were aware of or had seen the article.

(Id.)

In Ground Four of his section 2254 petition, Petitioner asserts that the trial court erred in failing to grant Petitioner's motions for change of venue based upon pre-trial publicity[8], which Petitioner claims resulted in the violation of his rights to due process and a fair trial.  (# 1-2 at 9).  Petitioner further states:

> Petitioner moved the trial court for an order changing the venue of the trial due to the massive negative pre-trial publicity.  The motion was based upon a random survey conducted among Kanawha County West Virginia residents by Dr. Gail Flint, Chair of the Criminal Justice Department at West Virginia State

---

[8] Petitioner filed a written Motion for Change of Venue on April 22, 1997 (# 51, Ex. 28).  In the motion, Petitioner's counsel argued that local media outlets had published at least 20 articles and aired 88 television reports about the events surrounding Petitioner's case, including the fact of Julia Leopold's pregnancy at the time of the attack and the fact that Petitioner had other charges pending in North Carolina.  Petitioner argued that he could not receive a fair and impartial trial in Kanawha County due to the "saturation of sensational pretrial publicity . . ."  (Id.) Petitioner's Motion for Change of Venue was subsequently denied, presumably after a pre-trial hearing on the issues that occurred sometime after June 19, 1997 (# 51, Ex. 29, Motion to Postpone the Change of Venue Hearing).  However, it does not appear that such hearing was transcribed; nor is an order denying the motion readily apparent on the docket sheet of the criminal case.

College; in which a large number indicated a prejudice against the petitioner (almost half of the people surveyed believed petitioner to be guilty). The trial court denied this motion. However, the trial court acknowledged the need to be extra vigilant in picking a fair and impartial jury.

During jury selection, only 54 [sic; 45?] jurors were called for duty. Of those potential jurors, a large number of jurors were immediately struck for cause based on their answers (which showed prejudice against the petitioner) to the jury questionnaire (21 of the 54 [sic; 45?] jurors ended up being struck). Counsel for petitioner moved for a continuance and renewed motion for change of venue based upon the lack of a sufficient number of impartial jurors. Both motions were denied.

(# 1-2 at 9). Because Grounds Two and Four are related, the undersigned will address them together.

Respondent's Memorandum of Law in support of his Motion for Summary Judgment addresses Ground Two of Petitioner's petition as follows:

In ground two Petitioner claims that some of the jurors who heard this case were exposed to a newspaper article that informed them that the Petitioner had admitted to the car-jacking charge. Although he does not specify, it would appear that exposure to this newspaper article constituted prejudicial juror misconduct. Petitioner also claims that the venire was not large enough to provide for a fair and impartial jury, the pool was tainted by pretrial publicity and familiarity of State witnesses, and the impaneling of the jury was done so in a way that excluded all African-Americans from the jury.

(# 41 at 19). Respondent then discusses the applicable federal case law concerning juror bias. (Id.)

A defendant is guaranteed a trial by an impartial jury under the Sixth and Fourteenth Amendments. See, e.g., Duncan v.

54

Louisiana, 391 U.S. 145, 149 (1968); Sheppard v. Maxwell, 384 U.S. 333, 362 (1966)("Due Process requires that the accused receive a trial by an impartial jury free from outside influence."). "The essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel . . . ." United States v. Brown, 799 F.2d 134, 135-36 (4th Cir. 1986).

As noted by Respondent, absent contrary indications, jurors are presumed to be impartial. Poynter v. Ratcliff, 874 F.2d 219, 221 (4th Cir. 1989). The defendant bears the burden of showing a strong possibility of juror bias. Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987). "The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law." Conway v. Polk, 453 F.3d 567, 585 (4th Cir. 2006) citing United States v. Wood, 299 U.S. 123, 133 (1936). (# 41 at 19).

Respondent further notes that "[m]atters of change of venue are committed to the sound discretion of the trial court . . . ." Tuggle v. Thompson, 57 F.3d 1356, 1364 (4th Cir.), overruled on other grounds by Tuggle v. Netherland, 516 U.S. 10 (1995). Respondent further asserts that, due to the limited scope of federal review of a state habeas application, a petitioner who seeks relief based on the denial of change of venue must show actual prejudice or that there is a presumption of prejudice

because the proceedings involved "such a probability that prejudice will result that it is deemed inherently lacking in due process." Estes v. Texas, 381 U.S. 532, 542-43 (1965). "A change of venue is required as a matter of constitutional law only where the jury pool is tainted 'by so huge a wave of public passion' that the impaneling of an impartial jury is impossible. Mu'min v. Pruett, 125 F.3d 192, 199 (4th Cir. 1997) citing Irvin v. Dowd, 366 U.S. 717, 728 (1961). (# 41 at 25).

Pretrial publicity can create either presumed prejudice or actual prejudice in a jury pool. Murphy v. Florida, 421 U.S. 794, 803 (1975) (holding that "[p]etitioner has failed to show that the setting of the trial was inherently prejudicial or that the jury selection process of which he complains permits an inference of actual prejudice.") Respondent further states:

> To establish actual prejudice, petitioner must demonstrate "the actual existence of [ ] an opinion in the mind of the juror as will raise the presumption of partiality." Murphy, at 800 (internal quotation marks omitted)(quoting Irvin, 366 U.S. at 723). To show actual prejudice, petitioner must cite to "the voir dire testimony and the record of publicity" for proof of "the kind of wave of public passion that would have made a fair trial unlikely by the jury that was impaneled as a whole." Patton v. Yount, 467 U.S. 1025, 1040 (1984). Merely citing to pretrial publicity or a preexisting knowledge of the facts of the case by jurors is not enough.

(Id. at 25-26). Respondent further contends that federal habeas review in this area is limited because of the deference accorded the trial judge "in assessing the demeanor of jurors as evidence of

the sentiment in the community at large." Patton, 467 U.S. at 1038. (Id. at 26). Respondent adds that, the trial judge, as a member of the community, "is advantaged by his perspective on prevailing sentiments and is thus given broad latitude in conducting voir dire and is afforded considerable deference by the reviewing courts." Citing Mu'Min v. Virginia, 500 U.S. [415], 423 [(4th Cir. 1991)]. (Id.)

Turning to Petitioner's claim that the jury panel in Petitioner's case contained prospective jurors who had already been exposed to the facts of the case through pre-trial publicity, Respondent notes that all of the prospective jurors completed a juror questionnaire, which was reviewed by the trial court and counsel. (# 25, Ex. 11 at 312-313). Based upon responses given in the questionnaires, the trial court excluded 17 out of 45 potential jurors. (Id. at 318-319). Respondent notes that, because of these results, the defense renewed its motion for change of venue, which was denied. The following day, the trial court sat six additional jurors. (# 25, Ex. 12 at 695).

The trial court permitted the parties to conduct individual voir dire. As argued by Respondent, there is no evidence in the record to suggest that any potential juror who admitted to a bias formed from pre-trial publicity was seated; nor is there any evidence to suggest that any juror who was actually biased because of prejudicial pretrial publicity failed to divulge such a

preconceived notion of guilt.  Finally, there is no evidence to suggest that anyone with any actual bias was seated on Petitioner's jury.  (# 25, Ex. 11 at 355-356, 465, 479-482, 486-487; # 25, Ex. 12 at 606-608, 691-692).

Petitioner further claims that a newspaper containing an article about the case that included an admission of guilt by Petitioner was found in the jury room.  Respondent notes that:

> Of the jurors chosen, nine admitted to seeing the newspaper in the jury lounge.  Juror Blackshire stated that she saw the newspaper in the jury lounge but did not read it.  ([# 25, Ex. 11] at 334.)  Juror Frazier testified that the paper was in the jury lounge, but that he did not read it. ([Id.] at 417.)  Juror Petry testified that she had seen the Petitioner's case mentioned on the news "early on," and in the papers, but had not seen the paper the first day of *voir dire*.  ([Id. at 422-23.)  Juror Lanham admitted seeing the morning paper, but was instructed not to read it.  ([Id.] at 459.)  Juror Lacy saw the front page but did not read it.  ([Id.] at 489.)  Juror Kalo testified that he had not seen the paper.  (# 25, Ex. 12 at 577).  Juror Coon testified that he picked up the paper but did not read it.  ([Id.] at 613.)  Juror Slater saw the paper in the jury lounge, but did not read it.  ([Id.] at 634-35.)
>
> Juror Hill admitted that he read the paper the morning of the first day, but stated unequivocally that it would have no effect on his deliberations.  ([# 25, Ex. 11] at 374.)  Neither the defense nor the State objected to him.  ([Id. at 384.)

(# 41 at 21).  Respondent emphasizes that, of all of the potential jurors questioned, only one juror, Juror Hill, admitted to reading the paper, and he was not objected to by either defense counsel or the State.  (Id.)  Respondent cites Strickland v. Lee, 417 F. Supp.2d 557 613 (W.D. N.C. 2007), in which the court held that

"[h]aving knowingly accepted jurors who were exposed to pretrial publicity, Petitioner cannot now complain that these jurors were exposed to pretrial publicity." (Id. at 21-22).

Respondent argues that, before Petitioner can show that the state courts incorrectly applied federal law in this instance, he must demonstrate that, "at the least, there is a real possibility that the jury was tainted and the findings of the habeas court were a misapplication of the federal authority that guarantees defendants the right to a trial by an unbiased jury. He has not." (Id. at 22).

Petitioner's Response attempts to distinguish Strickland v. Lee, which was cited by Respondent, on the basis that it was predicated on the fact that defense counsel therein did not use all of their peremptory challenges. 417 F. Supp.2d at 613 n.58. (# 44 at 16). Petitioner argues:

> In Petitioner's case, defense counsel not only exhausted their challenges, but there was a prolonged discussion by the trial court, the prosecutor, and defense counsel as to whether defense counsel could be afforded two more peremptory challenges. ([# 25, Ex. 12] at 710, 717-720, 757). Furthermore, defense counsel objected to the whole process and panel, and the objections and exceptions were saved. ([Id.] at 710, 713).

> Of the jurors chosen, none [sic; nine] (9) admitted to seeing the newspaper (article) in the jury lounge. Of the nine, [Jurors] Lacy and Coon admitted to either picking it up or seeing the front page, but not reading it. *Juror Hill* admitted to reading the paper and stated that it would not affect his deliberations.

At the very least, three jurors took with them into the jury room <u>prejudicial extraneous information</u>, outside of the evidence admitted at trial. Regardless of the court[']s rehabilitation of these jurors, there was implied bias. The fact that *Juror Hill* or the others stated that they could be impartial does not matter in this instance. (implied bias may be found despite a juror's denial of any partiality) [<u>United States v. Torres</u>, 128 [F.3d][38] at 45 [(2d Cir. 1997)] (. . . where the juror is apprised of such prejudicial information about the defendant . . .) *See* <u>Tinsley v. Borg</u>, 895 F.2d 520, 527-28 ([9th Cir. 1990]).

(# 44 at 12).

Petitioner's Response further states:

The Petitioner contends that the potential jury pool contained too many potential jurors who had already been exposed to extraneous prejudicial facts of the case through the local media and coupled with those jurors that either saw, or like [sic; likely] actually read the prejudicial news article [citation omitted]. ([# 25, Ex. 12] at 532, 648).

Prior to calling the panel, the trial court reviewed the jury questionnaires. Based upon their responses, the trial court excluded 17 out of the 45 potential jurors. [FN 10]. In Petitioner's case the "adverse pretrial publicity" created such a presumption of prejudice in the community that the jurors' claims that they can be impartial should not have been believed so simply out of haste to impanel a jury. <u>Patton v. Yount</u>, 467 U.S. 1025, 1031 (1984).

38% of the jurors were excluded by the trial court without the consent or participation of defense counsel. Indeed, the only indicated African-American male, Mr. Garland Johnson (college educated), was removed from the jury pool without defense counsel having the opportunity to voir dire.

Because of these results, the defense counsel renewed its motion for change of venue. It was again denied. The following day the trial court sat six additional jurors. (Respondent's motion, p. 20). The defense counsel was never given the opportunity to possibly, as was done in so many other jurors,

rehabilitate the only known African-American male.

> [FN 10 - Juror Qualification Report 1997-1999, WV Supreme Court of Appeals, March 2000, p.5.  In 1997, the West Virginia population included 58,095 African-Americans (3.2% of the total).  In 1997, 702 jurors reported their race as African-American (2.0%, p. 8.  Given the undeniable scarcity of qualified African-American[] jurors, if any jurors excluded solely on the basis of their questionnaires were African-Americans, Petitioner would have been harmed by their exclusion by the trial court.]

(_Id._ at 12A).

Petitioner's Response further addresses his claim concerning the denial of his motion for change of venue as follows:

> Respondent contends that all of the jurors who admitted to having a preconceived notion were struck. Defense counsel attempted to remove as many of the jurors as her challenges and strikes allowed.  However, that does not preclude Petitioner's argument nor validate the Respondent's.

> Defense counsel objected to the jury panel ([# 25, Ex. 12 at] 757).  This was an acknowledgment that there were still jurors with preconceived notions that, because there were no more strikes, were left on the jury.  In essence, the trial court (by denying the motion) left defense counsel having to choose between one prejudiced juror and another prejudiced juror.  See _Irwin v. Dowd_, 366 U.S. 717, 728 (1961).

> And further, a defendant is entitled to question the potential jurors on voir dire to determine whether ant [sic; any] of them are unalterably opposed to making a recommendation of mercy in any circumstances in which the verdict of guilt is returned.  The question in [sic] asked by the state in this instance was the _inverse_ of the above.  Defense counsel's silence relative to the predisposition of mercy or not was damaging to the point that the jury had the state saying it wanted the highest sentence, and the defense standing mute.

(_Id._ at 21).

In Petitioner's first habeas corpus proceeding (Case No. 00-MISC-350), the state habeas court addressed Petitioner's claims that he was denied a fair and impartial trial because of the racial makeup of the jury pool and the role of race in jury selection.[9] The state habeas court stated:

> Petitioner contends the prosecutor used its peremptory challenges to exclude African-American jurors from Petitioner's jury and that the jury pool was not representative of the population of West Virginia.
>
> Petitioner first notes the "exclusion" of Garland Johnson, an African-American male, from the jury pool. The record does not reflect that the Prosecution excluded Mr. Johnson from the jury or the jury pool. Mr. Johnson was indeed part of the jury pool. During the jury selection process, the trial court simply did not get to Mr. Johnson before reaching the required number of jurors - twelve, plus two alternates. The Court finds no racial animus behind Mr. Johnson's absence from Petitioner's jury. Furthermore, the Court finds that Mr. Johnson's absence in no way prejudiced Petitioner's case.
>
> Petitioner identifies potential juror Anna Smith, an African-American female, but offers no argument as to why her status as an alternate juror involved improper conduct by the prosecution.
>
> Petitioner objects to the striking of potential juror Crystalle Cyrus, an African-American female. The Court finds that the prosecution offered credible race-neutral reasons for striking Ms. Cyrus. Ms. Cyrus explained that she had been the victim of a rape, that

---

[9] The undersigned notes that Petitioner has not specifically raised a claim concerning racial discrimination in jury selection or the racial makeup of the jury pool in his section 2254 petition. However, such issues were raised in his state habeas proceedings, and arguments made in Petitioner's Response to the Renewed Motion for Summary Judgment (and also by Respondent in the Renewed Motion for Summary Judgment) compel the undersigned to address these issues so that a complete and through review of the state habeas courts' decisions has been made.

she was unhappy about the way the media covered her case, unhappy about the way the Cabell County Prosecutor's Office handled her case, and when asked if she was still angry replied that she had "let go somewhat." The trial court found these reasons to be "nonracial" to the extent Ms. Cyrus remained unhappy with the Cabell County Prosecutor's Office, law enforcement and the judiciary. This Court agrees and finds that Petitioner's contention is unsupported by the record.

The Court finds no evidence of racial animus behind the racial makeup of Petitioner's jury pool. The Court finds the racial makeup of Petitioner's jury pool was simply a phenomenon of random selection of individuals for jury duty and that there were no irregularities in Petitioner's case.

(# 25, Ex. 24 at 7-8). The first state habeas court also found that Petitioner's claim that his Sixth and Fourteenth Amendment rights had been violated by the denial of his Motion for Change of Venue had already been raised in his direct appeal. (Id. at 9).

Under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986) and State v. Marrs, 180 W. Va. 693, 379 S.E.2d 497 (1989), the State cannot use peremptory challenges to exclude jurors of a cognizable racial group to which the defendant belongs. However, if the State gives a credible, non-racial reason for excluding a juror, there is no bar to the use of the peremptory challenge.

In Batson, the Court discussed the burden of proving an equal protection violation on the basis of a peremptory challenge as follows:

As in any equal protection case, the "burden is, of course," on the defendant who alleges discriminatory selection of the venire "to prove the existence of some purposeful discrimination." Whitus v. Georgia, 385 U.S. [545] at 550, 87 S. Ct. [643] at 646-47 (citing Tarrance

63

v. Florida, 188 U.S. 519, 23 S. Ct. 402, 47 L. Ed.2d 572 (1903)).  In deciding if the defendant has carried his burden of persuasion, a court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266, 97 S. Ct. 555, 564, 50 L. Ed.2d 450 (1977). Circumstantial evidence of invidious intent may include proof of disproportionate impact. Washington v. Davis, 426 U.S. [229] at 242, 96 S. Ct. [2040] at 2049.

* * *

Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion. Alexander v. Louisiana, 405 U.S. [625] at 632, 92 S. Ct. [1221] at 1226.  The State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties.  See Alexander v. Louisiana, supra, 405 U.S., at 632, 92 S. Ct., at 1226; Jones v. Georgia, 389 U.S. 24, 25, 88 S. Ct. 4, 5, 19 L. Ed.2d 25 (1967).  Rather, the State must demonstrate that "permissibly racially neutral selection criteria and procedures have produced the monochromatic result." Alexander v. Louisiana, supra, at 632, 92 S. Ct., at 1226; see Washington v. Davis, supra, 426 U.S., at 241, 96 S. Ct., at 2048.

476 U.S. 79, 93-94 (1986).

In the instant case, African-Americans were not systematically excluded from Petitioner's petit jury venire and only one African-American juror was peremptorily removed from the panel.  The State provided a racially neutral reason for its decision to strike the one African-American juror.  Thus, based upon both direct and circumstantial evidence in the record, it does not appear that the State purposefully struck the juror because of her race.

Accordingly, to the extent that Petitioner is attempting to raise such a claim in his section 2254 petition, the undersigned

proposes that the presiding District Judge **FIND** that Petitioner has failed to demonstrate that the State's use of a peremptory challenge to strike an African-American juror violated his right to equal protection of the law under the Fourteenth Amendment to the United States Constitution.  Nor has Petitioner demonstrated any violation of his Fourteenth Amendment rights based upon the racial makeup of the jury pool.

In Petitioner's second state habeas proceedings (Case No. 02-MISC-232), the state habeas court took evidence on the jury selection and pre-trial publicity issues during the omnibus habeas corpus hearings and held:

1.    Pursuant to West Virginia Code § 62-3-3 the petit jury was selected from a lawful amount of qualified jurors.  Further, Judge Recht made this finding pursuant to <u>State v. Derr</u>, 192 W. Va. 165, 451 S.E.2d 731 (1994).

2.    Judge Recht qualified four (4) alternate jurors. Additionally, he took measures to ensure that they would not know until after the completion of the evidence if they were alternates.  There is nothing in the record to prove that trial counsel received additional strikes for cause in exchange for the defendant waiving his rights.

3.    There was certainly pre-trial publicity about this matter.  However, defense counsel only objected to Jurors Kalo, Petry, and Nixon.  Each juror responded to the jury questionnaire and was subject to cross examination in individual voir dire. Judge Recht found all petit jurors to be qualified and free of bias.  Judge Recht did not abuse his discretion in finding that the jurors were free from taint.

4.    There is no evidence to suggest that the newspaper article affected any juror in deciding the facts of

this case.   Counsel for defendant moved the Court
to continue this trial because of the discovery of
the news article.   Judge Recht, however, did not
abuse his discretion in denying that motion.
Additionally, trial counsel did not object to any
jurors, on this basis, once they were selected on
the panel.

* * *

6.   Judge Recht allowed for individual voir dire.
Additionally, Judge Recht allowed a jury
questionnaire.   Judge Recht oversaw the jury
selection process.   Judge Recht did not abuse his
discretion pursuant to State v. Woodlridge, 129 W.
Va. 448, (1946), by not granting a change of venue.

(# 25, Ex. 23 at 1-2).

Standing alone, juror exposure to media coverage concerning a
defendant's charges does not presumptively deprive the defendant of
due process.   Murphy v. Florida, 421 U.S. 794, 799 (1975).
Moreover, courts will presume that jurors will follow the court's
instructions, including the admonishment to avoid any media
coverage of the trial.   Jones v. United States, 527 U.S. 373, 394
(1999).   Prejudice may be presumed, however, when pre-trial and
mid-trial publicity is so invasive that the setting of the trial
becomes "inherently prejudicial."   Id. at 803; see also Sheppard,
384 U.S. at 352, 363.

While there was a great deal of media coverage concerning
Petitioner's arrest and his trial, each of the potential jurors was
individually questioned about their knowledge of the case based
upon media coverage, in particular their alleged exposure to the
newspaper article that was found in the juror lounge.   None of the

66

potential jurors who remained on the jury admitted under oath that they had formed any bias based upon the media coverage.  Thus, Petitioner has not demonstrated any inherent prejudice.

Petitioner has not provided clear and convincing evidence to rebut the presumption of correctness of the State habeas courts' findings.  Petitioner has not shown that his conviction was fundamentally unfair because of prejudicial media exposure. Moreover, Petitioner has failed to demonstrate that any outside source had a substantial and injurious effect or influence on the jury's verdict.  Furthermore, because there was no prejudice to Petitioner's defense from pre-trial publicity, there was no prejudice from the failure to grant a change of venue.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the state courts' denial of habeas corpus relief on these grounds was contrary to, or an unreasonable application of, clearly established federal law. The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Grounds Two and Four of Petitioner's section 2254 petition.

### C.   Ground Three - Failure to sever unrelated counts.

In Ground Three of his section 2254 petition, Petitioner contends that the trial court erred when it failed to sever unrelated counts for trial and, consequently, denied Petitioner's rights to due process and a fair trial as guaranteed by the Sixth

67

and Fourteenth Amendments to the United States Constitution.  (# 1-
2 at 8).  Petitioner's petition further states:

> There were two separate charges/counts of kidnaping
> in this case.  Petitioner moved the trial court for an
> order to sever these counts as they were unrelated.  The
> one count was on January 20, 1997 (Jay Ming Chu) and the
> other on January 21, 1997 (Julia Leopold).  Each count
> involved different victims, on different dates, under
> different circumstances.

> Jay Ming Chu never filed a complaint with police
> regarding a kidnaping or any other crime.  The
> Charleston, WV police contacted her only after a woman
> who had taken petitioner's and Ms. Chu's information saw
> petitioner on television being charged with other crimes.
> On the afternoon of January 20, 1997, petitioner was at
> the Morton Travel Plaza.  Ms. Chu had pulled into the
> plaza and petitioner asked her if she could give him a
> ride to Charleston.  After some further conversation (Ms.
> Chu is of Asian descent and spoke little English), she
> agreed to drop him off if he would go into the plaza and
> give the reception their identification information.
> Both petitioner and Ms. Chu went into the travel plaza
> together and approached the reception area.

> Ms. Chu told the reception area attendant that she
> was giving petitioner a ride and since she did not know
> petitioner, they would be giving her their identification
> information to ensure that everything would be on the up
> and up.  Petitioner, who was in the United States Marine
> Corp, gave his Military I.D. and Ms. Chu gave her
> information also.

> After dropping off Petitioner, Ms. Chu called back
> to the Morton Travel Plaza and informed attendant that
> everything was fine and she proceeded to school
> ([Marshall] University).

> Petitioner wanted to testify to these facts, but was
> unable to when trial court denied motion and failed to
> sever the charges.  With the kidnaping counts being
> joined, petitioner was unable to exercise his
> Constitutional rights.  Trial court left petitioner
> having to testify in regards to all charges or none.  The
> evidence and facts surrounding the charges in the Chu
> count versus the Leopold count warranted the counts to be

severed.  Defense made this point abundantly clear.
(# 1-2 at 8).

Respondent's Memorandum of Law in support of his Motion for
Summary Judgment asserts that Petitioner's claim in Ground Three
fails to assert a federal due process violation.  Respondent
contends that "[t]he Supreme Court has never held that a unitary
trial on separate charges is a violation of due process.  Moreover,
without demonstrating how the joinder of the charges resulted in
the violation of due process, this claim amounts to no more than a
challenge to a trial court ruling and the State's mandatory joinder
rule. [Footnote omitted].  (# 41 at 22).

Respondent then addresses the West Virginia mandatory joinder
rule in light of due process considerations:

> In West Virginia joinder is mandatory: "A defendant shall
> be charged in the same indictment in a separate count for
> each offense, if the offenses charged, whether felonies
> or misdemeanors or both, are of the same or similar
> character, or are based on the same act or transaction,
> or are two or more acts or transactions connected
> together or constituting parts of a common scheme or
> plan." Syl. Pt. 1, <u>Watson v. Ferguson</u>, 166 W. Va. 336,
> 274 S.E.2d 440 (1980).
>
> However, demonstrating improper joinder under state
> law is not sufficient to obtain federal habeas relief.
> Petitioner must show how the joinder of the offenses
> "result[ed] in prejudice so great as to deny . . . his .
> . . right to a fair trial." <u>United States v. Lane</u>, 474
> U.S. 438, 446 n.8 (1986).
>
> In <u>Lane</u>, the Supreme Court held that "[i]mproper
> joinder does not, in itself, violate the Constitution."
> <u>Id.</u> at 446 n.8.  "Rather," the Court indicated,
> "misjoinder would rise to the level of a constitutional
> violation only if it results in prejudice so great as to

69

deny as defendant his Fifth Amendment right to a fair trial." "Actual prejudice" means that the error "has 'a substantial or injurious effect or influence in determining the jury's verdict.'" Id. (quoting Brecht v. Ambrahamson, 507 U.S. 619, 637 (1993)). To show that the joinder of offenses prejudicially influenced the verdict, Petitioner must show how the joinder of charge[s] acted to bolster the convictions. United States v. Rox, 692 F.2d 453, 454 (6th Cir. 1982). ("A defendant is prejudiced if the jury would be unable to keep the evidence from each offense separated and unable to render a fair and impartial verdict on each offense.") "By allowing joinder of offenses, the possibility exists that a jury may use the evidence of one of the charged crimes to infer a general criminal disposition by the defendant; the jury also may confuse or cumulate the evidence of the various criminal charges." Davis v. Coyle, 475 F.3d 761, 777 (6th Cir. 2007).

In order to prevail under the federal standards on this issue, Petitioner must show how there was insufficient evidence to sustain each conviction without evidence from the other charges. Petitioner must show that the evidence of each charge prejudicially bolstered the evidence of the others. Until Petitioner does so under the controlling precedent on this issue, this claim amounts to no more than a challenge to West Virginia's mandatory joinder rule and that cannot form the basis for federal relief.

(Id. at 23-24).

Respondent asserts that, based upon the evidence presented at trial, a rational juror could have convicted the Petitioner of kidnapping Ms. Chu, notwithstanding any other evidence presented on the other offenses. Specifically, Respondent states that the evidence demonstrated that Petitioner approached Ms. Chu's vehicle and threatened her with a gun. (# 25, Ex. 13 at 1056). When Ms. Chu tried to leave, Petitioner put his hand inside the car and shifted the car into park, and then forced his way into the car.

70

(Id.)   When Ms. Chu asked to see the gun, Petitioner produced a tire iron, which intimidated Ms. Chu.   (Id. at 1057, 1059).   She stated that she felt trapped in her own car.   (Id. at 1058). Respondent adds that Ms. Chu's testimony was corroborated by her friend Helen Shapira, who described Ms. Chu as "very upset and looked as if she was shaken up scared."   (Id. at 10-79-1084).

Petitioner's Reply also cites the Lane case, and argues that he has established that the misjoinder of the Chu kidnapping counts with the Leopold counts resulted in undue prejudice that denied him a fair trial.   Petitioner states:

> In the Jay Ming Chu case a single Asian-American adult female student was persuaded to give Petitioner a ride to Charleston.  Ms. Chu was not injured.  Petitioner and Ms. Chu gave their true identities to a turnpike employee prior to departing the turnpike plaza.   Upon arrival in Charleston, Ms. Chu called the turnpike plaza employee and confirmed her safe arrival at her destination.   There was no basis to challenge Ms. Chu's identification of Petitioner as the individual who accompanied her on January 20, 1997.
>
> In the case of Ms. Leopold, a married Caucasian adult female was transported for "several seconds" across an urban parking garage.  Ms. Leopold sustained physical injuries and was robbed.  Her vehicle was in Petitioner's possession when he was arrested.  There was a substantial basis to challenge Ms. Leopold's identification of Petitioner as here [sic; her] assailant due to the diagnosis of retrograde amnesia.  (Tr. _____) [Citation left blank by Petitioner].  Petitioner would submit that the evidence supporting criminal conviction, i.e., larceny, in the Leopold case was stronger that [sic; than] the evidence supporting a criminal conviction in the Chu case.
>
> Therefore, the state courts disregarded established federal law when they failed to consider the prejudicial spillover of the evidence in the Leopold case into the

Chu case.  See <u>Davis v. Woodford</u>, 384 F.3d 628, 638 (9th Cir. 2004).  If all of the evidence presented in the consolidated trial would have been cross-admissible in separate trials, perhaps joinder [of the] charges would have been acceptable on the grounds of judicial economy, however, it was not.  There was the realistic and palpable danger that the weak case against the defendant in the Chu case (the one Petitioner would have testified in) would be prejudiced by the stronger case against Petitioner in the Leopold case.

However, while Petitioner was charged with two kidnappings (a crime against the person), Petitioner was also charged with malicious assault (a separate crime against the person) and first degree robbery (a separate crime against the person).  The presumption of the defendant's innocence in the state's prosecution in the Chu count was severely prejudiced by introduction of evidence of the alleged robbery and assault of Ms. Leopold.

One test of whether the jury was able to compartmentalize evidence related to the Chu count and the evidence related to the three other crimes is if the jury has rendered disparate verdicts in relative to Chu and acquittals or convictions of lesser included offenses in the Leopold case; such results might mitigate Petitioner's claim of prejudicial joinder.  See <u>Park v. California</u>, 202 F.3d 1146, 1148, 1150 (9th Cir. 2000)(Court held consolidation of two sets of crimes at petitioner's state trial did not violate his due process rights where the jury acquitted him on two counts and the cases were not weak.)

(# 44 at 13-15).

Petitioner asserts that the jury's imposition of a life sentence on the Chu kidnapping count demonstrates prejudice caused by the joinder of this count to the Leopold counts because such a sentence was "greatly disproportionate" to the circumstances of the offense.  (<u>Id.</u> at 15).

In <u>United States v. Foutz</u>, 540 F.2d 733 (4th Cir. 1976), the United State Court of Appeals for the Fourth Circuit addressed a claim of undue prejudice from the joinder of claims in a federal criminal trial under Rule 8(a) of the Federal Rules of Criminal Procedure.  Federal Rule 8(a) also contains language that allows the joinder of charges that constitute part of "a common scheme or plan."  The <u>Foutz</u> opinion states in pertinent part:

> When two or more offenses are joined for trial solely on this theory, three sources of prejudice are possible which may justify the granting of a severance under Rule 14: (1) the jury may confuse and cumulate the evidence, and convict the defendant of one or both crimes when it would not convict him of either if it could keep the evidence properly segregated [footnote omitted]; (2) the defendant may be confounded in presenting defenses, as where he desires to assert his privilege against self-incrimination with respect to one crime but not the other [footnote omitted]; or (3) the jury may conclude that the defendant is guilty of the other because of his criminal disposition.  As we view the record, we are concerned here with the latter form of prejudice.

> \* \* \*

> One inevitable consequence of a joint trial is that the jury will be aware of evidence of one crime while considering the defendant's guilt or innocence of another.  If the rationale of the "other crimes" rule is correct, it would seem that some degree of prejudice is necessarily created by permitting the jury to hear evidence of both crimes. [Citations omitted].

> Although the law does not allow consideration of other crimes as evidence of a defendant's criminal disposition, evidence of other crimes is admissible for certain other purposes because its probative value is then thought to outweigh its prejudicial effect.  In those instances where evidence of one crime is admissible at a separate trial for another, it follows that a defendant will not suffer any additional prejudice if the two offenses are tried together [footnote omitted].

73

* * *

> When offenses are joined under Rule 8 on the ground that
> they "are based on the same act or transaction or on two
> or more acts or transactions connected together or
> constituting part of a common scheme or plan," it is
> manifest that evidence of one offense would ordinarily be
> admissible at a separate trial for the other.

540 F.2d at 736.

The state habeas court addressed this claim in its order denying Petitioner's second habeas corpus petition (Case No. 02-MISC-232). The court simply held that "Judge Recht did not error by not severing the two kidnapping counts." (# 25, Ex. 23 at 2). At a pre-trial hearing held on July 24, 1997, the trial court conducted an evidentiary hearing pursuant to State v. McGinnis, 455 S.E.2d 516 (W. Va. 1994) on the defendant's motion to sever the charges.

At the hearing, the State presented five witnesses who were able to connect Petitioner's movement from North Carolina, when Petitioner stole a vehicle and some clothing from Scott McLamb, to West Virginia, where Petitioner wrecked the McLamb vehicle. Petitioner apparently had to change a tire on the vehicle, but was able to drive the car to the Morton Travel Plaza. Once at the Morton Travel Plaza, the witnesses demonstrated that Petitioner allegedly coerced Jay Ming Chu to give him a ride to Charleston. During the course of the trip, Petitioner showed Ms. Chu that he had a "metal pole." Ms. Chu dropped Petitioner off in Charleston, where the following day, Julia Leopold was attacked by what she

74

described to the investigating officer as "a tire tool."

The witnesses further demonstrated that Petitioner was found in Chicago the next day in the possession of Ms. Leopold's vehicle and wearing the clothing that had been taken from Scott McLamb. Although no tire iron was ever located that could be connected to the crimes, Mr. McLamb testified that a tire iron was missing from his car which was abandoned by Petitioner at the Morton Travel Plaza.

Unfortunately, because only a partial transcript from the hearing on July 24, 1997 was produced, there is no ruling on the motion to sever placed on the record before the court; nor is there a written order. However, the prosecutor previously proffered that the various charges against Petitioner "are part of a common scheme or plan and are so connected that should they be severed, I would have to call the witnesses as to that count in the presentation of my case in chief in this case." (# 51, Ex. 30 at 27). The undersigned assumes that the trial court denied the motion to sever on this basis.

It is not the province of this court to re-examine the evidence and determine whether the incidents were more similar or dissimilar, and whether the interpretation that these charges constituted a common scheme or plan was correct. Rather, this court must merely determine whether the decisions of the state courts were contrary to, or an unreasonable application of, clearly

75

established federal law.  Under the rationale discussed in <u>Foutz</u>,
Petitioner has not demonstrated that the trial of these incidents
together unduly prejudiced him or was fundamentally unfair.

The undersigned proposes that the presiding District Judge
**FIND** that Petitioner has failed to demonstrate a violation of his
due process rights based upon the trial court's failure to sever
the Chu kidnapping count from the remaining counts at his trial.
The undersigned further proposes that the presiding District Judge
**FIND** that the state courts' decisions denying Petitioner habeas
corpus relief on this basis were neither contrary to, nor an
unreasonable application of, clearly established federal law, and
that Respondent is entitled to judgment as a matter of law on
Ground Three of Petitioner's section 2254 petition.

**D.   Ground Five - Failure to grant continuance.**

In Ground Five of his section 2254 petition, Petitioner
contends that the trial court erred in the denial of Petitioner's
right to due process of law as guaranteed by the Sixth and
Fourteenth Amendments to the United States Constitution when it
failed to grant a continuance due to late disclosure of evidence.
(# 1-2 at 9).  The petition further states:

> During pre-trial proceedings the week of the
> commencement of trial, petitioner discovered that police
> officer from Chicago, Illinois who assisted in the arrest
> of petitioner, claimed that the petitioner confessed
> to the Leopold robbery and assault.  This revelation was not
> contained in any discovery material provided to the
> defense.  The defense set up to that point was based
> solely on the theory that petitioner did in fact steal

76

the Leopold vehicle, but did not kidnap or assault
Leopold.

After the revelation of this "confession," trial
counsel moved for a continuance to conduct further
investigation. Motion was denied. To further exacerbate
the trial court's violation of petitioner's
Constitutional rights, the police officer testifying,
after being cross-examined by defense was asked if he
were sure that a "confession" was given by petitioner, *he
stated he was **unsure**. After being asked if there were
any notes, documents, or other material noting supposed
confession he said no; and stated he never discussed
supposed confession with anyone else to that point. Even
the prosecution feigned surprise.

Trial court allowed the spurious allegation,
ignoring the fact that the prejudicial value far
outweighed the probative in light of the evidence.

(Id.) [Emphasis in original].

Respondent's Memorandum of Law in support of his Motion for

Summary Judgment asserts that:

[A] trial court's denial of a continuance rises to the
level of a constitutional violation only where there is
"an unreasoning and arbitrary 'insistence upon
expeditiousness in the face of a justifiable request for
delay'" Morris v. Slappy, 461 U.S. 1, 11-12
(1983)(quoting Ungar v. Sarafite, 376 U.S. 575, 589
(1964)); "There are no mechanical tests for deciding when
a denial of a continuance is so arbitrary as to violate
due process. The answer must be found in the
circumstances present in every case, particularly in the
reasons presented to the trial judge at the time the
request is denied." Ungar, 376 U.S. at 589. "Second, to
be entitled to relief, the defendant must establish that
the trial court's erroneous ruling prejudiced his
defense." Hill v. Ozmint, 339 F.3d 187, 197 (4th Cir.
2003) citing United States v. Colon, 975 F.2d 128, 130-31
(4th Cir. 1992). "Actual prejudice may be demonstrated
by showing that additional time would have made relevant
witnesses available or otherwise [would have benefitted]
the defense." Powell v. Collins, 332 F.3d 376, 396 (6th
Cir. 2003).

(# 41 at 27-28).   Respondent then addresses the trial court's denial of the motion to continue in Petitioner's case:

> In the case-at-bar the Petitioner claims that two Chicago policemen claimed that Petitioner confessed to the Leopold robbery and assault.  During a December 1, 1997 [FN 9] pretrial hearing Chicago plain-clothes officer Peter Trinidad testified that the Petitioner had told him that he had been smoking crack cocaine for six months, and had taken a lady's car.  He then stated, "Boy, I'm in trouble now, I'm in trouble now." ([# 25, Ex. 10] at 261.)  The State was not aware of the Petitioner's statements until Office Trinidad's testimony.  ([# 25, Ex. 12] at 769, 771.)  Officer Trinidad's testimony was corroborated by Officer Gino Ciardullo.  ([# 25, Ex. 13] at 812-813.)  Neither officer kept written notes.  This was the first time defense counsel or counsel for the State heard this evidence.  Defense counsel moved to continue the trial.  ([# 25, Ex. 12] at 757, 763-64, 773.)

> The trial court denied Petitioner's motion to continue, finding that the defense now had the statements, and that the officers would be made available for interviews.  ([# 25, Ex. 12] at 773-74, 776; [# 25, Ex. 13] at 959-60, 968-69.)

> The trial court's ruling was eminently reasonable.  The Petitioner cannot demonstrate prejudice, nor can he claim that the trial court's ruling made his trial fundamentally unfair.  The trial court is afforded substantial deference in these matters, and this Court's decision was well within the bounds of his discretion.

> [FN 9 - Petitioner's counsel began picking a jury on December 2, 1997; his trial began on December 4, 1997.]

(Id. at 28-29).

Petitioner's Response on this claim states:

> Respondent contends that Petitioner has demonstrated no prejudice relative to the failure to grant a continuance.  In making the decision of whether or not Trinidad's and C[i]ardullo's surprise statement[s], almost a year after the alleged crime, would be "substantially justified" or "harmless," the court only

78

performed, what could be termed, a snap-judgment with no consideration of prejudice or trustworthiness.

(# 44 at 21).

Petitioner's Response incorporates arguments he made in a Response to Respondent's original Answer and Motion for Summary Judgment, which was withdrawn.    (# 34).    In that document, Petitioner argued that the late disclosure of his alleged "confession" to the officers in Chicago created issues that were not adequately addressed in the brief period of time the defense had to prepare for trial without a continuance.    Petitioner's original Response states in pertinent part:

> The officers['] testimony regarding Miranda warnings could not be challenged (the first officer, Klups, Mirandized Petitioner, it was here that this Petitioner first asserted his right to remain silent and in the cruiser asked if he could make a call once at the station.   However, officer Klups was not available at trial to deny or concur).   Petitioner had a right to confrontation since Trinidad and Ciardullo [were] allowed to offer testimony as truth of the matter asserted related to what did or did not transpire while Petitioner was in Klups' custody. See, <u>Crawford v. Washington</u>, 541 U.S. 36, 68 (2004).   See, <u>Miranda v. Arizona</u>, 384 U.S. 436, 467 (1966).[10]

(# 34 at 26).

---

[10]   The undersigned notes that Petitioner has not and cannot raise issues concerning confrontation in this section 2254 proceeding because he did not exhaust such claims in his state proceedings.   The undersigned reads this argument to be made in support of his claim that his counsel did not have time to properly prepare a defense concerning his alleged confession without a continuance.   Petitioner also mentions <u>Miranda</u>.   Petitioner has separately raised a claim concerning the admissibility of his statements to the Chicago police, which will be addressed <u>infra</u>.

Petitioner's initial Response further asserts that his defense counsel and investigator did not have adequate time to prepare to address the issues that arose because of the late disclosure of Petitioner's alleged confession.   Petitioner's initial Response further states:

> As this Court and others are more than aware, "A defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." See Bellegue v. Moore, 574 F.2d 1092 (9th Cir.).   The State was allowed to use alleged inculpatory statements stemming from custodial interrogation of the Petitioner without having to demonstrate the use of procedural safeguards effective to secure the privilege against Petitioner outside of the officers['] testimony (neither of which documented or recorded these statements nor informed the State until December 1).   Moreover, defense counsel could not reasonably rebut any of the alleged, inflammatory, statements or purported confession through key witnesses due to the denial of the motion.

> Petitioner suffered the ultimate price for the court's unreasonable denial.   The ability of counsel to interrogate the witnesses can never suffice, it is [not] the same as being able to investigate other witnesses who were present and then reasonably rebut the testimony. What the trial court did was accept spurious testimony (in light of the circumstances) and allow for prejudicial and injurious evidence that only went to present what was tantamount to bad acts.

> The habeas court's decision was unreasonable in light of clearly established federal law, and Petitioner respectfully requests that the Respondent's motions be denied on this and further proceedings be held.

(Id. at 27).

Petitioner's Response to the Renewed Motion for Summary Judgment further addresses this claim as follows:

In So. States Rack & Fixture, Inc. v. Sherwin-Williams, Co., 318 F.3d 592, 596 (4th Cir. 2003), the 4th Circuit

80

outlined five factors that should go into any
determination of late disclosed evidence, especially when
it is potentially prejudicial to a defendant:

> (1) The surprise to the party against whom the
> evidence would be offered; (2) the ability of
> the party to cure the surprise; (3) the extent
> to which allowing the evidence would disrupt
> the trial; (4) the importance of the evidence;
> and (5) the nondisclosing party's explanation
> for failure to disclose the evidence.

Id. at 597.

(# 44 at 22).  The Response further states:

> Defense counsel was told that they could now, almost
> a year later, cure the surprise by talking to the
> officers.  Defense counsel moved to continue and the
> motion was denied.  In light of the circumstances and the
> gravity of the alleged "confession," the denial of a
> continuance was unreasonable and prejudiced Petitioner
> (it was after this hearing the news article blaring
> Petitioner confessed showed up in the jury room).  It was
> a domino effect.
>
> Counsel for Petitioner could not reasonably be
> tasked to readjust, possibly, her whole case relative to
> this late surprise.  There should have been a hearing
> relative to the trustworthiness and voluntariness of the
> supposed "confession" considering the circumstances,
> where the probative versus the prejudicial factors could
> be better attained.
>
> The jury was allowed to consider this prejudicial,
> and highly suspect alleged "confession."  This testimony,
> probatively, was not necessary, and only served to
> further prejudice the jury against Petitioner.  Indeed,
> after cross-examination, officer Trinidad actually stated
> that he had doubt as to whether or not Petitioner
> actually confessed to him (Tr., p. 1343). [FN 14].
> However, the damage had been done.
>
> [FN 14 - See also, (Tr. pgs. 744, 745, 1341-43, 1388-89,
> 1397-98).]
>
> The trial court's denial of a continuance raised to
> the level of a constitutional violation when [it] made

its "unreasonable and arbitrary 'insistence upon
expeditiousness in face of a justifiable request for
delay'," made by defense counsel.  Even though the State
was proceeding along without this alleged "confession,"
the trial court did not want the State to be burdened
since they had their witnesses available and opted to
essentially allow the jury to determine what he should
have himself looked into; prejudicing the Petitioner
through allowing the spurious allegations to go before
the jury.

(Id. at 18).

In his second state habeas corpus proceeding, the state habeas

court made the following findings on this claim:

7.   The State and the defendant first learned of the
alleged admission to Officer Trinidad on December
1, 2007.  The officer in question did not testify
at trial until December 5, 1997.  The Officer was
present, under subpoena, in Charleston, West
Virginia during those four (4) days.  The State
announced it would offer the officer available to
the defense.  The Petitioner failed to present
evidence on how the denial of the motion to
continue to prejudiced their rights at trial.
Judge Recht agreed on tt. p. 968-969.

(# 25, Ex. 23 at 2).

All of the officers from Chicago who were available to testify

were present in Charleston from the day of the disclosure by

Officer Trinidad of Petitioner's alleged verbal "confession" to

taking the vehicle from a "lady" in Charleston, to the time that

they testified at the trial, four days later.  Thus, Petitioner's

counsel had ample time to try to interview the officers and prepare

their defense in light of this evidence.  Petitioner has

demonstrated no actual prejudice from the late disclosure or

failure to continue the trial in light thereof.

82

Officer Trinidad first mentioned Petitioner's statement in a pre-trial hearing concerning the admissibility of evidence regarding Petitioner's flight to Chicago. Trinidad testified as follows:

A. . . . He was told that it was taken from an aggravated robbery which -- he was told what actually happened with a woman here who was beaten. My partner told me what happened, and from that, I asked him specific questions to the subject.

Q. And can you tell us what you asked and what the responses were?

A. I asked, "Were you in West Virginia?" He said, "Yes." I said, "Were you with anybody?" He said, "Yes, I was, with a friend." I believe the name that he gave was Style.

I then asked "Who is Style?" Then he looked at me and he said, "I'm lying. I was by myself." I then asked him, "What happened in West Virginia?" He started -- at that time he put his head down and really started crying, and he started making statements as if, "I didn't mean to do it." I then asked, "What do you mean by that, mean to do what?"

He says, "I've been using crack cocaine for six, seven months." At that time, I was trying to be very sentimental to him. I said, "Okay, you've been using it for six, seven months, I understand. What happened in West Virginia?"

He said, "Well, I took the vehicle from this lady." I go, "What lady is this?" He says, "Just from a lady," and he started crying, and he was very, very emotional.

And then he said -- as he put his head down and he was rolling his knees and his feet, he says, "Boy, I'm in trouble now, I'm in trouble now," crying at the same time. At that time, I asked him, "What's on your pants?" He said, "There's blood on my pants."

83

> I said, "How did you get blood on your pants?"  He
> said, "I was hitchhiking to West Virginia, and
> somehow I fell -- I fell off the side of the road
> and there were some very sharp bushes that were in
> the bottom of the road and I fell into the bushes."
> And I said, "Well, you must have cut yourself.  Or
> did you?"  He says, "Yes, I did."
>
> At that time, I had information that whoever took
> this vehicle was involved in an aggravated robbery
> as far as beating a woman.  I knew that much.  At
> that time, I asked him, "Did you beat a woman in
> West Virginia?"  He cried even more, even louder.
>
> His response was, "I don't know if I did or not.
> I've been high for the past three days."

(# 25, Ex. 10 at 260-262).

Officer Trinidad's partner, Officer Ciardullo, also testified in the pre-trial hearing.  He confirmed that Petitioner answered "Yes" to the question "Did you take this car from a lady?"  (# 25, Ex. 13 at 812).  Officer Ciardullo added that, when asked by Trinidad if he had hit a lady and had taken this car, he seemed "remorseful" and was "putting his head down like in awe or in shame maybe, in my opinion."  (Id.)  Officer Ciardullo further stated that he spoke with Petitioner himself and told him that "The lady was okay, she's in the hospital, she's fine and the baby is fine." Petitioner then apparently asked "Is the baby okay?"  (Id. at 813).

Clearly these statements were damaging to Petitioner.  The evidence of record from the pre-trial hearing indicates that both the prosecuting attorneys and the defense were surprised by this information, which had not been included in any written reports or materials disclosed in the discovery produced by the State.

84

At trial, the evidence presented about the alleged admission was much more limited than at the pre-trial hearing.  Officer Trinidad told the jury that, after being confronted with his military identification, which had been found in a wall at the house where Petitioner had parked the Leopold vehicle, Petitioner was asked by Officer Trinidad if he took the car from West Virginia, and Petitioner said, "Yes, I did take it from West Virginia." (# 25, Ex. 14 at 1336-1337).  Officer Trinidad further testified that he then asked Petitioner if he took it from a specific person and Petitioner responded "I took it from a lady." (Id. at 1337).  Officer Trinidad further testified that Petitioner was "very emotional, crying most of the time." (Id.)  Officer Ciardullo merely confirmed that Petitioner said "Yes" to the question "Did you take the car?" (Id. at 1377, 1389).

From the undersigned's review of the record, noone other than Officers Trinidad and Ciardullo were present at the time these statements were made by Petitioner.  Thus, other than attempting to interview these officers, Petitioner has not offered any other evidence he believes could have been developed to assist his defense, had a continuance been granted.  Furthermore, the trial record demonstrates that defense counsel thoroughly cross-examined both officers on the fact that this alleged admission by Petitioner was not placed in any written report and called into doubt whether Petitioner actually responded as they stated.  Therefore,

Petitioner has not demonstrated any actual prejudice from the failure of the trial court to grant his motion for a continuance.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has failed to demonstrate a violation of his due process rights based upon the trial court's failure to grant a continuance after the late disclosure of Petitioner's purported confession to police officers in Chicago. The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this basis were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Five of the petition.

> **E.   Ground Six - Failure to suppress Petitioner's statements.**

In Ground Six of Petitioner's section 2254 petition, Petitioner contends that his right to due process of law and a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated when the trial court failed to suppress statements purportedly made by Petitioner. Petitioner's petitioner states:

> At a pre-trial hearing scheduled to determine whether statements allegedly made by the petitioner to arresting authorities in Chicago, Illinois [were admissible], there was evidence to support the petitioner's claim of excessive drug use and lack of sleep prior to making any such statements to authorities in Chicago, Illinois. The "supposed" confession should have been suppressed.

(# 1-2 at 10).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment addresses this claim as follows:

So long as Petitioner was properly advised of his constitutional rights before making the incriminating statements introduced at trial, none of [his] constitutional rights were violated. Petitioner was *Mirandized* by Chicago Police Officers Michael Skoraczewski ([# 25, Ex. 10] at 212-15), John Dowling ([Id.] at 237, 254-45), Peter Trinidad ([Id.] at 257, [# 25, Ex. 13] at 810), and Detective Thomas Benoit [FN 10 - Detective Benoit *Mirandized* Petitioner twice. ([# 25, Ex. 13] at 874).] ([# 25, Ex. 13] at 867, 874-75). Nor was he denied access to a lawyer. ([Id.] at 898.) When he told Detective Benoit that he had nothing else to say, questioning ceased. ([Id.]) Indeed, the trial court suppressed Petitioner's second statement to Detective Benoit on prompt presentment grounds. [FN 11 - The Petitioner made the second statement to Detective Benoit twenty-five hours after he was arrested. ([Id.] at 976.)] ([Id.] at 978-79.)

In reviewing this issue, the State court's factual conclusions are entitled to a presumption of correctness if supported by the record, while the ultimate conclusion that a confession was voluntary is subject to independent federal review. Miller v. Fenton, 474 U.S. 104, 116-17 (1985); Correll v. Thompson, 63 F.3d 1279, 1290 (4th Cir. 1995).

The habeas court noted in its findings on ineffective assistance of counsel, that there was no evidence presented at the suppression hearing that Petitioner was under the influence of drugs or alcohol when he gave his confession. The habeas court noted that the officers who took the statements testified at the hearing that they did not detect an odor of alcohol or observe indications of drug abuse. According to the habeas court, the officers testified that Petitioner was alert and coherent during his confession. Because Petitioner does not claim his confession was coerced or otherwise taken in violation of controlling federal precedent, the habeas court's findings are sufficient to defeat this claim as Petitioner cites to no evidence other than his self-serving assertions, that he was incapable of giving an informed confession. ([# 25, Ex. 13] at 968.)

The record and the habeas court's findings controvert this claim.

(# 41 at 29-30).

Petitioner's Response contends that his defense was prejudiced by the admission of his statements to the Chicago police. He states:

> Petitioner contends his free will in this situation was constrained by his lack of sleep, excessive drug use just prior to his arrest, and the tag-team interrogation by detective Benoit, Trinidad, Dowling, Cardullo, and Skoraczewski over a sustained period. (Tr. _____). The Respondent does not acknowledge the pretrial hearing where this evidence came out and placed before the trial court. (Tr. _____).

> Ultimately the question is "whether, under the totality of the circumstances, a challenged confession was obtained in a manner compatible with the requirements of the Constitution." Miller v. Fenton, 474 U.S. 104, 112, 106 S. Ct. 445, 88 L. Ed. 405 (1985). Whether a suspect knowingly and intelligently waives his rights and whether his statement were voluntarily are questions of law. Id., at 115.

> The Miller Court asserted that whether a confession is [voluntary?] under the Fourteenth Amendment is a question of law and a state court's finding of fact is not entitled to a presumption of correctness. Also, jury cannot be assumed to have reliably found a confession voluntary where it also determines its truthfulness.

> Indeed, the trial court never held a hearing to look into its truthfulness or if it was voluntary. It left to the jury the question of truthfulness and voluntariness (Tr. _____).

(# 44 at 24) [Transcript citations left blank by Petitioner].

This claim was addressed, in some form, in both of Petitioner's state habeas proceedings. In the first case (Case No. 00-MISC-350), Petitioner challenged the performance of his trial

88

counsel for not requesting a hearing on the admissibility of his confession and in not seeking a psychiatric evaluation of Petitioner to support his contention that he was in a drug-induced state at the time of his confession. For the purpose of the instant claim, (which is a claim of trial court error that resulted in a violation of Petitioner's due process rights, not a claim of ineffective assistance of counsel), the undersigned will address only the pertinent portions of the state habeas court's ruling, which states:

> The [SCAWV] has discussed the effect of intoxication on the admissibility of statements made by a defendant. A defendant's confessions are not rendered inadmissible by virtue of intoxication that allegedly rendered the defendant incapable of voluntarily and intelligently waiving his constitutional rights, even though excerpts from the defendant's written statement indicated the defendant had consumed alcohol and drugs, where the investigator for the county prosecutor's office and two police officers all testified that defendant did not exhibit any signs of intoxication and that defendant was alert, responsive to their questions, and appeared to be control of his actions, and it appeared that defendant was able to effectively communicate with his counsel who arrived while his statement was being typed. <u>State v. Hickman</u>, 175 W. Va. 709 at 721-22, 338 S.E.2d 188 at 200-01 (1985).

> Chicago Police Officers conducting Petitioner's interrogation did not detect any odor of alcohol on Petitioner and noted that Petitioner did not exhibit any signs of intoxication and that he was alert and responsive to their questions.

(# 25, Ex. 24 at 2-3). Although the state court's analysis of Petitioner's statement was in the context of a claim of ineffective assistance of counsel, the analysis concerning the prejudice factor

of the ineffective assistance claims is relevant to a due process analysis as well.

In Petitioner's second state habeas proceeding (Case No. 02-MISC-232), the court simply found that "Findings related to whether statements were voluntarily given to law enforcement by a defendant are solely within the discretion of the trial court." (# 25, Ex. 23 at 2).

The trial record indicates that Petitioner was advised of his Miranda rights six different times. Furthermore, the investigating officers uniformly testified that Petitioner did not appear to be impaired during his questioning. Thus, under the totality of the circumstances, Petitioner has not demonstrated that the admission of his statement to Chicago police officers when he was arrested violated his right to due process of law or a fair trial.

Thus, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law. The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Ground Six of Petitioner's section 2254 petition.

   **F.   Ground Seven - Failure to dismiss kidnapping charge as incidental to commission of first degree robbery.**

In Ground Seven of Petitioner's section 2254 petition, Petitioner claims that his right to due process of law and a fair

90

trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated when the trial court failed to dismiss the kidnapping charge as incidental to the commission of first degree robbery.  Petitioner's petition addressed this claim as follows:

> Petitioner was charge[d], in the Leopold case, with having committed the felony offenses of aggravated robbery, malicious assault and kidnapping.  Petitioner moved the trial court twice to dismiss the kidnapping as incidental to the primary crimes of robbery and assault.

> There was evidence adduced, and unrefuted, that Leopold was only detained for several seconds after the alleged robbery and before the alleged assault.  Many Federal Circuits have recognized the dangers of broadly worded kidnapping statute and how they can overrun more primary offenses.  Even in West Virginia, who has a broadly worded kidnapping statute, there is recognition of how it can overrun more primary offenses, and that in cases of robbery and assault, there is almost always an element of detention necessary for the commission of those offenses.

> Further the jury is never instructed as to the *incidental to the crime* assertion which the West Virginia Supreme Court of Appeals cites and considers if the issue is raised on appeal regarding some ***primary*** count and kidnapping.  If the Highest court in West Virginia can hear arguments regarding this fact, should not the jury who will be making a determination as to the life imprisonment of the defendant if kidnapping is attached to a primary count and not shown to be incidental? Petitioner asserts that state should have the burden of proving that kidnapping was not incidental to the primary crimes.  The abuses that routinely happen with such broadly worded statutes is borne out in petitioner's case.

(# 1-2 at 10) [Emphasis in original].

Respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that this claim does not present a

constitutional claim.   Respondent states:

> Petitioner offers no argument as to why the trial court was under a duty to dismiss the kidnapping charges against him.  Petitioner offers no argument as to what instruction should have been offered and under what authority the court was required to give it.  Petitioner does not argue how West Virginia's kidnapping statute is unconstitutional in light of the fact that it has never been deemed unconstitutional in any federal court.
>
> If Petitioner is arguing that his conviction violated double jeopardy, then he is required to show why, under the <u>Blockburger</u> analysis, the trial court was required to dismiss the kidnapping charge.  <u>Blockburger v. United States</u>, 284 U.S. 299 (1932).  Pursuant to <u>Blockburger</u>, "[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not."  <u>Id.</u> at 302-03.  Petitioner has made no such argument nor has he cited to <u>Blockburger</u>.  Any subsequent development of this claim by Petitioner should present an analysis of the evidence at trial under West Virginia state statute and the evidence presented at trial.  That is what is required of Petitioner to sufficiently plead this claim.
>
> Until Petitioner makes a good faith argument in support of this claim, Respondent will argue that it is insufficiently developed to merit relief.

(# 41 at 30-31).

Petitioner's Response addresses this claim as follows:

West Virginia has adopted the four-factor test designed by the federal courts to determine whether the alleged kidnapping is incidental to another crime. [FN 15] This argument has been advanced in the state courts to argue that the kidnapping charges against petitioner should have been dismissed.  In the Chu case, there was no asportation of the victim without her consent.  And in the Leopold case, the alleged victim testified that she was moved a short distance for a few seconds during the larceny of her vehicle. [FN 16] Therefore, petitioner submits that the state court's decision to uphold and

affirm petitioner's conviction and sentence for kidnapping is contrary to federal constitutional law as the alleged kidnapping was "merely incidental to the commission of" larceny.

[FN 15 - Compare, Government of the Virgin Islands v. Berry, 604 F.2d 221, 227 (3rd Cir., 1979) [(1) Duration of the detention or asportation; (2) Whether the detention or asportation occurred during the commission of a separate offense; (3) whether the detention or asportation that occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense; with State v. Farmer, 101 W. Va. 372, 445 S.E.2d 759, 1994 W. Va. LEXIS 99 (1994); State v. Kitchen, 207 W. Va. 724, 536 S.E.2d 488 (2000)(length of time the victim was held or moved, the distance the victim was forced to move , the location and environment of the place victim was detained, and the exposure of the victim to increased risk of harm.)]

[FN 16 - The Model Penal Code treats the duration of the detention, and the distance of asportation as significant, concluding that kidnapping exists only if the victim is isolated "for a substantial period," or is carried away "a substantial distance." Model Penal Code 212.1.9 other citations omitted.]

(# 44 at 25).

Petitioner then cites to the decision of the state habeas court on this issue.  The state habeas court ruled as follows:

9.   The victim, Julia Leapold [sic; Leopold] was grabbed by her waist and below her chest by the Petitioner.  The Petitioner violently picked the victim off her feet and threw her into her own vehicle.  The Petitioner drove her to the level above the level where the initial abduction occurred in the parking garage while holding her by the collarbone and choking her.  The victim was subjected to an increased risk of harm as Rabb brandished a tire iron and held her *for many minutes* against her will.  The Leapold [sic; Leopold] Kidnapping count was, therefore, not incidental to the Robbery of her belongings.

(# 25, Ex. 23 at 2-3).

Petitioner argues that it is "highly improbable" that the state habeas court applied the four-factor test articulated in Berry.  Petitioner states:

> There is no clear analysis of the four factors identified in the Berry test to determine if the kidnapping was incidental to the robbery and malicious assault. [T]here is no comparison [of] the statutory elements of kidnapping to the statutory elements of malicious assault. [Footnote omitted].

(# 44 at 26).  Petitioner then discusses each of the four factors. He emphasizes that the asportation of Leopold "lasted no more than a few seconds," and that the only property found in Petitioner's possession was the vehicle, "which serves as the basis for prosecuting petitioner for larceny or robbery."  (Id. at 27). Petitioner further states that the state habeas court failed to compare the elements of malicious assault and robbery in combination to the elements of kidnapping.  He adds:

> Had such a comparison been made, petitioner submits, one would find the alleged kidnapping to be totally coterminous with the malicious assault and robbery, and petitioner is being punished twice for the same offense. [Footnote omitted].

(Id.)  Finally, Petitioner asserts that the state habeas court made no finding that the asportation created a significant or increased risk of harm independent of that posed by the other offenses. Petitioner states:

> The Court's finding that "the victim was subjected to an increased risk of harm as Rabb brandished a tire iron and held her *for many minutes* against her will" are

94

components of the coterminous malicious assault and robbery. Most state courts have held that kidnapping statutes do not apply to movements incidental to another felony. [Footnote omitted] Petitioner respectfully contends that only when the holding and movement is greater than that necessary to accomplish the malicious assault and robbery can an independent prosecution for kidnapping be sustained. [FN 23]

[FN 23 - Compare, <u>United States v. Peden</u>, 961 F.2d 517, 522-23 (5th Cir., 1992); <u>United States v. Howard</u>, 918 F.2d 1529, 1534-37 (11th Cir., 1990), cert. denied, 114 L. Ed.2d 482, 111 S. Ct. 2240 (1991)(The court found that there was no evidence that defendant intended to detain the victim any longer than was necessary to rob him; that there was no detention on addition to the robbery and no evidence of increased danger and that, therefore, kidnapping had not been shown.)

"There has been no reasoned state court judgment rejecting the federal claim." <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed.2d 1019 (1991). Petitioner submits that in the absence of reasoned state decision to which this Court can apply the AEDPA that the Court should undertake an independent review of the record to determine whether this claim is meritorious. [FN 24]

[FN 24 - <u>Matylinsky v. Budge</u>, 577 F.3d 1083, 1089 (9th Cir., 2009), citing <u>Richter v. Hickman</u>, 578 F.2d 944 (9th Cir., 2009)]

(<u>Id.</u> at 27-28).

In West Virginia, "the general rule is that a kidnapping has not been committed when it is incidental to another crime. In deciding whether the acts that technically constitute kidnapping were incidental to another crime, courts examine the length of time the victim was held or moved, the location and environment of the place the victim was detained, and the exposure of the victim to an increased harm." Syllabus pt. 2, <u>State v. Miller</u>, 175 W. Va. 616,

336 S.E.2d 910 (1985).

In order to prove his right to due process or his right against double jeopardy was violated, Petitioner must prove by preponderance of the evidence, with the holding of State v. Miller, taken into consideration, that a kidnapping was not committed because the kidnapping was incidental to the aggravated robbery of Julia Leopold.

A review of the record, in light of the Miller holding, indicates that Leopold was forced into her car and held down by the Petitioner for several minutes while Petitioner drove her car to a higher level of the parking garage.  It would appear that, but for Leopold's ability to escape from the car, that Petitioner would have attempted to leave the parking garage with her still in the car.  Although the length of time Leopold was held was short, due to the fact that she was able to escape from the vehicle, she could still be considered kidnapped under the law.  Additionally, Leopold was exposed to an increased risk of harm to herself and her unborn child while she was being held down by Petitioner in the vehicle.

In the context of a section 2254 petition, federal courts are bound to follow the highest state court's interpretation of legislative intent as to the availability of multiple punishments. Holdren v. Legursky 16 F.3d 57 (4th Cir. 1994).

The United States Supreme Court addressed the applicable analysis for a double jeopardy claim in Blockburger v. United

States, 284 U.S. 299 (1932).  "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not."
Id. at 304.  The State of West Virginia adopted this test for determination of the constitutionality of multiple prosecutions in State v. Zaccagnini, 380 S.E.2d 131 (W. Va. 1983).

Respondent asserts that the SCAWV has "recognized that the statutory definition of kidnapping is broad enough to encompass 'almost any forced movement or detention within the State.'" (Citing State v. Fortner, 387 S.E.2d 812, 827-28 (W. Va. 1989), which cites State v. Miller, 336 S.E.2d 910, 914 (W. Va. 1985)). (# 9 at 14).  Aggravated robbery does not require either movement or detention of the victim.  Thus, under the Blockburger test, the kidnapping and aggravated robbery of Leopold were separate offenses and may be punished separately.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated a violation of his due process rights under the Fourteenth Amendment to the United States Constitution based on the failure to dismiss the Leopold kidnapping charge as incidental to the aggravated robbery.  Thus, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas

corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

### G. Grounds Eight through Thirteen - Ineffective assistance of counsel claims.

In Grounds Eight through Thirteen of his section 2254 petition, Petitioner asserts various claims of ineffective assistance of counsel. At trial, Petitioner was represented by Barbara Brown and Chanin Wolfingbarger[11], Assistant Public Defenders for Kanawha County, West Virginia.

In <u>Strickland v. Washington</u>, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel. A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Id.</u> at 687-91. Moreover, "judicial scrutiny of counsel's performance must be highly deferential." <u>Id.</u> at 689. Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard."

---

[11] By the time of the evidentiary hearings in this matter, Ms. Wolfingbarger was using her married name, which is Krivonyak. For consistency in this document, the undersigned will continue to refer to her as "Ms. Wolfingbarger." Thus, her name will be changed in references from the evidentiary hearing transcripts.

Holman v. Gilmore, 126 F.3d 876, 881 (7th Cir. 1997).  Using this standard, and based upon all of the evidence of record, the court will address the merit of each of the allegations concerning ineffective assistance of counsel in the order they were presented by Petitioner.

### Grounds Eight and Nine

In Ground Eight of his section 2254 petition, Petitioner asserts that his counsel failed to advise Petitioner of his rights to seek a bifurcated trial.  His petition states:

> Trial counsel's failure to advise petitioner of his rights to move the Court to bifurcate or have right knowingly waived by petitioner.  The fact that counsel failed to discuss this matter with petitioner, their client, fell well below the standard of professional reasonableness and worked to substantially prejudice the petitioner.

(# 1-2 at 11).  In Ground Nine of his section 2254 petition, Petitioner contends that his counsel failed to move the court for bifurcation.  That claim further states:

> Trial counsel[]s were ineffective for failing to move the trial court for a bifurcation of trial into a guilt and mercy phase.  There was ample evidence that without the benefit of 20/20 hindsight showed that such would be warranted and should not have been done.

(Id.)

Respondent's Memorandum of Law in support of his Motion for Summary Judgment addresses these two claims of ineffective assistance of counsel as follows:

> As the habeas court noted, bifurcation is intended as a forum to put the defendant's criminal history as

99

well as potentially mitigating evidence before the jury
to assist them in determining if the defendant should
receive mercy. ([# 25, Ex. 24] at 5).  In this instance,
the record is replete with evidence that Petitioner had
a very long and very violent criminal history, all of
which could have been placed before the jury in a
bifurcated proceeding. [Footnote omitted].  ([# 25, Ex.
19] at 99-101).  The defense was able to keep one of the
victim's pregnancy from the jury, and that a crack pipe
was found in the victim's truck when it was picked up in
Chicago.  ([Id.] at 106, 189).  Strategically, it would
not have been a good idea to bifurcate the Petitioner's
trial. [FN 14] In a unitary trial, most of the evidence
available to the State for purposes of arguing against
mercy was inadmissible.  Therefore, a unitary trial was
sound strategy and Petitioner has not argued otherwise.

[FN 14 - Defense counsel Brown conceded as much during
the omnibus hearing. ([# 25, Ex. 19] at 103, 118-19.)]

(# 41 at 34-35).

Petitioner's Response asserts that Respondent has
mischaracterized his criminal history.  Petitioner adds that he had
no prior convictions and had never been arrested until December 23,
1996, when, in a four-week span of time, beginning with an incident
in North Carolina, events occurred that led to his arrest on the
instant charges.  (# 44 at 29).  Petitioner also notes that the
Charleston Gazette article about his case that was found in the
jury room mentioned that one of the victims was pregnant; thus,
Petitioner states that it cannot be said with confidence that those
jurors were not swayed by extrinsic influence.[12]

---

[12] The undersigned also notes that, notwithstanding the unitary
trial and the defense's efforts to keep the fact of Leopold's
pregnancy from the jury, the prosecution mentioned the fact that
Leopold was pregnant several times throughout trial and in closing
arguments.  The trial court accepted and allowed the State's

100

Petitioner's Response further argues that the SCAWV recently addressed the type of evidence that is admissible in the mercy phase of a trial.  Petitioner states:

> The type of evidence that is admissible in the mercy phase of a bifurcated first degree murder proceeding is much broader than the evidence admissible for purposes of determining a defendant's guilt or innocence.  Admissible evidence necessarily encompasses evidence of the defendant's character, including evidence concerning defendant's past, present, and future, as well as evidence surrounding the nature of the crime committed by the defendants that warranted a jury finding the defendant guilty of first degree murder.  <u>State v. McLaughlin</u>, 2010 W.Va. Lexis 70 (2010); <u>State v. Finley</u>, 219 W. Va. 747, 639 S.E.2d 839, 844 (2006).

(# 44 at 32).  Petitioner further asserts:

> Due to defense counsel's lack of preparation, the jury was not provided relevant information regarding petitioner's age, mental state, family responsibilities (wife and children), military experience (1989-1997), his educational achievement (undergraduate studies), or his prior work experience.  State and federal law mandate that criminal jury assess the defendant's background before making the sentencing decision. [FN 38]
>
> [FN 38 - <u>Gregg v. Georgia</u>, 428 U.S. 153. 191, 96 S. Ct. 2909, 2934 (1976), <u>Townsend v. Burke</u>, 334 U.S. 736, 741, 68 S. Ct. 58, 61 (1948); <u>Pennyslvania ex rel. Sullivan v. Ashe</u>, 302 U.S. 51, 55, 58 S. Ct. 58, 61 (1937); <u>State v. LaRock</u>, 196 W. Va. 196 (1996); <u>SER Leach v. Hamilton</u>, 280 S.E.2d 62, 65 (1980).]

(<u>Id.</u> at 33).

---

argument that the fact that Leopold was pregnant could have played into her attacker's mind in selecting a "weak" victim, and also affected Leopold's reactions to what was happening to her.  However, the trial court excluded any reference to the fact that Leopold's baby was born, prematurely, on the date of the attack.

During Petitioner's omnibus habeas corpus hearings, both Petitioner and Respondent presented expert witness testimony on the ineffective assistance of counsel claims. Petitioner's expert, Gregory Campbell, opined that Ms. Brown and Ms. Wolfingbarger were deficient in not discussing the bifurcation issue with Petitioner and not moving to bifurcate the mercy phase of the trial. (Id. at 34; # 25, Ex. 20 at 129-130; # 25, Ex. 21 at 5). Mr. Campbell testified that the issue should at least be discussed with a client, the same as you would discuss with the client whether or not they should testify. (# 25, Ex. 20 at 111-112; # 25, Ex. 21 at 5).

The State's expert witness, former Circuit Court Judge Andrew A. McQueen, disagreed. Judge McQueen stated that, in this particular case, he did not see any witnesses they could have called or evidence that could have been presented in a bifurcated penalty phase, that could not have been presented in a unitary trial. (# 25, Ex. 22 at 29-30). Judge McQueen added:

> The only thing that -- about this case that lends it to a discussion of bifurcation is the awful facts of the kidnapping of Ms. Leopold, and the beating, and the taking of her car.
>
> If that -- If those facts are so bad that if you can try to paint something a little bit better about your guy, you want to do it.
>
> The problem is that the State, in this case -- that from what I've seen, had a -- the possibility of putting on a three-state crime spree for all intents and purposes.

As I recall, the evidence was that there was a -- And, again, I have to look to the judgment of the attorneys who were defending this case, but it was my understanding that they were looking at kidnapping of a fellow marine, breaking and entering of a doctor's office, two aggravated robberies, and two breaking and enterings of residences, prior to this offense.

They also had a bunch of information about drug use, which -- most of which was -- I think, in fact all of which was kept out of the trial of this case.

And other than the apprehension of Mr. Rabb in Chicago, there was no other evidence -- the drug issue was not brought up about the Chicago experience either.

The State had the potential, at least, of having a bunch of material that could have been very harmful in a bifurcation -- in a mercy stage of a bifurcation.

(Id. at 33-34). Judge McQueen added that, you might talk to your client about bifurcation, but in this case, he believed it to be a mistake. (Id. at 34). He further testified that, in his opinion, Petitioner suffered no prejudice by not having a bifurcated proceeding. (Id. at 35). He said it is tough to argue for mercy at the same time you are arguing that your client is not guilty. (Id. at 36).

Ms. Brown and Ms. Wolfingbarger also testified in Petitioner's omnibus hearings. Ms. Wolfingbarger, stated that she relied on Ms. Brown, who had more criminal trial experience, in the determination of the issue of bifurcation and the overall defensive strategy. (# 25, Ex. 19 at 154). Ms. Brown testified that she did not believe this was the type of case where you would want to bifurcate and that she would stick by her tactical decision because, by putting

103

on good character evidence about Petitioner, they would have run the risk of allowing the State to rebut it with evidence of Petitioner's charges in North Carolina and his drug abuse. (# 25, Ex. 19 at 117-120).

In Petitioner's first state habeas proceeding (Case No. 00-MISC-350), the court made the following findings on the failure to move to bifurcate:

> Petitioner contends counsel failed to render effective assistance when they failed to request a bifurcated trial. The purpose of a bifurcated trial is to allow the trier of fact to consider the prior record of the defendant for the purpose of sentencing while avoiding prejudice to the defendant when determining guilt or innocence. Petitioner specifies no evidence that was admitted that prejudiced his trial.

> Petitioner states that defendants "acquired the right to bifurcated trial prior to Petitioner's indictment." This is false. A trial court has discretionary authority to bifurcate a trial and sentencing in any case where a jury is required to make a finding as to mercy. Syl. pt. 4, State v. LaRock, 196 W. Va. 294, 470 S.E.2d 613 (1996). The Court finds that Petitioner's trial was in no way prejudiced by counsel's decision not to request a bifurcated trial. The Court finds counsel's performance reasonable under the circumstances and within the broad range of professionally competent assistance.

(# 25, Ex. 24 at 5-6). In Petitioner's second habeas proceeding, after the benefit of being able to present testimony and evidence at his omnibus hearings, the state habeas court made the following findings on this claim:

> 10. Trial counsel failed to advise the Petitioner regarding the right to seek a bifurcated trial and did not file a motion to bifurcate the trial. The right is not a guarantee that a bifurcated trial

> will be ordered.  This issue lies solely within the
> sound discretion of the trial court, <u>State v.
> LaRock</u>, 196 W. Va. 294 (1996).  The Petitioner
> failed to prove that this was anything other than a
> strategic decision.  The Petitioner has failed to
> prove that trial counsel was ineffective and that
> these actions prejudiced the Petitioner at his
> trial.  Barbara Brown said that she would try this
> case the same way again.  Ms. Brown was worried
> about the Petitioner's past domestic violence
> history and pending North Carolina charges.  The
> Petitioner was, therefore, not prejudiced by not
> knowing about or receiving a bifurcated trial.

(# 25, Ex. 23 at 3).

At the omnibus hearings, Petitioner called his mother and his wife as witnesses, who stated that they would have testified for Petitioner, if asked.  (# 25, Ex. 22 at 127-175).  The evidence they could have offered concerning his background and character most assuredly would have been met with rebuttal concerning his more recent violent history and legal problems.

Ineffective assistance of counsel is not shown where a witness who is not called to testify would not have helped the defense. See <u>Jones v. Taylor</u>, 547 F.2d 808, 810 (4th Cir. 1977).  Clearly, Petitioner could have presented some "mitigating" evidence about his background, educational level, military service, and lack of a long-term criminal history.  However, this evidence was counter-balanced by the evidence of Petitioner's recent legal problems in North Carolina and the incidents leading up to his arrest in Chicago.

The decision of whether to call character witnesses or to present such evidence was a matter of trial strategy. The United States Court of Appeals for the Fourth Circuit has held that ineffective assistance of counsel may not be established by questioning counsel's choice of strategy. See Stamper v. Muncie, 944 F.2d 170, 178 (4th Cir. 1991). Furthermore, the decision not to call these witnesses did not prejudice Petitioner's defense and the state courts so found. Because Petitioner was not prejudiced by the failure to present mitigating evidence, there could be no prejudice by failing to move for bifurcation.

The undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on these claims of ineffective assistance of counsel were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on Grounds Eight and Nine of Petitioner's section 2254 petition.

<u>Ground Ten</u>

In Ground Ten of his section 2254 petition, Petitioner contends that his counsel failed to advise Petitioner of the necessity to argue for mercy in a capital case. The petition states:

> Petitioner was not advised as to the necessity to argue for mercy in a capital case. Trail [sic; trial] counsel failed to call any witnesses to prove petitioner's youth, mental condition, competence, state

106

of mind, addiction, intellect, education, or any other
fact that would have mitigated the crime or given factual
basis for requesting mercy.

The fact that petitioner faced the most severe
punishment that a defendant could face, and never once,
was any mitigating evidence considered or witness called
on the issue of mercy, created a great miscarriage of
justice and counsel's performance fell well below
standards.

(# 1-2 at 11).

Respondent's Memorandum of Law in support of his Motion for

Summary Judgment argues that Petitioner fails to account for the

fact that he did receive mercy on the kidnapping count involving

Jay Ming Chu, which, Respondent asserts, indicates that the jury

was aware of the option of granting mercy.  (# 41 at 35).  The

state habeas court agreed with this assertion, finding as follows:

11. Trial counsel did not ask the jury to give the
petitioner mercy during closing arguments.  The
jury, however, gave the Petitioner mercy on the Chu
count.  Therefore, the jury considered mercy and
its implications.  The Petitioner failed to present
evidence as to how he was prejudiced by his lawyers
asking for mercy herein.

(# 25, Ex. 23 at 3-4).

Respondent further states:

Petitioner has failed to make a reasonable showing
of incompetence in this regard nor has Petitioner argued
how any argument for mercy by trial counsel created a
strong possibility that the jury would have granted it in
light of the evidence presented at trial.  Indeed, at the
heart of Petitioner's defense was the theory that he did
not kidnap either Ms. Chu or Ms. Leopold, and that he
only stole Ms. Leopold's car.  ([# 25, Ex. 19] at 104,
118).  Strategically, had defense counsel argued mercy,
she would have had to convince the jury that her client

107

had lied to them throughout the trial, but was deserving
of another chance.  Reasonable defense counsel could very
well reject such contradictory positions.  ([# 25, Ex.
19] at 103-04, 128.)

This claim fails to rebut the presumption that the
habeas court's findings were correct under prevailing
Supreme Court precedent.

(# 41 at 35-36).

Petitioner's Response first discusses his expert, Gregory

Campbell's testimony concerning the failure to argue for mercy.  (#

44 at 35).  Mr. Campbell stated:

If they ask for "no mercy" -- the jury is sitting there,
. . . the judge has told them they can grant it or not,
the prosecutor asks you not to, if you don't say a word
about it, I think it falls below the standard.

(# 25, Ex. 20 at 125).  Petitioner further argues:

Two acts of omission and one act of commission by
petitioner's trial counsel conspired to deny petitioner
a sentence proportionate to the character and degree of
the offense.  One, counsel assented to a unitary trial,
without giving any consideration to requesting a
bifurcated trial.  Two, counsel made no meaningful effort
to prepare for the sentencing phase of petitioner's
trial.  Three, counsel advised petitioner to forgo
testifying in his own defense.  These errors mutually
reinforced one another and prevented the jury from
getting a full picture of the defendant who [sic; whose]
fate was entirely in their hands.  "At the penalty stage,
a jury considers the character and propensities of a
defendant to make a 'unique, individualized judgment
regarding the punishment that a particular person
deserves." [FN 48 - Zant v. Stephens, 462 U.S. 962, 900,
103 S. Ct. 2733, 77 L. Ed.2d 235 (1983).]

(# 44 at 35-36).

Petitioner contends that his counsel did not properly prepare

for the sentencing phase of the trial before the trial began.

108

Petitioner notes that the state habeas court found that:

> 17.   Chanin [Wolfingbarger] believed Judge Recht could
>        give the petitioner mercy even if a jury did
>        otherwise.    However,   the   jury   was   properly
>        instructed on the law.   Trial counsel never relied
>        to the petitioner's detriment on their belief that
>        Recht could disregard the jury's verdict.   Neither
>        expert witness believed this issue had much merit.
>        Therefore, the Court does find that Petitioner was
>        not prejudiced by this mistake.

(# 25, Ex. 23 at 5).   Petitioner argues that Ms. Wolfingbarger did

not  provide a "viable explanation of why she believed Judge Recht

could   grant   mercy   when   the   jury   did   not   make   such   a

recommendation." (# 44 at 37).   Petitioner further asserts that

defense  counsel  did  not  contact  any  mitigation  witnesses,  and

without  inquiring  of  such  witnesses,  they  did  not  know  if  the

substance of such testimony would be helpful to defendant.  (<u>Id.</u>)

Petitioner's defense at trial was that he did not kidnap, rob

or assault Ms. Leopold.   He merely conceded to taking her vehicle,

since he was found in possession of it in Chicago.   Thus, it would

have  been  inconsistent  to  argue  that  he  did  not  commit  the  crime,

but,  even  if  the  jury  believed  he  did,  then  they  should  grant  him

mercy.   Respondent's expert witness, retired Circuit Court Judge

Andrew  A.  McQueen,  agreed.    He  stated  that  he  did  not  see  any

evidence produced that would have made a difference in the outcome

of  the  jury's  verdict.   (# 25, Ex. 22 at 43).   He further stated

that  he  does  not  believe  that  the  failure  to  argue  for  mercy

prejudiced the defense.  (<u>Id.</u> at 50).

The decision not to argue for mercy in the face of a defense of complete innocence was, again, a matter of trial strategy that cannot be the basis of a claim of ineffective assistance of counsel under <u>Strickland</u>.  The undersigned proposes that the presiding District Judge **FIND** that the state habeas courts' decisions denying Petitioner habeas corpus relief on these claims of ineffective assistance of counsel were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Ten of Petitioner's section 2254 petition.

<u>Ground Eleven</u>

In Ground Eleven of his section 2254 petition, Petitioner contends that his counsel failed to retain a competent expert on the identification issues.  Petitioner also filed his own Motion for Partial Summary Judgment concerning this claim.  The petition states:

> Petitioner and [sic; an] African-American male, was identified by several Caucasian witnesses as being either the perpetrator of the crimes or in the vicinity of the crimes.  Counsel retained an expert in the area of eyewitness identification of African-Americans, but expert was not allowed.  Trial counsel then asked jurors whether they believed there was nay [sic; any] difficulty in the identification of African-Americans by Caucasians, and most panel members responded in the negative.  There is substantial information available which supports the difficulties in eye-witness identification.  Counsel should have had an expert or witness.  No such expert or witness was called to address this very serious issue.  The failure to do so prejudiced petitioner and his case.

(# 1-2 at 12).

110

Petitioner's Motion for Partial Summary Judgment (# 32) expands on this claim.  Petitioner's Motion for Partial Summary Judgment states:

> 3.  Defense Counsel employed Dr. Marc Lindberg, Ph.D., as an expert witness.  Defense counsel requested a hearing before the Trial Court to qualify Dr. Lindberg and secure the admissibility of his testimony. [# 25, Ex. 17] at 2116-2150.  Defense counsel did not arrange for Dr. Lindberg to interview any of the state witnesses. [Id.] at 2147.  The Trial Court ruled the basic reason for excluding Dr. Lindberg's testimony was that it did not comport with Rule 702, West Virginia Rules of Evidence.  The Trial Court also ruled that "discrepancies in eyewitness testimony can be brought out on cross-examination." [Id.] at 2148.

> 4.  The only question in Ground 11 is whether petitioner is entitled to judgment as a matter of law.  The question before the court is whether the trial court's exclusion of expert testimony by Dr. Marc Lindberg, Ph.D. on cross-racial identification for the reasons articulated by the trial court violated petitioner's right to effective assistance of counsel, petitioner's right to due process of law, and petitioner's right to an impartial jury trial.  A crucial element of the state's case was the victim's identification of defendant as her assailant and Dr. Lindberg's testimony involved a proper subject that would have been helpful to the jury in evaluating this issue.

(Id. at 3).

Petitioner's Memorandum of Law in support of his Motion for Partial Summary Judgment further states:

> Julia Leopold is an adult Caucasian female. Petitioner is an adult African American male.  Mrs. Leopold's cross-racial misidentification of petitioner as her assailant is a crucial element of the defense's theory of the case.  There was no comparable identification issue in the Chu case which constitutes an additional justification for separate kidnapping trials.

111

>During the voir dire, defense counsel asked prospective jurors if it was more difficult for a person to identify an individual of a different racial or ethnic group.  Contrary to well-respected psychological studies, virtually every prospective juror replied that they saw no difference in their ability to identify physical features of an African-American male and their ability to identify a Caucasian male.

(# 33 at 1-2).

As noted by Petitioner, the trial court relied on United States v. Harris, 995 F.2d 532 (4th Cir. 1993) in support of his ruling to exclude Dr. Lindberg's testimony.  (# 25, Ex. 17 at 2148).  Petitioner's Memorandum of Law further states:

>Petitioner submits the trial court's reliance on United States v. Harris is misplaced.  In Harris, the Court rules that the U.S. District Court did not err in excluding testimony of defendant's expert witness concerning the psychological limitations on eyewitness identifications made by three witnesses when there were no special circumstances requiring its admission. (Emphasis added).  In Harris, the Court ruled that under certain circumstances, expert testimony on the reliability of eyewitness identifications can assist the jury in reaching a correct decision and therefore may meet the helpfulness requirements of Federal Rules of Evidence 702.  The offer of proof should establish the presence of "such problems as cross-racial identification, . . . identification after observation under stress, and psychological phenomena as the feedback factor and unconscious transference." Harris, 995 F.2d at 535 (4th Cir. 1993)[citations omitted].  These qualifying factors are present in petitioner's case.
>
>In 1993, the U.S. Supreme Court set forth the framework for analyzing the admissibility of scientific expert testimony under Rule 702, in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed.2d 469 (1993).  Daubert requires an analysis of (A) whether the proffered testimony is reliable; and (B) whether the proffered testimony will assist the trier of fact.  In 2000, the U.S. Court of Appeals for the Sixth Circuit held that the science of eyewitness perception

has achieved the level of exactness, methodology, and
reliability of any psychological research.  U.S. v.
Smithers, 212 F.3d 306 (2000).  It necessarily follows
that [] under Daubert, Dr. Lindberg's proposed testimony
should have been deemed reliable, an assessment not made
by the trial judge in this case.

(# 33 at 3).

Petitioner cites to the state habeas court's decision which

found:

> 12.   Defense   Counsel   retained   an   expert   on
> identification.   Judge Recht (the trial judge)
> found this area of expertise to invade the jury's
> province.  Judge Recht did not abuse his discretion
> in  making  this  finding.   This  Court  does
> incorporate by reference all findings Judge Recht
> made with respect to this witness in this finding.

(# 25, Ex. 23 at 4).

Petitioner's Memorandum of Law further asserts that Petitioner

was denied meaningful and effective assistance of counsel because

his counsel "failed to call a competent expert on cross-racial

identification."  (# 33 at 4).

Petitioner summarizes Dr. Lindberg's testimony as follows:

> Dr. Lindberg  planned  to  testify  about  memory,
> suggestibility, and several facts that run counter to may
> [sic; many] beliefs held by the average citizen.
> Specifically, Dr. Lindberg would assist the jury and
> provide time tested laws of the effect of time on memory,
> how suggestions entered into memory, the phenomenon of
> unconscious  transference,  the  relationship  between
> eyewitness certainty and accuracy, the things that most
> influence eyewitness confidence, the effects of stress
> and trauma on memory, the facts of retrograde amnesia,
> the weapon focus effect, and the relative accuracy of
> same race versus cross-racial identifications.

(Id. at 5).

113

Petitioner asserts that the trial court did not make the required assessment of the proposed testimony under Daubert. Petitioner states:

Under Daubert, the Court is required to analyze Dr. Lindberg's proposed testimony to determine whether his testimony reflected scientific knowledge, whether the testimony was relevant and would have aided the trier of facts. Prior to petitioner's trial, Dr. Lindberg had been recognized as an expert witness in state and federal criminal and civil trials. His published work on eyewitness identification had been subject to peer review prior to publication.

The exclusion of Dr. Lindberg's testimony deprived petitioner of "a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed.2d 413 (1984). Dr. Lindberg was prepared to testify to the core issue in the Leopold case, i.e., the purported identification of petitioner by the sole witness to the crime, Julia Leopold. Dr. Lindberg could be expected to illuminate critical relevant facts: (1) the fact that there is no correlation between an eyewitnesses' confident [sic; confidence] in selecting a perpetrator in court and the accuracy of the identification; (2) the fact that cross-racial identifications are less accurate than same race identifications; (3) the fact that the phenomenon of "weapon focus" which occurs when a witness is confronted by a perpetrator who is visibly armed, can reduce the accuracy of an identification, and (4) the fact that an eyewitness who is anxious or excited at the time of the offense has worse memory than a person who was not anxious or excited at the time of the viewing. See, 615 F. Supp. 2d at 568-69.

In this case, virtually every juror who served on the petit jury subscribed to the popular belief that cross-racial identification was no different [than] same-racial identification even under conditions of stress. Psychological studies have exposed the fallacies behind such beliefs. Therefore, defense counsel [sic; failed?] to employ an expert witness on cross-racial identification, adequately prepare the witness so he might readily survive the Daubert assessment and identify relevant psychological facts to assist the trier of

114

> facts.   Julia Leopold identified petitioner, but the
> circumstances of this identification implicate factors
> that psychological studies have clearly established
> diminish the accuracy and reliability of such cross-
> racial identification.   The problems of cross-racial
> identification are well-known to psychologists but not
> lay persons called for jury duty.  [Footnote omitted]

(Id. at 6-7).

Respondent characterizes Petitioner's claim in Ground Eleven

as a matter of state evidentiary law, which is not cognizable in

federal habeas corpus. (# 39 at 3).   Respondent's Response to

Petitioner's Motion for Partial Summary Judgment states:

> The Petitioner himself concedes that the trial court
> based its decision [on] West Virginia Rule of Evidence
> 702, a state rule of evidence.  Although he throws terms
> such as due process and effective assistance of counsel
> into the pot, he makes little or no effort to explain how
> they are relevant to his ground for relief.   They are
> merely passing references.  Petitioner is merely seeking
> to relitigate an issue that has already been decided by
> the trial court.  His argument is improper and should be
> stricken from the record.

(Id. at 4).   Respondent further asserts that Petitioner did not

properly exhaust his claim through his habeas appeal.   Respondent

asserts that Petitioner did not raise this claim in his habeas

appeal as a due process challenge, but, rather, only raised it as

a claim of ineffective assistance of counsel for failing to present

Dr. Lindberg's testimony.  (Id. at 4-5).

Respondent further argues that, even if Petitioner's claim

could be considered, it lacks merit, both as a claim of ineffective

assistance of counsel and as a matter of due process.  Respondent

states:

115

In the case-at-bar, defense counsel presented Dr. Lindberg, thoroughly reviewed his credentials, and set forth his theories regarding memory. Not only did counsel perform in an objectively reasonable fashion, her performance was exemplary. Petitioner has no reason to complain about her [Ms. Wolfingbarger's] performance. ([# 25, Ex. 17] at 2117-48.) He cannot overcome the first prong of the Strickland test. Nor has the Petitioner proven how Dr. Lindberg's testimony would have been helpful to his defense. Indeed, defense counsel testified that Dr. Lindberg "turned out not to be very reliable" and that she was happy he was not called as a witness. ([# 25, Ex. 19] at 56-57.)

(Id. at 5-6). Respondent adds:

Even if this Court were to address the merits of Petitioner's claim, the outcome would be no different. The trial court ruled Dr. Lindberg's testimony inadmissible. ([# 25, Ex. 17] at 2148). The trial court based its decision on a direct appeal out of the Fourth Circuit, United States v. Harris, 995 F.2d 532 (4th Cir. 1993)[FN 2 omitted - Petitioner asserts that this case represents the view of a majority of other circuits], in which the Court of Appeals refused to admit psychological testimony regarding the reliability of eyewitness identification because it did not assist the trier of fact as required under Federal Rule of Evidence 702. Harris, 995 F.2d at 534-35. See also Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 591-93 (1993) (with respect to relevance proposed evidence must assist the jury with a fact in issue). As the trial court found in the case-at-bar, this issue is best left to the jury, and any weaknesses can be brought out on cross-examination. ([# 25, Ex. 17] at 2148-49.)

Petitioner claims that the trial court's decision, pursuant to Harris, that the circumstances surrounding the identification testimony were sufficient to trigger the special circumstances exception. Harris, 995 F.2d at 534-35 (narrow exception permitting expert testimony on eyewitness identification where identification is made under circumstances whose affect on the accuracy of the identification may not be generally known). Once again, the Petitioner seeks to relitigate an issue that was already decided by the trial court. This matter was considered by the trial court, and rejected. ([Id. at 2148-49.) The court was acting well within the bounds of

116

its discretion.

(Id. at 6-7).

Petitioner filed a Reply to Respondent's Response to his Motion for Partial Summary Judgment as to Ground Eleven (# 46). The Reply basically reiterates the arguments made in Petitioner's Memorandum of Law in support of his motion, save for some discussion concerning the exhaustion issue raised by Respondent. Petitioner contends that, however inartfully plead, "Petitioner afforded the State court a full and fair opportunity to consider whether the absence of an expert witness on cross-racial identification adversely affected his federal constitutional rights to due process of law, a fair trial and meaningful assistance of counsel." (# 46 at 3). Petitioner's Reply further states:

> Petitioner contends that the outcome would have been different if the Court would address the merits of Petitioner's claim. The Respondent, in his response opposing the Motion for Partial Summary Judgment, asserts that the trial court's decision to exclude Dr. Lindberg's proposed testimony is sanctioned by Harris . . . .

> As Petitioner recounted in his motion, the Circuit Court ruled that "discrepancies in eyewitness testimony can be brought out on cross-examination" and the trial judge cited Harris, as support for his ruling.

> * * *

> More importantly, the [Harris] Court further stated that under certain circumstances, expert testimony on the reliability of eyewitness identifications can assist the jury in reaching a correct decision and therefore ma[y] meet the helpfulness requirement of Federal Rules of Evidence 702. The offer of proof should establish the presence of "such problems as cross-racial identification, . . . identification after observation

117

under stress, and psychological phenomena as the feedback factor and unconscious transference. [FN 7]

[Fn 7 - Harris, Id., See United States v. Stevens, 935 F.2d at 1400 (admitting testimony on the lack of correlation between confidence and accuracy in eyewitness identification); United States v. Smith, 736 F.2d 1103, 1106 (6th Cir. 1984)(determining that the jury could be helped by testimony on: stress and weapons at the bank, and cross-racial transference).

(Id. at 4-5).

Petitioner's Response addresses other federal cases calling for careful consideration of permitting expert testimony concerning cross-racial identification and other issues of eyewitness identifications. See United States v. Rodriquez-Felix, 450 F.3d 1117, 1124-25 (10th Cir. 2006); United States v. Chamberlin, 326 Fed. Appx. 640, n,7 (3d Cir. 2009); United States v. Brownlee, 454 F.3d 131 (3d Cir. 2006); and United States v. Moore, 786 F.2d 1308, 1212-13 (5th Cir. 1985).

Dr. Lindberg's testimony was presented to the court outside the presence of the jury. His testimony focused on his participation in studies concerning the various stages of memory, and events or circumstances that can affect memory storage and accuracy, including weapon focus and cross-racial identification issues. After admitting that he had not interviewed any of the witnesses in this case, the trial court stopped the questioning and ruled as follows:

I'm not going to permit the testimony. Not in any way to denigrate this gentleman at all, don't mean to do that. But I don't find that the testimony comports with Rule

118

702 - - you may sit down.

      And that's the basic reason for excluding it.  I
draw attention to the case of <u>United States v. Harris</u>,
Fourth Circuit case, 1993, that says that discrepancies
in eyewitness identification can be brought out on cross-
examination.  The weaknesses of identifications can be
explored on cross-examination and during final argument.

      There are -- the problem that's associated with this
kind of testimony - and on the surface, it appears to be
rather appealing - but the concern that you have - and
this gentleman has identified factors that generally
would interfere with eyewitness accuracy and reliability
- but they just do not permit the kind of relevant
testimony to be made about accuracy of the witnesses in
this particular case and under the circumstances involved
in this case.

      And that is the reason why I am not permitting
eyewitness -- this witness to testify.  I'm bothered by
the science of it, but like Justice Cleckley says in
<u>Gentry</u>, many times you let the jury sort that out.  But
I am concerned about the relevancy of it, the fit of it
in this particular case.

      This witness could testify, I think, just in terms
of kind of general comments and interesting comments, and
I'm sure the guy is -- the guy is a smart guy.  But not
for this specific case.  And your exception certainly can
be saved to that ruling and those findings.

      One other finding is that the very thing that this
witness has testified to is specifically what this Court
looked to in <u>State v. Casdorph</u> to determine whether or
not the eyewitness - or the in-court identification  -
would be permitted.

      These are the various markers that you go through.
And the things that the defense has brought out in terms
of the weaknesses of those areas of reliability can
certainly be the subject of argument and proper
instruction.

(# 25, Ex. 17 at 2148-2150).

In addition to the standard instructions on witness testimony and how a jury should weigh discrepancies in a witness's testimony, an instruction was specifically given on identification testimony. The trial court instructed the jury as follows:

The Court instructs the jury that the State has the burden of proving identity . . . It is not essential that the witness himself, herself be free from doubt as to the correctness of his or her statement.

However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him.  If you are convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you may find the defendant guilty.

Identification testimony is an expression of belief or impression by the witness.  Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later.

In appraising the identification testimony of a witness, you should consider the following: Are you convinced that the witness had the capacity to observe the offender, that is, whether the mental or emotional state of the witness was such that it might have affected the ability of the witness to observe and recall the identity of the perpetrator?

Are you convinced that the witness had an adequate opportunity to observe the offender? Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short a time was available, how far or close the witness was, how good were lighting conditions and the degree of attention the witness was paying to the offender.

In general, a witness bases any identification he or she makes on his or her perception through the use of all his or her senses.  Usually the witness identifies an offender by the sense of sight, but this is not necessarily so, and he or she may use other senses such

as voice or touch or smell.

Are you satisfied that the identification by the witness subsequent to the offense was the product of his or her own recollection? You may take into account both the strength of the identification and the circumstances under which the identification was made.

You must consider the credibility of the identification witness in the same way as any other witness.  Consider whether he or she is truthful, and consider whether he or she had the capacity and opportunity to make a reliable observation on the matter covered in his or her testimony.

The Court instructs the jury that in this case, an eyewitnesses' certainty about an identification may have many sources, and does not necessarily bear on the correctness of the identification.  The correctness of the identification is a question for you, the jury to decide.

The Court instructs the jury that the identifying witnesses are of different race than the defendant.  Even people with no prejudice against other races and substantial contact with persons of other races still experience some difficulty in accurately identifying members of a different race.

Quite often, people do not recognize this difficulty in themselves.  You should consider these facts in evaluating the witness' testimony.

(# 25, Ex. 18 at 2312-2315).

In closing arguments, Ms. Brown drew the jury's attention to Dr. Velasquez's diagnosis that Julia Leopold suffered from retrograde amnesia and that she could be "confabulating" or filling in the blank spaces of her memory with information that she had learned of after the attack, including seeing Petitioner on television following his arrest.  (# 25, Ex. 18 at 2363-2365).

121

Thus, many of the concerns that would have been brought to light by the testimony of Dr. Lindberg were addressed through cross-examination of witnesses, the instructions, and closing argument. Petitioner has not demonstrated that he suffered any undue prejudice from the trial court's exclusion of his expert witness. Therefore, Petitioner has not established either a violation of his due process rights, or that his counsel provided ineffective assistance that prejudiced his defense.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state habeas courts' decisions denying Petitioner habeas corpus relief on this claim of ineffective assistance of counsel were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent, not Petitioner, is entitled to judgment as a matter of law on Ground Eleven of Petitioner's section 2254 petition.

<u>Ground Twelve</u>

In Ground Twelve of his section 2254 petition, Petitioner contends that his counsel failed to assert the defense of diminished capacity. The petition states:

> There was competent and state of mind evidence that existed at trial of severe substance abuse problem of petitioner, and his excessive use of alcohol and cocaine prior to the alleged criminal activity. No evaluation was performed to determine his competence or state of mind and no reference was made by trial counsel to the diminished capacity. There was no expert witness called to illuminate the issue of diminished capacity.

122

The failure to have an evaluation performed and to retain and call a qualified expert witness to diminished capacity further deteriorated Petitioner's constitutional rights.

(# 1-2 at 12).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment further contends:

No legitimate evidence was developed on the record in either the trial court proceedings or the post-conviction habeas proceedings to support Petitioner's assertion of a diminished capacity defense. According to the findings of the habeas court "[Trial Counsel] testified at the evidentiary hearing that a defense related to diminished capacity would not have been a good faith defense. Therefore, trial counsel did not provide ineffective assistance of counsel related to not using a diminished capacity defense. [# 25, Ex. 23] at 4.) As defense counsel testified, "I'm almost certain that I chose [innocence] over [diminished capacity], and I decided not to go, you know, the route of using his drugs, as opposed to trying to keep them out of the - ." ([# 25, Ex. 19] at 59.)

In order to raise a legitimate claim in this regard, Petitioner is required to make a showing that there [sic] diminished capacity was a viable defense and had it been presented [to] the jury in light of the evidence of guilt presented at trial, the verdict would have been favorable. Petitioner, however, offers no such argument and his own defense attorney testified at an omnibus habeas corpus hearing there was no evidence to support a diminished capacity defense. Defense counsel was not required to advance a defense not supported by the facts. In light of the absence of any evidence to support a diminished capacity defense, any attempt by trial counsel to raise this defense would have been meritless. Failure to raise a baseless argument or defense cannot form the basis for an ineffective assistance of counsel claim. "[T]here can be no claim of ineffective assistance where, as here, counsel is alleged to have failed to raise a meritless argument." Moore v. United States, 934 F. Supp. 724, 731 (E.D. Va. 1996).

(# 41 at 36-37).

123

Petitioner's Response asserts that his counsel "failed to marshal the available facts regarding defendant's alcohol and drug use in any meaningful manner to lead the jurors to conclude he was either innocent of the specific intent crimes or a suitable candidate for mitigation of punishment." (# 44 at 38). Petitioner's Response further cites to West Virginia precedent establishing the diminished capacity defense as follows:

> The diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed of forming a mental state that is an element of the crime charged."

Syl. Pt. 3, State v. Joseph, 590 S.E.2d 718 (W. Va. 2003). (Id. at 39). Petitioner further argues that, "[p]rior to Petitioner's trial, the Court held that a court may allow evidence of voluntary intoxication to show that a defendant was incapable of forming the requisite mental state for first degree murder." See State v. Keeton, 272 S.E.2d 817, 820 (W. Va. 1980). (Id. at 39-40).

Petitioner's Response further states:

> Contrary to state court's finding and Ms. Brown's post-hoc rationalization, the trial record is replete with evidence of heavy drug use by petitioner prior to his criminal activity and at the time of his arrest. [FN 60 - [# 25, Ex. 14] at 1120-1136]. The officers from Chicago testified that petitioner was arrested in an area of Chicago well-known for widespread drug use. [FN 61 - [Id.]] Counsel failed to request an instruction to the jury regarding diminished capacity. If such an instruction had been proposed and granted, a rational juror could conclude that petitioner could not have formed the specific intent required for kidnapping or robbery. If Ms. Brown and Ms. [Wolfingbarger] had

124

conducted a reasonable investigation and fashioned a reasonable argument for mitigation, diminished capacity predicated on excessive drug use would have been available to the defense.

(Id. at 35).

The law in West Virginia has "long recognized that proof of voluntary intoxication may serve to reduce a charge of first-degree murder to second-degree murder where the level of intoxication is 'such as to render the accused incapable of acting with malice, premeditation or deliberation.'" State v. Hobbs, 358 S.E.2d 212, 215 (W. Va. 1987); see also, e.g., State v. Painter, 63 S.E.2d 86, 92 (W. Va. 1950)(evidence of "gross intoxication" may reduce homicide from first-degree to second-degree murder); State v. Brant, 252 S.E.2d 901 (W. Va. 1979)(intoxication defense "can only be used when there is demonstrated a total lack of capacity such that the bodily machine completely fails"); State v. Bush, 442 S.E.2d 437, 440 (W. Va. 1994)(defendant convicted of two counts of second-degree murder based upon evidence of intoxication). A reading of the relevant case law indicates that the level of intoxication necessary to claim a defense thereon must be extreme. It stands to reason that such a defense of "diminished capacity" at the time of the crime would be applicable to other specific intent crimes such as aggravated robbery, malicious assault and kidnapping.

The issue of Petitioner's level of intoxication was placed before the jury to the extent that the Chicago police officers

testified about Petitioner's demeanor at the time of his arrest, and uniformly stated that they did not believe him to be grossly intoxicated at that time. Otherwise, defense counsel actually fought to keep evidence of Petitioner's drug use out of the knowledge of the jury. No witnesses testified that Petitioner was grossly intoxicated at the time of the crimes. Without personal observations or a reliable blood or breathalyzer test to review, expert testimony concerning the level of Petitioner's intoxication at the time of the crimes and his intent would be entirely speculative.

In his second habeas corpus proceeding, the state habeas court made the following findings:

> 13. Ms. Brown testified at the evidentiary hearing that a defense related to diminished capacity would not have been a good faith defense. Therefore, trial counsel did not provide ineffective assistance related to not using a diminished capacity defense.

(# 25, Ex. 23 at 4).[13]

The undersigned proposes that the presiding District **FIND** that the decision of Petitioner's trial counsel not to present expert testimony or other evidence concerning Petitioner's alleged diminished capacity due to drug and alcohol use at the time of the

---

[13] The undersigned also notes that, in his first state court habeas proceeding, Petitioner raised a claim of ineffective assistance of counsel concerning the failure to seek a psychiatric evaluation of Petitioner to support a defense of diminished capacity at the time of his arrest and giving of statements to police. That is an entirely separate issue. (# 25, Ex. 24 at 2-3).

126

subject crimes was not unreasonable.  The undersigned further proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that there is a reasonable probability that the presentation of such evidence or the request for a diminished capacity instruction would have altered the outcome of Petitioner's trial.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that his counsel was constitutionally ineffective.  The undersigned further proposes that the presiding District Judge **FIND** that the state habeas courts' denial of relief on this claim was neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Twelve of Petitioner's section 2254 petition.

<u>Ground Thirteen</u>

In Ground Thirteen of his section 2254 petition, Petitioner claims that his counsel failed to properly investigate Petitioner's case and prepare for trial.  The petition states:

> Trial counsel, representing a defendant facing the most severe sentence that can be imposed by law failed to investigate critical facts in the case-in-chief: counsel failed to interview police officers in Chicago, Illinois that ended up testifying about a purported confession and was shocked by the revelation and requested a continuance for further investigation.  This [sic; there] was almost a year to secure interviews with officers in Chicago, Illinois.  Trial counsel asserted that they were denied the right to send investigators to Chicago to investigate facts of this case.

127

Trial counsel also prepared the defense around an incomplete investigation of the facts. There were witnesses in North Carolina and Chicago that trail [sic; trial] counsel were aware of and they neither contacted nor considered contacting these witnesses. In a capital case, trail [sic; trial] counsel should have not only prepared a defense but investigated all pertinent witnesses that might aid in the strategic decisions concerning possible mitigation of possible sentence or trial witnesses to affirm or refute other facts in the case.

The failure of counsel to investigate led to their inability to make sound decisions in regards to whether or not to bifurcate and preparing or presenting mitigating evidence in a sentencing phase. Counsel's performance severely prejudiced petitioner and left petitioner with no opportunity to plead for mercy in a capital case.

(#1-2 at 12-13).

In <u>Wiggins v. Smith</u>, 539 U.S. 510, 521-522 (2003), the Supreme Court emphasized that "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Furthermore, in the American Bar Association's "Standards for Criminal Justice," which serve as a guide for assessing reasonable conduct, Standard 4-5.2, concerning "Control and Direction of the Case," states as follows:

(b) Strategic and tactical decisions should be made by defense counsel after consultation with the client where feasible and appropriate. Such decisions include what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and what evidence should be introduced.

ABA Standards for Criminal Justice, Standard 4-5.2.

128

Respondent asserts that Petitioner has not cited to "legitimately probative evidence that was not discovered by trial counsel because of a lack of diligence." (# 41 at 37). Respondent adds:

> Petitioner would then be required to show just how any such evidence would have been sufficiently probative to cast his guilt into doubt in light of the overwhelming evidence to the contrary presented at trial.
>
> Petitioner has not done that. It is the duty of Petitioner to cite to either evidence in the record or show the real possibility that evidence of his innocence went undiscovered because of trial counsel's failure to adequately investigate.

(<u>Id.</u>)

Petitioner's Response argues that "his counsel's pre-trial investigation was inadequate and the subsequent deficient examination of witnesses deprived Petitioner of a complete defense." (# 44 at 43). Petitioner offers several reasons that he believes his counsel's preparation for trial was deficient. First, Petitioner asserts that his counsel was not prepared to properly argue for mercy before the close of the trial because of a mistaken belief that the trial court could grant mercy to the defendant, notwithstanding a jury verdict without mercy. Petitioner has argued that this mistake was compounded by the fact that his counsel failed to investigate and call character witnesses who could have presented mitigation evidence. Petitioner's Response asserts as follows:

Every defendant is entitled to an attorney who
cognizant that sanction that the Court will impose upon
conviction. Chanin [Wolfingbarger], Petitioner's defense
counsel failed to ascertain the penalty for the crime of
kidnapping in West Virginia. At the state evidentiary
hearing, she testified that she believed [that the] trial
judge could grant her client eligibility for parole on a
life sentence even when the jury did not recommend mercy.
[FN 65 - [# 25, Ex. 23] at 4.]

(# 44 at 37). Petitioner adds:

This mistake prompted defense counsel to make little to
no effort to prepare for the sentencing phase of the
trial. The harm caused by this misunderstanding of the
basic law in this case is far greater than the respondent
cares to admit.

(Id.)

Concerning this specific issue, the State habeas court found:

17.  Chanin [Wolfingbarger] believed Judge Recht could
     give the Petitioner mercy even if the law did
     otherwise.   However,  the  jury  was  properly
     instructed on the law.  Trial counsel never relied
     to the defendant's detriment on their belief that
     Recht could disregard the jury's verdict.  Neither
     expert witness believed this issue had much merit.
     Therefore, the Court does find that the Petitioner
     was not prejudiced by this mistake.

(# 25, Ex. 23 at 5).

Petitioner further argues that, "although defense counsel

requested Leopold's medical records, counsel was not prepared to

question Dr. Velasquez [an expert witness who testified for the

defense about Ms. Leopold suffering from retrograde amnesia, which

allegedly affected her memory of the incident itself] about the

effects the victim's extensive blood loss and the subsequent

administration of anxiolytic (anti-anxiety drugs) and amnestic

pharmaceuticals on Mrs. Leopold's memory.  Defense counsel did not ask their medical expert to explain the effects of medication customarily used to treat amnesiacs."  (# 44 at 39).  Petitioner asserts that Leopold's identification of her assailant was "unaccountably altered after the administration of medical drugs." (Id.)

Thus, Petitioner asserts that, although his counsel called an expert witness to educate the jury on the effect of trauma on memory, Petitioner does not believe that the issue was presented to the jury as well as it could have been.  Dr. Velasquez had never actually met with or examined Leopold.

An allegation that an attorney conducted an inadequate investigation does not warrant relief absent a proffer of the specific favorable evidence the investigation would have brought out.  See Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1991).  Furthermore, the reasonableness of an investigation made by counsel must be evaluated under the totality of the circumstances facing the attorney.  See Bunch v. Thompson, 949 F.2d 1354 (4th Cir. 1991).  Petitioner has offered nothing more than speculation as to what effect additional evidence or witnesses may have had on the outcome of his trial.

Petitioner has not established that any of this evidence would have altered the outcome of Petitioner's trial.  Based upon a thorough review of the entire record of proceedings that have been

131

produced to this court, it appears that counsel conducted an adequate investigation under the circumstances, and there was no undue prejudice to Petitioner's defense by the failure of Ms. Brown and Ms. Wolfingbarger to do additional investigation or cross-examination on these issues.

In Petitioner's first state habeas proceeding (Case No. 00-MISC-350), the court made two general findings concerning defense counsel's conduct in investigating Petitioner's case. The findings state:

> Petitioner claims ineffective assistance of counsel because his attorneys did not properly investigate the case and provide Petitioner with what Petitioner vaguely terms "this information." It is unclear whether Petitioner is referring to the aforementioned psychiatric evaluation or some other aspect of his case. The Court has already responded to Petitioner's claims regarding a psychiatric evaluation. If Petitioner is referring to some other flaw in counsel's performance, he fails to state with any particularity what it might be. The Court is unable to address vague or conclusory allegations of unprofessional conduct or poor performance.

> \* \* \*

> Petitioner finally contends that his counsel failed to render effective assistance because they did not properly prepare for trial. Petitioner also contends simply that counsel was "incompetent." The Court finds this contention utterly unsupported by the record. The Court finds no evidence whatsoever that Petitioner's counsel failed to prepare for trial. Furthermore, the Court cannot ascertain any evidence of counsel's incompetence. Petitioner contends that counsel attempted to "coerce" him into a plea bargain because the prosecution had, in Petitioner's words, "enough evidence for a conviction of life without mercy." The Court finds no evidence of coercion in counsel's attempt to apprise Petitioner of one potential outcome of his case were it to go to trial. Petitioner asserts that counsel did not

> consider the evidence against Petitioner before advising him.  Petitioner offers no evidence to support this allegation.  The Court is unable to address mere assertions of unprofessional conduct.  The Court finds counsel's performance reasonable under the circumstances and within the broad range of professionally competent assistance.

(# 25, Ex. 24 at 4, 6).

The state habeas court in Petitioner's second habeas proceeding (Case No. 02-MISC-232) focused on Petitioner's individual claims of ineffective assistance of counsel raised therein.  The court has already addressed the claims concerning the failure to seek bifurcation and to argue for mercy.  To the extent that Petitioner had argued that his counsel had insufficiently investigated the case by failing to go to Chicago to interview witnesses, the state habeas court found:

> 14.  Trial counsel understood that the Chicago trip would not benefit them because the Chicago Police would not talk to them about this case.  There is nothing in the record to suggest how the Petitioner was prejudiced in counsels['] not going to Chicago.  Therefore, the petitioner's rights were not prejudiced.

(# 25, Ex. 23 at 4).

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that his counsel provided ineffective assistance based upon these allegations.  Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal

law, and that Respondent is entitled to judgment as a matter of law on Ground Thirteen of Petitioner's section 2254 petition.

### H. Grounds Fourteen and Fifteen - Failure to instruct jury on Defendant's theory of defense and lesser included offense.

In Ground Fourteen of Petitioner's section 2254 petition, Petitioner contends that his right to due process and fair jury trial were violated when the court failed to instruct the jury on Petitioner's theory of defense. Petitioner's petition states:

> The trial record is replete with evidence that the petitioner stole the Leopold vehicle. The entire defense was that the Petitioner, in fact, stole the Leopold vehicle, but did not rob, kidnap, or assault Leopold. The court failed to allow the instruction on the theory of defense when there was a foundation in the evidence to warrant the instruction.

(# 1-2 at 13).

In Ground Fifteen of his section 2254 petition, Petitioner contends that his right to due process and a fair jury trial were violated when the trial court refused to instruct the jury on a lesser included offense. The petition states:

> Petitioner requested a jury instruction on the crime of grand larceny as a lesser included offense of robbery. Defendant was entitled to the lesser included offense instruction because "there was evidentiary conflict and insufficiency as to the elements of the greater offense which differed from the elements of the lesser included offense . . ." The failure to instruct the jury on the lesser included offense denied him his rights as afforded by the United States Constitution.

(# 1-2 at 13).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment addressed these claims together stating that Petitioner's claims do not comport with the record. Respondent further states:

> In fact, the trial court instructed the jury on the elements of larceny. ([# 25, Ex. 18] at 2309.) Petitioner also argues that the trial court prevented him from arguing that he stole Ms. Leopold's car, but did not rob her. During summation, defense counsel argued that the defense had not pulled any punches, that the Petitioner had stolen Scott McLamb's car and Julia Leopold's car. ([Id.] at 2362.)
>
> Petitioner does not argue what his theory of defense was and what evidence supported it nor does Petitioner explain why the jury should have been instructed on a lesser included offense and what the offense was. Petitioner further fails to argue what effect the trial court's refusal to give the challenged instructions had on the outcome of the trial in light of the weight and quality of evidence presented at trial.

(# 41 at 37-38).

Respondent cites to the state habeas court's ruling on this claim which states:

> Trial counsel requested a grand larceny instruction. [sic] Pursuant to Syllabus Point 11 of State v. Derr, 192 W. Va. 165 (1994).
>
> There is no evidence to suggest that the failure to give that instruction impaired the defendant's ability to receive an effective defense. Additionally, there existed no evidentiary dispute between robbery and grand larceny at the trial. Therefore, Judge Recht properly denied the instruction as to grand larceny.

([# 25, Ex. 23] at 4).

As noted by Respondent, "[o]n collateral review of a state trial court's jury instructions, a federal court "exercises a

135

limited role," <u>Smith v. Bordenkicher</u>, 718 F.2d 1273, 1276 (4th Cir.

1983), and "the inquiry is narrow," <u>Murphy v. Holland</u>, 776 F.2d

470, 476 (4th Cir. 1985).  (# 41 at 38).  Generally speaking,

alleged errors in the instructions given by a trial court are not

cognizable on federal habeas review, because they raise issues of

state law, not federal constitutional law.  <u>Grundler v. North</u>

<u>Carolina</u>, 283 F.2d 798, 802 (4th Cir. 1960).  A federal court may

grant habeas relief only when the challenged instruction "by itself

so infected the entire trial that the resulting conviction was

'undesirable, erroneous, or even universally condemned.'" <u>Cupp v.</u>

<u>Naughten</u> 414 U.S. 141, 146 (1973).  (<u>Id.</u>)

> It is black letter law that a federal court may
> grant habeas relief "only on the ground that [the
> petitioner] is in custody in violation of the
> Constitution or laws or treaties of the United States."
> 28 U.S.C. § 2254(a)(West Supp. 1998); <u>see also</u> <u>Estelle v.</u>
> <u>McGuire</u>, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed.2d
> 385 (1991)(emphasizing that "it is not the province of a
> federal habeas court to reexamine state-court
> determinations on state-law questions.  In conducting
> habeas review, a federal court is limited to deciding
> whether a conviction violated the Constitution, laws or
> treaties of the United States.").  Because Wright's
> claim, when pared down to its core, rests solely upon an
> interpretation of Virginia's case law and statutes, it is
> simply not cognizable on federal habeas review.  <u>See</u>
> <u>Smith v. Moore</u>, 137 F.3d 808, 822 (4th Cir.
> 1998)(refusing to entertain claim that jury instruction
> misstated South Carolina law).

<u>Wright v. Angelone</u>, 151 F.3d 151, 157 (4th Cir. 1998).

Thus, unless Petitioner can show that the failure to give his

instruction was so fundamentally unfair as to deny him due process

and a fair trial, this claim is not cognizable.  Furthermore, an

136

omission of a required jury instruction is "less likely to be prejudicial than a misstatement of the law." Nickerson v. Lee, 971 F.2d 1125, 1137-38 (4th Cir. 1992)(quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

Respondent's Memorandum of Law further notes that the Fourth Circuit has specifically held that, "[f]ailure to give an appropriate theory-of-defense instruction, without more, is not a violation of the Due Process Clause. Some other circumstances, demonstrating a serious miscarriage of justice, must be present." Nickerson, 971 F.2d at 1138 (quoting Frey v. Leapley, 931 F.2d 1253, 1255 (8th Cir. 1991). (# 41 at 38-39). Respondent contends that Petitioner has made no showing that the trial court's refusal to give his proposed grand larceny instruction "resulted in a violation of his right to due process such that the ultimate verdict was a serious miscarriage of justice." (Id. at 39).

Petitioner's Response asserts that larceny is a lesser included offense of robbery (citing State v. Neider, 295 S.E.2d 902, 907 (W. Va. 1982) and Syl. Pt. 3, State v. Louk, 285 S.E.2d 432 (W. Va. 1981)). Petitioner further argues that both crimes require the taking of goods with the specific intent to permanently deprive the owner of his or her property. Thus, Petitioner asserts that it is impossible to commit robbery without first committing larceny. (# 44 at 45). Petitioner further asserts that Respondent has inconsistently argued, on the one hand, that the trial court

137

"instructed the jury on the elements of larceny" and, on the other

hand stated that the trial court "properly denied the instruction

as to grand larceny." (Id.)

Petitioner further contends:

> Defense counsel requested an instruction on larceny
> which was compatible with the defendant's theory of the
> case [that being, that he did not assault or rob Ms.
> Leopold, but did take her vehicle from the parking garage
> and drove it to Chicago]. A defendant is entitled to a
> jury instruction on his theory of the case as long as it
> is legally valid and when there is sufficient evidence to
> permit a reasonable juror "to credit the defendant's
> theory." United States v. Joselyn, 99 F.3d 1182, 1194
> (1st Cir. 1996); Bashor v. Risley, 730 F.2d 1228, 1240
> ([9th Cir. 1984]). The exclusion of the proposed larceny
> instruction left the jury with the Hobson's Choice of
> either finding the defendant guilty of aggravated robbery
> or not convicting petitioner. Given defense counsel's
> admission that petitioner had taken Ms. Leopold's
> vehicle, the latter choice was illusionary. "The refusal
> by a court to instruct the jury on [] lesser included
> offenses," especially in a capital case, "when those
> offenses are consistent with defendant's theory of the
> case, may constitute a cognizable habeas claim." Solis
> v. Garcia, 219 F.3d 922, 929 ([9th Cir.] 2000); Bashor,
> 730 F.2d at 1240. Therefore, respondent's motion for
> summary judgment should be rejected as respondent has
> failed to put forth a consistent position on the trial
> court's failure to instruct the jury on larceny, as
> requested by defense counsel. The trial court failed to
> afford the petit jury an opportunity to return a guilty
> verdict for larceny predicated on the theft of the
> Leopold vehicle which is central to the petitioner's
> theory of the case. In effect, the Trial Court coerced
> the jury into returning a guilty verdict for robbery by
> failing to provide the requested alternative.

(Id. at 41-42). Petitioner adds that "[t]he omission of an

instruction regarding a particular offense (i.e., larceny) may

effectively result in a directed verdict, thereby implicating the

Sixth and Fourteenth Amendment rights." Armstead v. Frank, 383

F.3d 630, 632 ([7th Cir.] 2004).  (<u>Id.</u> at 42).

The jury in Petitioner's case was instructed on aggravated robbery, as well as larceny, as follows:

> The court instructs the jury that aggravated robbery is defined as the unlawful taking and carrying away of property, money, or goods from the person of another, or in his presence by the use of force or violence on the victim, or through the use, threat or presentment of a dangerous or deadly weapon or instrumentality and with the intent to permanently deprive the owner permanently [sic] of such property, money or goods.
>
> * * *
>
> The Court instructs the jury that to constitute larceny, it is necessary for the State to show beyond a reasonable doubt that the defendant exercised exclusive dominion and control over the goods in question with the intention of permanently depriving the owner of the possession thereof.
>
> This taking is accomplished in a case where the defendant takes the goods of another out of the place where they were put.  The taking is accomplished by the moving of property from the particular portion of the space where it occupied before the alleged taking.

(# 25, Ex. 18 at 2308-2309).  The court did not instruct the jury that larceny is a lesser included offense of robbery; nor did the court instruct the jury about "grand larceny."  Furthermore, the jury verdict form did not include any provision for the jury to find Petitioner guilty of larceny as a lesser included offense of robbery.

On the evening of December 11, 1997, outside of the presence of the jury, the parties began their charge conference.  As the parties discussed the proposed instructions, defense counsel, Ms.

Brown, referred to "the grand larceny instruction."  (# 25, Ex. 17
at 2262).  Ms. Brown stated that she wanted such instruction to be
given, "if there's an option for that."  (<u>Id.</u>)  The prosecutor
stated that she had offered a "larceny" instruction because "it is
an element of aggravated robbery," but that she was "not asking for
a lesser-included offense."  (<u>Id.</u> at 2263).  The trial court agreed,
and stated that he would give the larceny instruction because it is
an element of aggravated robbery, but he would not include larceny
on the verdict form.  (<u>Id.</u>)  The conference was then adjourned until
the next day.

When the parties reconvened for the charge conference,
Petitioner's counsel objected to the instruction on larceny,
stating:

> MS. BROWN:  Yes Judge.  On page 13, the paragraph that
> begins "The Court instructs the jury that to constitute
> larceny" -- again - and I alluded to it last night - my
> problem is, in this paragraph, to a lay person sitting on
> the jury listening to this paragraph which includes,
> "This taking is accomplished in a case where the
> defendant takes the goods of another out of the place
> where they were put," and that is so completely different
> from an aggravated robbery that there could be confusion
> there, that by merely taking the truck, they may confuse
> that with an aggravated robbery.
>
> THE COURT: The element - or an element - to an aggravated
> robbery is the taking of property - I'm paraphrasing  -
> with the intent to permanently deprive the owner of its
> possession, which is the definition of larceny.
>
> MS. BROWN: It's the violent taking, the forceful taking
> of that.
>
> THE COURT: It is.  That's one element.  I'm not giving
> you the entire definition, but one of the elements is

140

that there has been a taking of property.  The manner in
which it's taken is what, of course, distinguishes
aggravated robbery from larceny.  But it is necessary to
be able to instruct the jury as to the meaning of the
taking of property in the care, custody and control of
another.  So that is the purpose of it.  And it is a
necessary element, and it is something that - at least in
the view of this Court - protects the defendant.  Last
evening, the State made an interesting comment, that
without some definition of larceny, it would be similar
to not having a reasonable doubt instruction given.
That's an interesting analogy.  In other words, the
defendant could not waive that type of instruction, the
same as the defendant could not waive the definition of
larceny.  So your objection is noted, certainly, and
exception saved.

(# 25, Ex. 18 at 2287-2288).  Petitioner's counsel then requested

that, in light of that instruction, the verdict form reflect a

lesser-included charge of larceny, which the trial court again

refused, without further explanation.  (Id. at 2288).

Under West Virginia law, "larceny is a lesser-included offense

in robbery."  Syl. Pt. 5, State v. Neider, 295 S.E.2d 902 (W. Va.

1982).  In Neider, the court noted that:

"The test of determining whether a particular offense is
a lesser included offense is that the lesser offense must
be such that it is impossible to commit the greater
offense without first having committed the lesser
offense.  An offense is not a lesser included offense if
it requires the inclusion of an element not required in
the greater offense."  Syllabus Point 1, State v. Louk,
169 W. Va. 24, 285 S.E.2d 432 (1981).

295 S.E.2d at 903.  The Neider court also cited Sansone v. United

States, 380 U.S. 343, 350 (1965), in which the Supreme Court held

that "[a] lesser-included offense instruction is only proper where

the charged greater offense requires the jury to find a disputed

141

factual element which is not required for conviction of the lesser-included offense." Id. at 905.

However, in State v. Plumley, 384 S.E.2d 130, 136 (W. Va. 1989), the SCAWV held that the conclusion in Neider that larceny is a lesser-included offense of robbery "does not uniformly apply to grand larceny and aggravated robbery because of additional required elements." Plumley was decided in 1989, based upon the grand larceny statute drafted in 1977. The statute was amended in 1994, and that was the version in effect at the time of Petitioner's conviction. At that time, grand larceny was defined as follows:

> If any person commits simple larceny of goods or chattels of the value of one thousand dollars or more, such person is guilty of a felony, designated grand larceny, and upon conviction thereof, shall be confined in a penitentiary not less than one nor more than ten years, or in the discretion of the court, be confined in the county jail not more than one year and shall be fined not more than two thousand five hundred dollars.

W. Va. Code § 61-3-13(a).

Because grand larceny is not a lesser included offense of aggravated robbery, and because the facts supported a finding that Petitioner could only have committed grand larceny, not simple larceny, by taking Ms. Leopold's vehicle, the trial court did not err in not instructing the jury on a lesser included offense of grand larceny or including it as a lesser included offense on the verdict form.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated a violation of his right

142

to due process of law by the failure of the state court to give a lesser-included offense instruction at his trial in accordance with Petitioner's theory of defense.  The undersigned further proposes that Grounds Fourteen and Fifteen of Petitioner's section 2254 petition do not otherwise state a cognizable claim.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on these claims were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on Grounds Fourteen and Fifteen of Petitioner's section 2254 petition.

**J.  Ground Sixteen - Cumulative error.**

In Ground Sixteen of his section 2254 petition, Petitioner contends that his rights to due process, a fair jury trial and equal protection were violated due to the cumulative effect of the errors set forth above.  (# 1-2 at 14, Supp. 3).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that Petitioner has not shown how any trial errors individually or cumulatively deprived him of a federal constitutional right, and that Petitioner has not specified any clearly-established Supreme Court precedent holding that "cumulative trial errors which have not been shown to have had a 'substantial and injurious effect or influence in determining the jury's verdict' can form the basis for federal habeas relief."  (#

143

41 at 39-40).

In <u>Fisher v. Angeleone</u>, 163 F.3d 835, 852 (4th Cir. 1998), the Fourth Circuit held that "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error . . . ."  Thus, in order for a cumulative error analysis to apply, the court must first find that there have been actual constitutional errors.

The State habeas court found as follows:

> The court has found no harmless error during these evidentiary proceedings.  Therefore, there can be no cumulative errors.  However, assuming a reviewing court believes that error exists, it is still not of the prejudicial nature that substantially affected the Petitioner's rights herein.

(# 25, Ex. 23 at 4-5).

Petitioner's assertion of cumulative error stems from claims which the undersigned has determined to lack merit except for Ground One.  Petitioner was entitled to a fair trial, not a perfect one.  The error found in Ground One is easily separable from other grounds for relief raised by Petitioner.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner was not denied a fair and impartial trial based on the cumulative effect of any alleged errors asserted by Petitioner in his federal petition, and that the State courts' decisions were neither contrary to, nor an unreasonable application of, clearly established Federal law (except for Ground One), and that Respondent is entitled to judgment as a matter of law on Ground Sixteen of Petitioner's section 2254 petition.

**RECOMMENDATION**

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Renewed Motion for Summary Judgment (# 40), as to all of the claims contained in Petitioner's section 2254 petition, with the exception of Ground One, which will be addressed below.  It is further respectfully **RECOMMENDED** that the presiding District Judge **DENY** Petitioner's Motion for Partial Summary Judgment, with regard to Ground Eleven of his section 2254 petition (# 32).  Finally, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Petitioner's Petition for a Writ of Habeas Corpus (# 1) as to Ground One.

The parties are notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendation" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendation" to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a

145

waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to the opposing party and Judge Copenhaver.

The Clerk is directed to file this "Proposed Findings and Recommendation," to mail a copy of the same to Petitioner, and to transmit it to counsel of record.

February 24, 2011
Date

Mary E. Stanley
United States Magistrate Judge